UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| ALLSTATE INSURANCE COMPANY, ALLSTATE PROPERTY & CASUALTY INSURANCE COMPANY, ALLSTATE INDEMNITY COMPANY, AND ALLSTATE FIRE & CASUALTY INSURANCE COMPANY, <br><br> Plaintiffs, <br><br> vs. <br><br> SMK PHARMACY, CORP. d/b/a NATURE'S FIRST LONG TERM CARE & COMPOUNDING, S & K WARBASSE PHARMACY INC. d/b/a WARBASSE PHARMACY, SIMON FIELD, KIM VOLMAN, MARC KASSMAN, ALEXANDER BURLAK, ARLEN LEIS, AND JACQUELINE MITSEL a/k/a JACQUELINE G. VOLMAN, <br><br> Defendants. | C.A. No. 1:24-cv-04627 |

**PLAINTIFFS' COMPLAINT AND DEMAND FOR JURY TRIAL**

Plaintiffs Allstate Insurance Company, Allstate Property & Casualty Insurance Company, Allstate Indemnity Company, and Allstate Fire & Casualty Insurance Company (collectively, "Allstate" and/or "plaintiffs"), by their attorneys, King, Tilden, McEttrick & Brink, P.C., allege as follows:

## I.    INTRODUCTION

1.    Defendants Simon Field ("Field"), Kim Volman ("Volman"), Marc Kassman ("Kassman"), Alexander Burlak ("Burlak"), Arlen Leis ("Leis"), and Jacqueline Mitsel a/k/a

1

Jacqueline G. Volman ("Mitsel") schemed to operate pharmacies named SMK Pharmacy, Corp. d/b/a Nature's First Long Term Care & Compounding ("SMK Pharmacy") and S & K Warbasse Pharmacy Inc. d/b/a Warbasse Pharmacy ("S & K Warbasse") (collectively, "Pharmacy Defendants") in violation of New York law.

2.      The Defendants[1] damaged Allstate by submitting fraudulent claims through the Pharmacy Defendants seeking payment for topical compounded pain products ("Compounded Products"), and other topical pain-relief drugs, including diclofenac sodium 3% gel, lidocaine 5% ointment, lidocaine 5% patches, and Lidothol patches ("Topical Pain Products").

3.      The Pharmacy Defendants' claims were submitted to Allstate under New York's No-Fault laws, which provide insurance coverage to persons ("claimants") involved in automobile accidents.  New York was an ideal venue for this scheme because claimants are eligible for at least $50,000.00 in coverage for necessary medical and pharmacy expenses, and because claimants can assign their No-Fault benefits to pharmacies.  Pharmacies can seek payments directly from the claimant's insurer, which removes claimants from the billing process and keeps them in the dark about the cost of their care.

4.      The claims submitted by the Defendants were fraudulent because the Pharmacy Defendants were not eligible to collect payments under New York's No-Fault laws.

5.      Pharmacies are not eligible to collect No-Fault payments if they fail to comply with applicable New York state licensing laws.  Pharmacies are prohibited from paying kickbacks or from maintaining unlawful referral arrangements with prescribers.  Pharmacies are also prohibited from billing for unnecessary or uncovered drugs.

---

[1] The term "Defendants" means SMK Pharmacy, S & K Warbasse, Field, Volman, Kassman, Burlak, Leis, and Mitsel, collectively.

6.     Here, the Pharmacy Defendants billed Allstate for Topical Pain Products and Compounded Products that were not medically necessary—the claimants did not need the Topical Pain Products and Compounded Products, and the drugs were ineffective to treat musculoskeletal conditions.

7.     The Defendants knew that the Topical Pain Products and Compounded Products billed to Allstate by the Pharmacy Defendants were medically unnecessary and ineffective.

8.     Pharmacies must also comply with a specific schedule of fees when submitting No-Fault claims because pharmacy claims are paid using rates that are calculated based on the drug's average wholesale price—a rate that is often many times greater than a drug's actual acquisition cost.

9.     The Defendants purposely targeted certain drugs that could be acquired at a low cost and then charged at high price.

10.     The Defendants secured a steady stream of prescriptions for these drugs through unlawful referral arrangements with No-Fault prescribers and clinics.  The Topical Pain Products and Compounded Products were ordered for claimants as part of fraudulent predetermined treatment protocols that required prescriptions for all claimants regardless of medical need. Prescriptions were generated by clinics that specifically catered to No-Fault patients.  Many of the prescribers and clinics have been implicated in other fraud schemes.  Once issued, the prescriptions were steered to the Pharmacy Defendants so the Defendants could bill Allstate.

11.     The Defendants enriched themselves at the expense of patients.  The scheme generated vast numbers of prescriptions for the Pharmacy Defendants.  The indiscriminate ordering and dispensing of unnecessary drugs without regard for actual medical need placed claimants at risk.

12.     Overall, the Pharmacy Defendants operated in violation of applicable New York licensing laws, and therefore were ineligible to collect No-Fault payments.

13.     The Defendants knew that the Pharmacy Defendants were ineligible to collect No-Fault payments, yet they still created and submitted statutory claim forms (i.e., NF-3 forms and CMS-1500 forms), which falsely certified the Pharmacy Defendants' eligibility to collect No-Fault payments under New York law.

14.     Allstate reasonably relied on the facial validity of the records and bills mailed by the Defendants—and the representations contained therein—when making payments on the Pharmacy Defendants' No-Fault claims.

15.     The success of the Defendants' scheme to defraud relied on the transmission to Allstate, through the U.S. Mail, of invoices, bills, and other No-Fault claim documents warranting the Pharmacy Defendants' eligibility to collect No-Fault payments under New York law.

16.     By this Complaint, Allstate brings this action against the Defendants for: (a) violations of the federal Racketeer Influenced and Corrupt Organizations (RICO) Act, 18 U.S.C. § 1961, *et seq.*; (b) common-law fraud; and (c) unjust enrichment.

17.     This action seeks actual damages in excess of $1,071,349.00, which represent No-Fault payments that Allstate was wrongfully induced to make to the Pharmacy Defendants during the course of this scheme.

18.     Allstate also seeks a declaration pursuant to 28 U.S.C. § 2201 that it is not legally obligated to make any further payments to the Pharmacy Defendants (or their agents) in connection with any No-Fault claims.

19.     All of the acts and omissions of the Defendants described throughout this Complaint were undertaken intentionally.

20.     The Defendants' fraudulent scheme was designed to elicit payment of automobile insurance contract proceeds from Allstate to the Pharmacy Defendants for the benefit of the Defendants.

21.     In each claim at issue in this Complaint, an Allstate automobile insurance contract was the platform upon which the Defendants sought—and in many instances obtained—payment for pharmacy services that were not compensable under New York's No-Fault laws.

22.     The Defendants knew that the patients identified in this Complaint were eligible for insurance coverage pursuant to automobile insurance policies issued by Allstate.

23.     Allstate estimates that the Defendants purposely submitted to Allstate hundreds of bills on behalf of the Pharmacy Defendants knowing that none of the bills were lawfully compensable under prevailing New York law relative to No-Fault insurance coverage and reimbursement eligibility.

## II.    PARTIES

### A.    PLAINTIFFS

24.     Allstate Insurance Company, Allstate Property & Casualty Insurance Company, Allstate Indemnity Company, and Allstate Fire & Casualty Insurance Company are corporations duly organized and existing under the laws of the State of Illinois, having their principal place of business in Northbrook, Illinois.

25.     At all times relevant to the allegations contained in this Complaint, Allstate Insurance Company, Allstate Property & Casualty Insurance Company, Allstate Indemnity Company, and Allstate Fire & Casualty Insurance Company were authorized to conduct business in New York.

B.    DEFENDANTS

    1.    **SMK Pharmacy, Corp. d/b/a Nature's First Long Term Care & Compounding**

26.    SMK Pharmacy is a corporation organized under the laws of the State of New York.

27.    SMK Pharmacy's principal place of business is 8702 Rockaway Beach Blvd, Rockaway Beach, NY 11693.

28.    SMK Pharmacy is a registered pharmacy, but has never been registered as an outsourcing facility in New York.

29.    SMK Pharmacy has also never registered as a drug manufacturing establishment with the United States Federal Drug Administration.

30.    Volman, Field, Kassman, and Burlak participated in the operation and management of the SMK Pharmacy enterprise during the relevant period.

31.    SMK Pharmacy billed for pharmacy services in connection with Allstate claimants.

32.    SMK Pharmacy dispensed medically unnecessary drugs, including compounded products, without regard for patient care and in disregard of its duties under New York law.

33.    SMK Pharmacy's bills are fraudulent because the billed-for drugs were unnecessary and prescribed pursuant to a predetermined prescription protocol designed to maximize the Defendants' profits at the expense of patient safety and well-being.

34.    Accordingly, SMK Pharmacy was never eligible to collect No-Fault payments from Allstate under N.Y. Ins. Law § 5102.

    2.    **S & K Warbasse Pharmacy Inc. d/b/a Warbasse Pharmacy**

35.    S & K Warbasse is a corporation organized under the laws of the State of New York.

36.     S & K Warbasse's principal place of business is 499 Neptune Avenue, Brooklyn, NY 11224.

37.     S & K Warbasse is a registered pharmacy in New York.

38.     Field, Leis, Mitsel, and Volman participated in the operation and management of the S & K Warbasse enterprise during the relevant period.

39.     S & K Warbasse billed for pharmacy services in connection with Allstate claimants.

40.     S & K Warbasse dispensed medically unnecessary drugs without regard for patient care and in disregard of its duties under New York law.

41.     S & K Warbasse's bills are fraudulent because the billed-for drugs were unnecessary and prescribed pursuant to a predetermined prescription protocol designed to maximize the Defendants' profits at the expense of patient safety and well-being.

42.     Accordingly, S & K Warbasse was never eligible to collect No-Fault payments from Allstate under N.Y. Ins. Law § 5102.

### 3.     Kim Volman

43.     Volman resides in and is a citizen of the State of New York.

44.     Volman is a licensed pharmacist authorized to practice pharmacy in the State of New York.

45.     Volman owns SMK Pharmacy.

46.     Volman was the original supervising pharmacist of S & K Warbasse.

47.     Volman participated in the operation and management of the SMK Pharmacy and S & K Warbasse enterprises during the relevant period, and is therefore responsible for the fraudulent and non-compensable pharmacy billing submitted in connection with the claimants at issue in this Complaint.

### 4. **Simon Field**

48.     Field resides in and is a citizen of the State of New York.

49.     Field is a licensed pharmacist authorized to practice pharmacy in the State of New York.

50.     Field owns SMK Pharmacy.

51.     Field owns S & K Warbasse.

52.     Field participated in the operation and management of the SMK Pharmacy and S & K Warbasse enterprises during the relevant period, and is therefore responsible for the fraudulent and non-compensable pharmacy billing submitted in connection with the claimants at issue in this Complaint.

### 5. **Marc Kassman**

53.     Kassman resides in and is a citizen of the State of New York.

54.     Kassman is a licensed pharmacist authorized to practice pharmacy in the State of New York.

55.     Kassman owns SMK Pharmacy.

56.     Kassman was the supervising pharmacist at SMK Pharmacy during the relevant period.

57.     Kassman participated in the operation and management of the SMK Pharmacy enterprise during the relevant period, and is therefore responsible for the fraudulent and non-compensable pharmacy billing submitted in connection with the claimants at issue in this Complaint.

### 6. **Alexander Burlak**

58.     Burlak resides in and is a citizen of the State of New York.

59.     Burlak is a licensed pharmacist authorized to practice pharmacy in the State of New York.

60.     Burlak owns SMK Pharmacy.

61.     Burlak was the supervising pharmacist at SMK Pharmacy during the relevant period.

62.     Burlak participated in the operation and management of the SMK Pharmacy enterprise during the relevant period, and is therefore responsible for the fraudulent and non-compensable pharmacy billing submitted in connection with the claimants at issue in this Complaint.

### 7.    Arlen Leis

63.     Leis resides in and is a citizen of the State of New York.

64.     Leis is a licensed pharmacist authorized to practice pharmacy in the State of New York.

65.     Leis owns S & K Warbasse.

66.     Leis was the supervising pharmacist at S & K Warbasse during the relevant period.

67.     Leis participated in the operation and management of the S & K Warbasse enterprise during the relevant period, and is therefore responsible for the fraudulent and non-compensable pharmacy billing submitted in connection with the claimants at issue in this Complaint.

### 8.    Jacqueline Mitsel a/k/a Jacqueline G. Volman

68.     Mitsel resides in and is a citizen of the State of New York.

69.     Mitsel is not a licensed pharmacist authorized to practice pharmacy in the State of New York.

70.    Mitsel owns S & K Warbasse.

71.    Mitsel participated in the operation and management of the S & K Warbasse enterprise during the relevant period, and is therefore responsible for the fraudulent and non-compensable pharmacy billing submitted in connection with the claimants at issue in this Complaint.

## III.    JURISDICTION AND VENUE

72.    Subject matter jurisdiction over this action is conferred upon this Court by 28 U.S.C. §§ 1331 and 1332.

73.    Supplemental jurisdiction over Allstate's state law claims is proper under 28 U.S.C. § 1367.

74.    Venue is proper under 28 U.SC. § 1391(b)(2) whereas the vast majority of the acts known to Allstate alleged herein were carried out within the Eastern District of New York.

75.    At all relevant times, the Defendants have engaged in purposeful activities in New York by creating and submitting bills and claims pursuant to New York's No-Fault laws, as detailed, *infra*.

76.    The Defendants' activities in and contacts with New York were purposely sought and transacted to take advantage of the benefits available under New York's No-Fault laws.

77.    Because Allstate's allegations and causes of action arise from (a) the Defendants' unlawful acts committed in the State of New York, and (b) the fraudulent and non-compensable billing that Defendants generated and submitted from within the State of New York seeking payment under New York's No-Fault laws, there is no question that there exists a substantial relationship between the transactions at issue and Allstate's causes of action.

## IV.   NO-FAULT LAWS AND RELEVANT LICENSING STATUTES

### A.   GENERAL OVERVIEW OF NEW YORK'S NO-FAULT LAWS

78.     Allstate underwrites automobile insurance in the State of New York.

79.     New York's No-Fault laws are designed to ensure that injured victims of automobile accidents have an efficient mechanism to pay reasonable fees for necessary healthcare services, including prescription drugs.

80.     Under New York's Comprehensive Motor Vehicle Insurance Reparations Act (N.Y. Ins. Law § 5101, *et seq*.), and the regulations promulgated pursuant thereto (11 N.Y.C.R.R. § 65, *et seq*.) (collectively, "the No-Fault laws"), automobile insurers are required to provide Personal Injury Protection Benefits (hereinafter, "No-Fault benefits") to Allstate claimants.

81.     Under New York's No-Fault laws, individuals are entitled to be compensated for "basic economic loss" resulting from injuries caused by the operation of an automobile.

82.     "Basic economic loss" is defined to include "all necessary expenses" for prescription drug services.  N.Y. Ins. Law § 5102(a)(1); 11 N.Y.C.R.R. § 65-1.1.

83.     No-Fault benefits include at least $50,000.00 per Allstate Claimant for necessary expenses that are incurred for healthcare goods and services, including prescription drugs.

### B.  ELIGIBILITY REQUIREMENTS UNDER NEW YORK'S NO-FAULT LAWS

84.     Pharmacies are not eligible to collect payment under New York's No-Fault laws if they fail "to meet **any** applicable New York State or local licensing requirement necessary to perform such services in New York."  *See* 11 N.Y.C.R.R. § 65-3.16(a)(12) (emphasis added).

85.     New York's Education Law applies to pharmacies.  *See* N.Y. Educ. Law § 6800, *et seq.*  Under New York Education Law § 6808, no person, firm, corporation or association shall possess drugs, prescriptions or poisons for the purpose of compounding, dispensing, retailing, wholesaling or manufacturing, or shall offer drugs, prescriptions or poisons for sale at retail or wholesale unless registered by the New York State Department of Education as a pharmacy, wholesaler, manufacturer or outsourcing facility.

#### 1.     Duties of Pharmacies and Their Owners

86.     Pharmacy owners and supervising pharmacists "shall be responsible for the proper conduct of [the] pharmacy."  N.Y. Educ. Law § 6808(2)(e).

87.     "No pharmacist shall have personal supervision of more than one pharmacy at the same time." *Id.*

88.     Only a licensed pharmacist or pharmacy intern may perform professional pharmacy services.  *See* 8 N.Y.C.R.R. § 63.6; 8 N.Y.C.R.R. § 29.7(21).

89.     Pursuant to 8 N.Y.C.R.R. § 63.6(b)(7), pharmacists "shall conduct a prospective drug review before each prescription is dispensed or delivered to the patient," which "review shall include screening for potential drug therapy problems due to therapeutic duplication, drug-drug interactions, including serious interactions with over-the-counter drugs, incorrect drug dosage or duration of drug treatment, drug-allergy interactions, and clinical abuse or misuse."

90.     With regard to both off-premises and on-premises deliveries of drugs and medications, nothing in either delivery scenarios shall prevent a pharmacist "from refusing to dispense a prescription if, in his or her professional judgment, potential adverse effects, interactions or other therapeutic complications could endanger the health of the patient."  8 N.Y.C.R.R. § 63.6(b)(8)(i)(e), § 63.6(b)(8)(ii)(d)(5).

91.     Before drugs can be delivered to new patients on the pharmacy's premises, the pharmacist must personally counsel the patient by telephone or in person on appropriate matters, including known indications, common adverse side effects or interactions, and therapeutic contraindications.  8 N.Y.C.R.R. § 63.6(b)(8)(i)(a)-(b).  The same rules apply when new drugs are delivered to existing patients.

92.     When drugs are delivered to patients off-premises, the pharmacist must "include with each prescription a written offer to counsel the patient" regarding the drug or medication, including its "known indications" and "common severe side or adverse effects or interactions and therapeutic contraindications that may be encountered."  8 N.Y.C.R.R. § 63.6(8)(i)(a)(1), (4), § 63.6(b)(8)(ii)(a).  The written offer of counseling "shall provide a telephone number at which a licensed pharmacist or pharmacy intern may be readily reached." *Id*.  If a pharmacist or pharmacy intern determines that the prescription(s) present "potential drug therapy problems which could endanger the health of the patient," such as "therapeutic duplications, drug-drug interactions and drug-allergy interactions," then the pharmacist "shall personally contact the patient" either by phone or in person to "offer counseling on the identified potential drug therapy problems" and other issues that the pharmacist deems appropriate in their judgment.  8 N.Y.C.R.R. § 63.6(b)(8)(ii)(d)(1).

93.     The responsibility of offering counseling to patients in these situations "shall not be delegated to an individual not authorized to practice pharmacy under a license or limited permit." 8 N.Y.C.R.R. § 68.6(b)(8)(ii)(d)(2).

94.     If the patient refuses to accept counseling, such refusal must be documented. 8 N.Y.C.R.R. § 63.6(b)(8)(ii)(d)(4).

95.     Unlicensed persons are not authorized to perform functions requiring professional judgment, and thus cannot "interpret and evaluate a prescription for conformance with legal requirements, authenticity, accuracy and interaction of the prescribed drug with other known prescribed and over-the-counter drugs," cannot "sign or initial any record of dispensing required to be maintained by law," and cannot "counsel patients." 8 N.Y.C.R.R. § 29.7(21)(ii)(b)(1), (2), (6), (7). Aiding and abetting an unlicensed person to practice a profession, including pharmacy, is considered a crime. N.Y. Educ. Law § 6512.

### 2.     Unlawful Prescription Referral Arrangements

96.     New York law prohibits registered pharmacies from exploiting patients for financial gain. 8 N.Y.C.R.R. § 29.1(b)(2) (prohibiting registered pharmacies from "exercising undue influence on the patient or client, including the promotion of the sale of services, goods, appliances or drugs in such manner as to exploit the patient or client for the financial gain of the practitioner or of a third party").

97.     New York law prohibits registered pharmacies from engaging in unlawful referral relationships. *Id.* at § 29.1(b)(3) (prohibiting registered pharmacies from "directly or indirectly offering, giving, soliciting, or receiving or agreeing to receive, any fee or other consideration to or from a third party for the referral of a patient or client or in connection with the performance of professional services.").

98.     New York Education Law § 6509-a prohibits pharmacists from "directly or indirectly" requesting, receiving, or participating in the division, transference, assignment, rebate, splitting or refunding of fees for pharmacy or medical services.

99.     Providers are prohibited from making referrals to pharmacies when a financial relationship exists.  *See* New York Public Health Law § 238-a.  Prohibited relationships include kickbacks and compensation agreements that vary directly or indirectly based on the volume or value of any referrals or business between the parties.  N.Y. Pub. Health Law § 238-a(1), (5); *see also* N.Y. Educ. Law § 6530(18) (defining professional misconduct of physicians and physician assistants to include "[d]irectly or indirectly offering, giving, soliciting, or receiving or agreeing to receive, any fee or other consideration to or from a third party for the referral of a patient or in connection with the performance of professional services"); N.Y. Educ. Law § 6530(38) (defining professional misconduct of physicians and physician assistants to include "[e]ntering into an arrangement or agreement with a pharmacy for the compounding and/or dispensing of coded or specially marked prescriptions").  It is also a crime for "[a]ny person to enter into an agreement with a physician…for the compounding or dispensing of secret formula (coded) prescriptions." N.Y. Educ. Law § 6811.

### 3.   **Electronic Prescription Mandate**

100.     As of March 27, 2016, New York law requires electronic prescriptions for both controlled and non-controlled substances.  N.Y. Educ. Law § 6810(10); N.Y. Pub. Health Law § 281(3).

101.     The electronic prescription mandate was intended to reduce prescription drug fraud and misuse.  *See* N.Y. Senate Bill S7637 (2011-2012 Leg. Session) (explaining how "E-prescribing

is a secure method of transmitting prescriptions from practitioners to pharmacists. Since an e-prescription cannot be physically altered, forged, or stolen …, it curtails prescription fraud.").

102.    There are few exceptions to the electronic prescription mandate, such as when electronic prescribing is not available due to temporary technological or electrical failure, where the prescribing provider has obtained a waiver, or where drugs cannot be prescribed electronically in a timely manner (and such delay would adversely impact the patient's medical condition).  N.Y. Educ. Law § 6810(10); N.Y. Pub. Health Law § 281(3).

103.    If a prescription is not issued electronically, then the prescribing provider must indicate in the patient's health record the reason that the prescription was not issued electronically. N.Y. Educ. Law § 6810(11)-(12).  The prescriptions must be issued using an Official New York State Prescription Form or an oral prescription in accordance with New York law.  *Id.*

104.    All drugs must be prescribed electronically, absent one of these limited exceptions.

C.    CLAIMING REIMBURSEMENT UNDER NEW YORK'S NO-FAULT LAWS

105.    Claimants can assign their No-Fault benefits directly to pharmacies.

106.    Under a duly executed assignment, a claimant's pharmacy may submit claims directly to an insurance company and receive payment for necessary pharmacy services rendered. 11 N.Y.C.R.R. § 65.3-11(a).

107.    Pharmacies can submit claims using the claim form required by the New York State Department of Financial Services f/k/a New York State Department of Insurance ("DOI") (known as "Verification of Treatment by Attending Physician or Other Provider of Health Service" or more commonly as an "NF-3 form").  11 N.Y.C.R.R. § 65.3-11(b).

108.    Alternatively, pharmacies may submit claims to insurance carriers using the Health Insurance Claim Form (known as the "CMS-1500" form and formerly known as the "HCFA-1500" form).

109.    NF-3 and CMS-1500 forms are important because they certify that the pharmacy's request for payment is not materially false, misleading, or fraudulent, subject to the following warning:

> "Any person who knowingly and with intent to defraud any insurance company or other persons files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime[.]"

N.Y. Ins. Law § 403(d).

110.    Pharmacies make material misrepresentations when they submit NF-3 or CMS-1500 forms that omit or misrepresent material information about the services or their eligibility to collect No-Fault payments.

111.    It is a material misrepresentation to submit NF-3 or CMS-1500 forms for drugs that are (a) never provided, (b) not medically necessary, (c) prescribed because of unlawful referral arrangements, (d) dispensed in violation of applicable licensing laws, and (e) billed at grossly excessive rates.

### D.    REIMBURSEMENT FOR PRESCRIPTION DRUGS UNDER NEW YORK'S NO-FAULT LAWS

112.    The New York Workers' Compensation Board has established a schedule of fees known commonly as the "Workers' Compensation Fee Schedule" ("Fee Schedule").

113.    The Fee Schedule applicable to pharmacies and prescription drugs is set forth under 12 N.Y.C.R.R. § 440.1, *et seq.*

114.    Representations about compliance with the Fee Schedule are material because insurers rely on the Fee Schedule to determine the proper level of payment on eligible claims.

115.    In terms of charges submitted by pharmacies prior to October 1, 2019, 12 N.Y.C.R.R. § 440.5(a)(1)(i) states that a provider may charge no more than the Average Wholesale Price ("AWP") for the national drug code ("NDC") for the drug on the day it was dispensed minus 12% of the AWP, plus a single dispensing fee of $4.00, for brand name drugs or medicines, and minus 20 percent of the average wholesale price, plus a dispensing fee of $5.00, for generic drugs or medicines.

116.    The NDC is a unique 10-digit, 3-segment numeric identifier assigned to each drug that reflects the vendor of the drug, identifies the drug itself, and indicates the quantity in which the drug is packaged.  Each NDC number has a corresponding AWP, which identifies the price.

117.    AWP means the average wholesale price of a prescription drug as provided in the most current release of the Red Book published by Thomson Reuters or Medi-Span Master Drug Database by Wolters Kluwer Health, or any successor publisher, on the day a drug is dispensed. 12 N.Y.C.R.R. § 440.2(a).

118.    For charges submitted by pharmacies for brand name and generic prescription drugs or medicines on or after October 1, 2019, 12 N.Y.C.R.R. § 440.5(a)(1)(ii) states that a provider may charge no more than, as applicable here, the lesser of the calculated cost or the usual and customary price for the prescription drug or medication.

119.    "Calculated cost means the average wholesale price for the national drug code of the prescription drug or medicine on the day it was dispensed plus a dispensing fee. For brand name drugs the calculated cost shall be AWP minus 12 percent of the average wholesale price plus

18

a dispensing fee of $4.  For generic drugs the calculated cost shall be AWP minus 20 percent plus a dispensing fee of $5."  12 N.Y.C.R.R. § 440.2(c).

120.    "Usual and customary price means the retail price charged to the general public for a prescription drug."  12 N.Y.C.R.R. § 440.2(s).

121.    For Compounded Products, the fees for medically necessary prescriptions are determined at the ingredient level, plus a single dispensing fee of $6.  *See* 12 N.Y.C.R.R. §§ 440.5(d).

122.    For each brand-name drug included in a Compounded Product, a provider may charge no more than the AWP for the NDC for the drug on the day it was dispensed minus 12% of the AWP.

123.    For each generic drug included in a Compounded Product, a provider may charge no more than the AWP for the NDC for the drug on the day it was dispensed minus 20% of the AWP.

124.    Pharmacies are prohibited from billing in excess of the Fee Schedule under New York's No-Fault laws.

125.    Pharmacies are not eligible to collect No-Fault payments when they fail to meet any applicable licensing requirements.  *See* 11 N.Y.C.R.R. § 65-3.16(a)(12).  As alleged herein, the Defendants failed to meet several laws and regulations when providing pharmacy services to claimants during the course of this scheme.

### E.    LAWS APPLICABLE TO COMPOUNDED PRODUCTS

126.    The United States Food and Drug Administration ("FDA") is authorized to oversee the safety of food, drugs, and cosmetics under the Federal Food, Drug, and Cosmetic Act ("FDCA").

127.    A compounded medication is "a drug that is created by combining one or more active pharmaceutical ingredients, and/or one or more inactive ingredients, to meet specific patient medical needs that are not met with U.S. Food and Drug Administration (FDA)-approved prescription drugs, FDA-approved non-prescription drugs, or other drugs commercially available in the marketplace." 12 N.Y.C.R.R. § 441.1.

128.    In New York, compounded medications may be prepared and dispensed by compounding pharmacies registered by the New York State Department of Education, with limited FDA oversight.

129.    Under New York Education Law § 6808, no person, firm, corporation or association shall possess drugs, prescriptions, or poisons for the purpose of compounding, dispensing, retailing, wholesaling, or manufacturing, or shall offer drugs, prescriptions, or poisons for sale at retail or wholesale unless registered by the New York State Department of Education as a pharmacy, wholesaler, manufacturer, or outsourcing facility.

130.    If any person, firm, corporation, or association is a "manufacturer" or "outsourcing facility" and seeks to register as such with the New York State Department of Education in the manner required by New York Education Law § 6808, then such person, firm, corporation, or association must also register with the FDA and be listed as a manufacturer or outsourcing facility on the FDA's website.

131.    Indeed, compounded drugs are generally not FDA approved, though they may include FDA-approved drugs, and are generally exempt from the FDA approval process that applies to new drugs.

132.    Moreover, compounded medications are not subject to the rigorous drug review process that all commercially available prescription drugs must undergo to demonstrate safety and effectiveness prior to receiving FDA approval.

133.    Therefore, compounded topical medications have not been approved for safety and efficacy by the FDA and pose a higher risk to patients than FDA-approved drugs.

134.    Further, compounded medications generally do not have standardized dosages and duration for use, and the protocols for preparing each compound are not necessarily standardized.

135.    For all of these reasons, compounded preparations are likely to have batch-to-batch variability, and their sterility and purity cannot be guaranteed.

136.    In terms of compounded pain topical medications, such as those prepared and dispensed by SMK Pharmacy, these compounded medications have not been proven (with rare exceptions) to be more effective than commercially-available, manufactured drugs.

137.    Drug manufacturers are subject to a number of requirements under the FDCA, including adherence to current good manufacturing practice (CGMP) requirements, drug labeling requirements, and drug approval requirements.

138.    Outsourcing facilities also are subject to requirements under the FDCA, including CGMP requirements, FDA inspections, and adverse event reporting requirements.  *See* 21 U.S.C. § 353b.

139.    Pharmacies that engage in compounding may be exempted from these requirements applicable to conventional manufacturers and outsourcing facilities under certain conditions.

140.    These conditions are necessary to reduce the risks arising from exempting the compounding pharmacies from CGMP requirements and other oversight.

141.    Under 21 U.S.C. § 353a(a)(1), pharmacies may engage in compounding if the drug is compounded for an identified individual patient based on the receipt of a valid prescription or a notation, approved by the prescribing practitioner on the prescription order, that a compounded product is necessary for the identified patient.

142.    Under 21 U.S.C. § 353a(a)(2), pharmacies may engage in compounding in limited quantities before receipt of a valid prescription order (known as "anticipatory compounding") only under specific conditions and can only distribute the compounded product after receipt of a *valid patient-specific prescription* for the product.

143.    When compounded pain topical medications meet these requirements of Section 353a and are compounded for an individual patient, they can be exempted from the requirement, among others, that they be FDA approved.  *See* 21 U.S.C. § 355(a) ("No person shall introduce or deliver for introduction into interstate commerce any new drug, unless an approval of an application filed pursuant to [this section] is effective with respect to such drug.").

144.    When Congress adopted this provision of the FDCA governing compounding, its express intent was to "ensure continued availability of compounded drug products as a component of individualized therapy, while limiting the scope of compounding so as to prevent manufacturing [of drugs that would otherwise require FDA approval] under the guise of compounding."  H.R. Rep. No. 105-399, at 94 (1997) (Conf. Rep.).

145.    As Congress stated at the time, the "exemptions in [the section] are limited to compounding for an individual patient based on the medical need of such patient for the particular drug compound.  To qualify for exemptions, the pharmacist or physician must be able to cite to a legitimate medical need for the compounded product that would explain why a commercially available drug product would not be appropriate.  Although recording the medical need directly

on each prescription order would not be required, this technique would be one of many acceptable ways of documenting the medical need for each compounded drug product.  This medical need would not include compounding drugs that are essentially copies of commercially available drug products for largely economic reasons.  The pharmacist may rely on appropriately documented input from the physician as to whether a commercially available drug product is not appropriate for the identified individual patient."  S. Rep. No. 105-43, at 67-68 (1997).

146.    Therefore, under the FDCA, the ability of a pharmacy to engage in compounding is limited to specific circumstances where there is no FDA-approved product to meet a patient's clinical needs (e.g., due to an allergy, inability to swallow, or specialized weight-based dosing) and where the pharmacy has or will receive a *valid prescription order* for the product.

147.    The requirement that a pharmacy engage in compounding based on an individual patient's needs pursuant to a valid prescription is a critical distinction between compounding by a pharmacy and conventional manufacturing; in the absence of these prerequisites, a pharmacy cannot lawfully compound drugs and enjoy the exemptions of 21 U.S.C. § 353a.

148.    The FDA does not monitor these pharmacies or their compounding practices and is often not aware of potential problems with the pharmacies' compounded drug products or compounding practices until it receives a complaint.

149.    To maintain patient safety, it is crucial that pharmacies, including SMK Pharmacy, strictly adhere to state and federal law and regulations governing compounding under the FDCA exemptions.

## V.    SPECIFIC FACTS ABOUT THE DEFENDANTS' SCHEME TO DEFRAUD

### A.    NEXUS AMONG THE DEFENDANTS

150.    Field and Volman are long-time business partners with a history of operating pharmacies in New York.

151.    Field and Volman are the founding owners of non-party Volfi Inc. d/b/a S & K Pharmacy ("Volfi"), which was named using a combination of **Vol**man's and **Fi**eld's names. Likewise, Volfi's trade name, S & K Pharmacy, was formulated using Field's (**S**imon) and Volman's (**K**im) first initials, respectively.

152.    Field and Volman later recruited Kassman to partner with them in opening a new pharmacy named SMK Pharmacy, whose name was also derived from the owners' first initials (**S**imon Field, **M**arc Kassman, and **K**im Volman).

153.    Volman then incorporated another new pharmacy named S & K Warbasse, which is named after **S**imon and **K**im.

154.    Field was an original shareholder of S & K Warbasse along with Mitsel, who is not a licensed pharmacist.

155.    Volman was S & K Warbasse's supervising pharmacist before being replaced by Leis, who became S & K Warbasse's supervising pharmacist and co-owner alongside Field and Mitsel.  Upon information and belief, Volman continued to participate in the operation and management of S & K Warbasse after vacating the supervising pharmacist position.

156.    There are several other important connections between and among the Defendants.

157.    For example, Field and Volman operated non-party Volfi alongside S & K Warbasse.

158.    S & K Warbasse shares a website with non-party Volfi, which is located at www.skpharmacy.com.

159.    S & K Warbasse and non-party Volfi advertise themselves together as the "Brooklyn Pharmacy Network":



160.    S & K Warbasse and non-party Volfi are located on the same street in Brooklyn, NY less than half a mile apart:

161.    On March 28, 2017, SMK Pharmacy closed its original retail pharmacy, but then Field, Kassman, and Volman re-opened SMK Pharmacy under a new registration number as a "closed-door" pharmacy, which operated at the same location in Rockaway Beach, NY.

162.    A closed-door pharmacy is not open to the public and offers services to a specific group of patients, such as patients in a long-term care facility.

163.    The new iteration of SMK Pharmacy operated under the assumed name Nature's First Long Term Care & Compounding.

164.    Notably, Field, Volman, and Kassman previously owned and operated a different pharmacy named non-party Natures First Pharmacy Corp. d/b/a Natures First Pharmacy ("Natures First").

165.    Burlak participated in the operation and management of non-party Natures First as a co-owner alongside Field, Volman, and Kassman.

166.    Natures First was closed May 2017, soon after the Defendants re-opened SMK Pharmacy under the assumed name of Nature's First Long Term Care & Compounding.

167.    In 2023, Burlak became a co-owner of SMK Pharmacy alongside Volman, Kassman, and Field.

**B.    OVERVIEW OF THE DEFENDANTS' SCHEME**

168.    At all relevant times, the Pharmacy Defendants failed to comply with New York law governing pharmacies and were not eligible to seek or receive payments under New York's No-Fault laws as a result of the Defendants' scheme to defraud.

169.    The overarching purpose of the Defendants' scheme was to obtain No-Fault payments that the Pharmacy Defendants were not entitled to receive and to funnel these proceeds to Volman, Field, Kassman, Burlak, Leis, and/or Mitsel for their personal benefit.

170.    The Defendants achieved this goal by causing the Pharmacy Defendants to submit charges for a predetermined protocol of medically unnecessary and expensive drugs and medications, including Topical Pain Products and Compounded Products.

171.    The Defendants selected those drugs and medications comprising this predetermined protocol to include those that could be acquired at low cost and then billed at inflated rates to maximize the Pharmacy Defendants' profits.

172.    The Defendants were previously accused of running a pharmacy fraud scheme through SMK Pharmacy that was "designed to exploit the Insureds for financial gain, without regard to the genuine needs of the patients, and with gross indifference to patient health and safety." *See Gov't Empls. Ins. Co. v. SMK Pharmacy, Corp.*, No. 21-cv-03247-AMD-RLM (E.D.N.Y.).

173.    The Pharmacy Defendants could not bill for the Topical Pain Products and Compounded Products without prescriptions from licensed medical providers, so the Defendants entered into unlawful referral arrangements with prescribing providers and No-Fault clinics with the aim of steering all prescriptions to the Pharmacy Defendants. *See Gov't Empls. Ins. Co. v. SMK Pharmacy, Corp.*, No. 21-cv-03247-AMD-RLM (E.D.N.Y.).

174.    As explained below, there is significant evidence that the prescriptions for drugs and medications billed by the Pharmacy Defendants to Allstate under New York's No-Fault laws were funneled to the Pharmacy Defendants pursuant to unlawful referral relationships.

175.    These indicia of collusive relationships between the Defendants and prescribing providers and/or clinic controllers includes, among other things, the prescribing providers' histories of involvement in similar alleged schemes to defraud, the routine transmission of prescriptions to the Pharmacy Defendants by telephone without excuse or justification, the routine use of rubber stamps and pre-printed prescription forms to prescribe Topical Pain Products and Compounded Products, and the prescribing providers' and clinics' funneling of the prescriptions

directly to the Pharmacy Defendants without giving claimants any choice of where to fill their prescription.

176.    SMK Pharmacy also paid several shell companies with the purpose of generating cash, which could be used to conceal the prohibited kickback/referral payments made to the prescribing providers and clinic controllers in exchange for false and fraudulent prescriptions for medically unnecessary Topical Pain Products and/or Compounded Products.

177.    The Defendants devised and executed their scheme knowing that (a) the prescriptions were issued pursuant to predetermined treatment protocols of medically unnecessary and ineffective drugs and medications, which elevated profits over genuine patient care, (b) the prescriptions were invalid under New York law, (c) the prescriptions were issued in exchange for unlawful kickbacks or other incentives, and (d) the No-Fault claim documents submitted to Allstate falsely represented the Pharmacy Defendants' eligibility to collect No-Fault payments.

C.    FRAUDULENT PHARMACY BILLING

1.    Predetermined Prescription Protocol

178.    The Defendants' scheme was designed such that prescribers were limited to a predetermined set of drugs and medications, which included topical gels, ointments, creams, topical pain patches, and NSAIDs; in doing so, the Defendants ensured that these drugs and medications were prescribed in all cases, regardless of whether the patients even needed or wanted them.

179.    As a result, the Pharmacy Defendants billed Allstate for the same recurring set of unnecessary, unwarranted, and ineffective Topical Pain Products, including: diclofenac sodium 3% gel, lidocaine 5% ointment, lidocaine 5% patches, and Lidothol patches.

180.    The Defendants focused on billing for these expensive Topical Pain Products even though substantially similar products were available as over-the-counter drugs at a fraction of the cost.

181.    The Defendants intentionally based their fraudulent scheme on steering providers to prescribe these specific Topical Pain Products to be billed for by the Pharmacy Defendants, in place of other less expensive products, to maximize the amounts collected by the Defendants in violation of New York's No-Fault laws.

182.    The same Topical Pain Products were ordered for different claimants on the same day by the same prescriber, which is evidence that these medications were prescribed as part of a predetermined treatment protocol without any regard for whether the Topical Pain Product was necessary or effective.

183.    The chart below contains representative examples of instances where the same prescriber ordered the same Topical Pain Product for different claimants on the same day:

| Claim Number | Claimant Initials | Prescription Date | Medication(s) Prescribed | Prescriber | Pharmacy Defendant |
|---|---|---|---|---|---|
| 0638268938 | A.I. | 12/7/2021 | Lidocaine 4% topical cream | Raz Winiarsky, M.D. | SMK Pharmacy |
| 0625450951 | I.R. | 12/7/2021 | Lidocaine 4% topical cream | Raz Winiarsky, M.D. | SMK Pharmacy |
| 0676113871 | A.V. | 6/27/2022 | Lidocaine 5% patch | Tara LaRocca, PA | SMK Pharmacy |
| 0676113871 | D.R. | 6/27/2022 | Lidocaine 5% patch | Tara LaRocca, PA | SMK Pharmacy |
| 0595330135 | J.G. | 8/4/2020 | Lidocaine 5% ointment | John Greco, M.D. | S & K Warbasse |
| 0595330135 | N.R. | 8/4/2020 | Lidocaine 5% ointment | John Greco, M.D. | S & K Warbasse |
| 0603715236 | G.C. | 10/22/2020 | Lidothol patches | John Greco, M.D. | S & K Warbasse |
| 0603715236 | S.S. | 10/22/2020 | Lidothol patches | John Greco, M.D. | S & K Warbasse |

| Claim Number | Claimant Initials | Prescription Date | Medication(s) Prescribed | Prescriber | Pharmacy Defendant |
|---|---|---|---|---|---|
| 0629054347 | C.D. | 6/24/2021 | Lidothol patches | Aleksandr Kopach, M.D. | S & K Warbasse |
| 0629054347 | T.D. | 6/24/2021 | Lidothol patches | Aleksandr Kopach, M.D. | S & K Warbasse |
| 0690680871 | R.V. | 12/14/2022 | Lidocaine 5% ointment | Hong Pak, M.D. | S & K Warbasse |
| 0690680871 | P.R. | 12/14/2022 | Lidocaine 5% ointment | Hong Pak, M.D. | S & K Warbasse |

184.    The Defendants targeted and selected these particular Topical Pain Products because they could be acquired at a low cost and then billed to Allstate in terms of the drugs' AWP, which allowed the Defendants to realize a substantial profit for every prescription at Allstate's and the claimants' expense.

185.    The charts attached hereto as Exhibits 1-2 lay bare the Defendants' disproportionate focus on billing for Topical Pain Products, including the following most commonly billed-for products:

| Drug Name | NDC | Pharmacy Defendant |
|---|---|---|
| Diclofenac sodium 3% gel | 68462-0355-94 | SMK Pharmacy and S & K Warbasse |
| Diclofenac sodium 3% gel | 51672-1363-07 | SMK Pharmacy and S & K Warbasse |
| Lidocaine 5% ointment | 65162-0918-53 | SMK Pharmacy and S & K Warbasse |
| Lidocaine 5% ointment | 67877-0473-80 | SMK Pharmacy and S & K Warbasse |
| Lidocaine 5% ointment | 71085-0011-50 | SMK Pharmacy and S & K Warbasse |
| Lidocaine 5% ointment | 52565-0008-55 | SMK Pharmacy and S & K Warbasse |
| Lidocaine 5% patch | 00591-2679-30 | SMK Pharmacy and S & K Warbasse |
| Lidocaine 5% patch | 00591-3525-30 | SMK Pharmacy |
| Lidocaine 5% patch | 00603-1880-16 | SMK Pharmacy |
| Lidocaine 5% ointment | 16714-0878-02 | S & K Warbasse |
| Lidocaine 5% ointment | 50383-0933-55 | S & K Warbasse |
| Lidocaine 5% ointment | 51672-3008-05 | S & K Warbasse |
| Lidocaine 5% ointment | 64380-0789-33 | S & K Warbasse |
| Lidothol patch | 53225-1025-01 | S & K Warbasse |

186.    One of the most popular drugs pushed by the Defendants was the generic form of diclofenac sodium 3% gel.

187.    For example, the Pharmacy Defendants billed for generic diclofenac sodium 3% gel with NDC No. 68462-0355-94.

188.    The published AWP of diclofenac sodium 3% gel (NDC No. 68462-0355-94) is $1,179.46 per 100-gram package.

189.    Claimants were prescribed a 200-gram supply of diclofenac sodium 3% gel under the Defendants' predetermined protocol, which meant that the Defendants could charge approximately $1,887.14 for the drug (after application of the 20% reduction required under applicable New York law).

190.    The Defendants deliberately billed for diclofenac sodium 3% gel under NDC No. 68462-0355-94 to exploit the spread between the AWP and the actual market price.

191.    The wholesale acquisition price (WAC) of diclofenac sodium 3% gel sold under NDC No. 68462-0355-94 is only $92.97 for a 100-gram supply.  The WAC is an important metric because it generally represents the actual price paid by the pharmacy to acquire the drug.

192.    However, in November 2022, S & K Warbasse paid only $22.85 per 100 grams of diclofenac sodium 3% gel sold under NDC No. 68462-0355-94.

193.    The acquisition cost of diclofenac sodium 3% gel billed under NDC No. 68462-0355-94 was especially important because the Defendants knew that they could charge approximately $1,887.14 for a 200-gram supply (after application of the 20% reduction required under applicable New York law).

194.    Acquiring the diclofenac sodium 3% gel at $22.85 per 100 grams meant that S & K Warbasse realized a profit of over $1,800.00 each time that it billed for 200 grams of diclofenac sodium 3% gel under NDC No. 68462-0355-94.

195.    For example, on November 28, 2022, S & K Warbasse purchased 48 100-gram units of diclofenac sodium 3% gel (NDC No. 68462-0355-94) for $1,096.80, along with several other medications, including 1,500 capsules of celecoxib 200 mg and 2,000 tablets of cyclobenzaprine 7.5 mg.  In all, S & K Warbasse paid a total of $2,057.38 to purchase all of these medications:

| Bill To | | Ship To | | | | TOTAL | |
|---|---|---|---|---|---|---|---|
| S & K Warbasse Pharmacy Inc 499 Neptune Ave Brooklyn NY 11224 United States | | S & K Warbasse Pharmacy Inc 499 Neptune Ave Brooklyn NY 11224 United States | | | | | $2,057.38 |
| **Customer ID#** | | **License#** | | **DEA#** | | **FL HCCE Permit#** | **Invoice Status** |
| 116386 | | 028471 | | FS0540547 | | | |
| **Terms** | | **Auto Pay Method** | **Due Date** | | **PO #** | **Sales Rep** | **Shipping Method** |
| EOM+10 | | AUTO ACH | 12/10/2022 | | | Ellen Shupak | UPS Next Day Air® |
| **SKU** | **Description** | | **SIZE** | **NDC** | **QUANTITY** | **PRICE** | **TOTAL** |
| 101-101 0183 | CELECOXIB 200MG (CELEBREX) | | 100CP | 69367030201 | 15 | $1.99 | $29.85 |
| 1006689 | DORZOLAMIDE HYDROCHLORIDE/TIMOLOL MALEATE 2%-0.5% OPHTHALMIC SOLUTION (COSOPT) | | 60 PER PK | 42571038273 | 2 | $63.99 | $127.98 |
| 100421 | DICLOFENAC SOD 3% GEL (SOLARAZE) | | 100GM | 68462035594 | 48 | $22.85 | $1,096.80 |
| 1004361 | CYCLOBENZAPRINE HCL 7.5MG (FEXMID) | | 1000TB | 69420100101 | 2 | $354.00 | $708.00 |
| 1003037 | OSELTAMIVIR PHOS 75MG (TAMIFLU) | | 10CP | 64380079901 | 5 | $18.95 | $94.75 |

196.    The following week, on December 1, 2022, S & K Warbasse billed Allstate $2,733.39 for 200 grams of diclofenac sodium 3% gel (NDC 68462-0355-94), 60 capsules of celecoxib 200 mg (NDC 50228-0158-01), and 90 tablets of cyclobenzaprine 7.5 mg (NDC 69420-1001-01) in connection with claimant A.L. (claim no. 0689712080):

| Date of Service | Place of Service Including Zip Code | Description of Treatment or Health Service Rendered | Unit | Fee Schedule Treatment Code | Charges |
|---|---|---|---|---|---|
| 12/01/2022 | 499 Neptune Ave, Brooklyn, NY, 11224 | Diclofenac Gel 3% 200 gm | 1 | NDC:68462-0355-94 | $ 1892.19 |
| 12/01/2022 | 499 Neptune Ave, Brooklyn, NY, 11224 | Pharmacy dispensing service | 1 | S9430 | $ 5.00 |
| 12/01/2022 | 499 Neptune Ave, Brooklyn, NY, 11224 | Celecoxib 200 mg Caps | 60 | NDC:50228-0158-01 | $ 369.00 |
| 12/01/2022 | 499 Neptune Ave, Brooklyn, NY, 11224 | Pharmacy dispensing service | 1 | S9430 | $ 5.00 |
| 12/01/2022 | 499 Neptune Ave, Brooklyn, NY, 11224 | Cyclobenzaprine 7.5 mg Tab | 90 | NDC:69420-1001-01 | $ 457.20 |
| 12/01/2022 | 499 Neptune Ave, Brooklyn, NY, 11224 | Pharmacy dispensing service | 1 | S9430 | $ 5.00 |
| | | | | **TOTAL CHARGES TO DATE** | **$ 2733.39** |

197.     Cyclobenzaprine is a muscle relaxant typically prescribed as a 5mg or 10mg tablet, rather than the 7.5mg strength tablet that S & K Warbasse billed for in connection with A.L. and other Allstate claimants, which is considerably more expensive than the 5mg and 10mg doses:

| **Drug** | **NDC** | **AWP** |
|---|---|---|
| Cyclobenzaprine (10mg) | 59746-0177-10 | $1.10/tablet |
| Cyclobenzaprine (7.5mg) | 69420-1001-01 | $6.277/tablet |

198.     Therefore, it only took prescriptions for the diclofenac sodium 3% gel, celecoxib, and cyclobenzaprine—which were "phoned in" to S & K Warbasse by or on behalf of non-party Phyllis Gelb, M.D.—for *one* claimant to generate charges in excess of S & K Warbasse's acquisition cost for these, or similar, medications.  *See Gov't Empls. Ins. Co. v. Q Pharmacy Rx Inc.*, No. 1:23-cv-09085 (E.D.N.Y.) (alleging that Phyllis Gelb, M.D. regularly issued "telephone prescriptions issued pursuant to predetermined fraudulent treatment and billing protocols, and collusive arrangements").

199.    The Defendants also exploited the AWP and WAC for lidocaine 5% ointment, which the Pharmacy Defendants billed under NDC Nos. 65162-0918-53, 67877-0473-80, and/or 52565-0008-55.

200.    The published AWP of a 50-gram package of lidocaine 5% ointment sold under NDC Nos. 65162-0918-53, 67877-0473-80, and 52565-0008-55 was approximately $380.00.

201.    The Pharmacy Defendants could charge approximately $1,216.00 for a 200-gram supply of lidocaine 5% ointment (after application of the 20% reduction required under applicable New York law).

202.    The WAC for lidocaine 5% ointment sold under NDC Nos. 65162-0918-53, 67877-0473-80, and 52565-0008-55 ranged from $16.00 to $25.00 per 50 grams.

203.    Additionally, during the relevant period, a 50-gram tube of lidocaine 5% ointment billed under NDC 67877-0473-80 was available for purchase at wholesale by pharmacies for just $7.00 per unit.

204.    Acquiring lidocaine 5% ointment at or around the WAC meant that the Defendants realized a profit of over $1,000.00 each time that the Pharmacy Defendants billed for 200 grams of lidocaine 5% ointment under NDC Nos. 65162-0918-53, 67877-0473-80, and 52565-0008-55.

205.    The Defendants generated substantial profits because they knew that all No-Fault claims were priced and paid according to the AWP and that they could acquire the billed-for drugs at a cost well below the drugs' AWP.

### 2.    Billing for Medically Worthless Topical Pain Products

206.    The Pharmacy Defendants billed Allstate for Topical Pain Products, including diclofenac sodium 3% gel, lidocaine 5% ointment, and lidocaine patches, that were medically

unnecessary, not indicated for the treatment of musculoskeletal injuries, and/or chosen for their potential reimbursement value over lower-priced alternatives available over the counter.

207.    Topical pain medications, including topical NSAIDs, lack proven effectiveness for the treatment of widespread musculoskeletal pain.

208.    Topical pain medications may be indicated where the patient failed a trial of oral medications, has specific allergies to certain oral medications, or is incapable of swallowing pills.

209.    However, despite no documentation of an intolerance to oral NSAIDs or muscle relaxants, the Pharmacy Defendants' claimants were prescribed both topical and oral NSAIDs to treat a diagnosis of musculoskeletal pain.

210.    The specific Topical Pain Products billed to Allstate by the Pharmacy Defendants are not approved or intended to treat musculoskeletal injuries; rather, they are approved for the treatment of superficial pain, skin conditions, or nerve pain.

211.    Less toxic formulations of topical lidocaine and diclofenac are available over the counter at significantly lower cost.

212.    By prescribing and dispensing a predetermined protocol of among the most expensive topical pain medications, the prescribing providers and Defendants subjected the patients to unnecessarily high concentrations of topical medications intended to treat conditions other than musculoskeletal pain for the purpose of exploiting these patients' available No-Fault benefits.

### a.    *Unnecessary Lidocaine 5% Ointment*

213.    The Pharmacy Defendants billed Allstate for lidocaine 5% ointment.  *See* Exhibits 1-2.

214.     Lidocaine 5% ointment is not a first-line treatment for musculoskeletal pain; rather, it is indicated for temporary pain relief for minor burns, skin abrasions, insect bites, and as a topical anesthetic.

215.     Indeed, the product labeling for lidocaine 5% ointment indicates that the drug is not effective when applied on intact skin, which is because lidocaine 5% ointment is incapable of sufficiently penetrating intact skin.  Even though topical lidocaine is sometimes used to treat neuropathic pain in adults, high concentrates of the drug must be used because topical lidocaine crosses the skin poorly.

216.     The patients prescribed lidocaine 5% ointment billed to Allstate by the Pharmacy Defendants did not have any documented minor skin conditions or true neuropathic pain warranting lidocaine 5% ointment.

217.     Moreover, lidocaine 4% cream—sold under the brand name Aspercreme—is commercially available without a prescription at a fraction of the price charged by the Pharmacy Defendants for the lidocaine 5% ointment.

218.     The Pharmacy Defendants' bills for lidocaine 5% ointment are fraudulent and non-compensable, and Allstate is entitled to recover payments and disclaim coverage in all such claims including, but not limited to, the claims listed in Exhibits 1-2.

### b.     *Unnecessary Lidocaine Patches*

219.     The Pharmacy Defendants billed Allstate for topical lidocaine 5% patches and Lidothol (lidocaine/menthol 4.5%-5%) patches ("Lidocaine Patches").  *See* Exhibits 1-2.

220.     Lidocaine Patches are topical analgesics, which can be used to temporarily relieve minor muscle and joint aches and pains.

221.    The efficacy of these patches is very doubtful; they are not supported for use in patients with deep joint injuries (e.g., shoulder and spine injuries), or injuries in multiple areas.

222.    Rather, Lidocaine Patches are indicated for post-herpetic neuralgia, which is a condition causing nerve pain after shingles.

223.    Lidocaine Patches also increase the risk of lidocaine toxicity because the patch continuously exposes the skin to lidocaine.

224.    An overdose of topical lidocaine can be fatal if too much medicine is absorbed through the skin.

225.    The area to which the Lidocaine Patches are applied must be protected from direct heat, such as from a heating pad, which can accelerate absorption into the body thereby increasing the chances of serious side effects or overdose.

226.    However, in certain instances, SMK Pharmacy billed for heating pads simultaneously with Lidocaine Patches, which items were prescribed or recommended by the same prescribing provider without regard for patient care.

227.    For example, SMK Pharmacy billed Allstate for heating pads and lidocaine 5% patches in connection with claimant D.S. (claim no. 062944747507), which were prescribed by the same provider:



228.    The Lidocaine Patches billed by the Pharmacy Defendants were ineffective and unnecessary because the drug is not proven to be safe or effective for treating deep joint pain in areas such as the shoulders or back.

229.    The Defendants also steered prescribers into ordering unnecessary Lidocaine Patches so the Pharmacy Defendants could bill for them even though lidocaine 4% patches are available over-the-counter and at a fraction of the cost—a package of 15 lidocaine 4% patches (e.g., Salonpas patches) can be purchased at a neighborhood drug store without a prescription for approximately $25.00; notably, the cost of such over-the-counter products is not covered under No-Fault.

230.    The prescribing providers prescribed, and the Pharmacy Defendants dispensed, the Lidocaine Patches despite the availability of an over-the-counter alternative at significantly lower cost.

231.    Moreover, the FDA categorizes Lidothol patches (NDC 53225-1025-01) as an unapproved drug, which may pose significant risks to patients:

| Proprietary Name | NDC Package Code | Strength | Dosage Form | Route | Appl. No. | Labeler Name | Product NDC | Nonproprietary Name | Substance Name | Product Type Name | Start Marketing Date | End Marketing Date | Market Category | Package Description | Pharm Class |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 🟢 LIDOTHOL | 53225-1025-1 | 4.5 g/1, 5 g/1 | PATCH | TOPICAL | | Terrain Pharmaceuticals | 53225-1025 | LIDOCAINE, MENTHOL | LIDOCAINE, MENTHOL | HUMAN PRESCRIPTION DRUG | 06/16/2015 | N/A | UNAPPROVED DRUG OTHER | 15 PATCH in 1 BOX (53225-1025-1) / 1 PATCH in 1 PATCH | Amide Local Anesthetic [EPC], Amides [CS], Antiarrhythmic [CS], Antiarrhythmic [EPC], Local Anesthesia [PE] |

232.    Such unapproved drugs have not been reviewed by the FDA for safety, effectiveness, and quality; therefore, there is no proof that Lidothol patches are safe and effective for their intended use.

233.    Federal law requires that all new drugs be demonstrated as safe and effective for their intended use prior to marketing with few exceptions (i.e., subject to a drug efficacy study implementation program, no FDA-approved drugs to treat a serious medical condition, or insufficient supply of an FDA-approved drug); no such exception applies to Lidothol patches to lawfully permit it to be marketed as an unapproved prescription drug.

234.    Additionally, New York law requires that wholesalers located outside of New York State that ship, mail, or deliver prescription drugs to other establishments residing in the state be registered with the New York State Education Department.  N.Y. Educ. Law § 6808-b; 8 N.Y.C.R.R. § 63.8.  Registration serves several purposes, including assuring the purity, potency, and safety of medications distributed in New York State.

235.    The Defendants purportedly acquired Lidothol patches from non-party Terrain Pharmaceuticals ("Terrain"), which is a Nevada-based wholesaler.  Terrain was not registered with the New York State Board of Pharmacy during any part of the relevant period and thus was not

permitted to ship, mail, or deliver Lidothol patches to pharmacies registered in New York, including S & K Warbasse.

236.    Even if S & K Warbasse obtained the Lidothol patches from a supplier registered in New York State, S & K Warbasse regularly dispensed Lidothol patches to Allstate Claimants even though this Topical Pain Product is unapproved and medically unnecessary and originally was sourced from Terrain Pharmaceuticals, a company not registered in New York State as a non-resident wholesaler or manufacturer.

237.    The Defendants' inclusion of an unapproved and expensive Topical Pain Product in S & K Warbasse's predetermined prescription protocol imposed on patients and prescribing providers that has not been proven safe or effective by the FDA emphasizes that the protocol was based on profit margins rather than patient care.

238.    The Pharmacy Defendants' bills for the ineffective and medically unnecessary Lidocaine Patches are fraudulent and non-compensable, and Allstate is entitled to recover payments and disclaim coverage in all such claims including, but not limited to, the claims listed in Exhibits 1-2.

### c.    *Unnecessary Diclofenac Sodium 3% Gel*

239.    The Pharmacy Defendants billed for massive quantities of diclofenac sodium 3% gel, which is not effective, approved, or indicated for the topical treatment of musculoskeletal injuries, such as those sustained in a motor vehicle accident.

240.    Diclofenac sodium 3% gel (i.e., Solaraze) is FDA-approved for the topical treatment of a skin condition called actinic keratosis, which is characterized by rough, scaly lesions caused by long-term sun exposure.

241.    Diclofenac sodium 3% gel thus is designed for minimal depth of absorption to keep the drug in the skin to optimize treatment of actinic keratosis.

242.    The use of diclofenac sodium 3% gel in patients without actinic keratosis exposes the patients to increased and unnecessary risks for skin irritation, hypersensitivity, and photosensitivity.

243.    Diclofenac gel also exists in a 1% concentration; it is a NSAID that may be effective in the treatment of pain in the peripheral joints, such as the hand or knee, but it has no proven efficacy for pain relief for larger and deeper joints, such as the spine or shoulder, to which the gel cannot penetrate.

244.    Like diclofenac sodium 3% gel, diclofenac sodium 1% gel is not effective to treat complaints of pain to multiple areas of the body.

245.    Merely because diclofenac sodium 3% gel is triple the concentration of diclofenac sodium 1% gel does not mean that diclofenac sodium 3% gel is three times more effective for the treatment of joint pain, for which condition diclofenac sodium 3% gel is not indicated.

246.    Diclofenac sodium 3% gel is substantially more toxic topically and systematically than diclofenac sodium 1% gel.

247.    The Fee Schedule calls for reimbursement of diclofenac sodium 3% gel at a much higher rate than generic diclofenac sodium 1% gel.

248.    The generic diclofenac sodium 3% gel billed to Allstate by the Pharmacy Defendants has an AWP of $1,179.46 per 100-gram package.

249.    Generic diclofenac sodium 1% gel (NDC No. 65162-0833-66) has an AWP of less than $55.00 per 100-gram package.

250.    Therefore, the Defendants could charge no more than $88.00 for each prescription of 200 grams of generic diclofenac sodium 1% gel.

251.    However, the Defendants could charge over $1,800.00 for each prescription of 200 grams of generic diclofenac sodium 3% gel.

252.    Since May 2020, diclofenac sodium 1% gel has been available over the counter; a 100-gram tube of Voltaren topical 1% gel may be purchased at retail without a prescription for less than $20.00.

253.    Accordingly, the Defendants were motivated by profit to ensure that prescribers ordered diclofenac sodium 3% gel for their patients instead of the less expensive diclofenac sodium 1% gel even though the 3% preparation is neither approved nor effective at treating joint pain.

254.    The Pharmacy Defendants were not eligible for No-Fault reimbursement for the diclofenac sodium 3% gel billed to Allstate because these drugs were not medically necessary or effective in treating the claimants' musculoskeletal conditions.

255.    The Defendants induced healthcare providers to prescribe diclofenac sodium 3% gel to permit the Defendants to submit inflated and/or excessive charges for this product.

256.    The Pharmacy Defendants' bills for diclofenac sodium 3% gel are fraudulent and non-compensable, and Allstate is entitled to recover payments and disclaim coverage in all such claims including, but not limited to, the claims listed in Exhibits 1-2.

### 3.    Billing For Medically Worthless Compounded Products

257.    SMK Pharmacy billed Allstate for medically unnecessary Compounded Products.

258.    Licensed pharmacists or licensed physicians create compounded drugs by combining, mixing, or altering drug ingredients.

259. In limited circumstances, a patient may require compounded drugs when commercially available drugs cannot meet that patient's specific clinical needs.

260. Thus, if deployed responsibly, compounded drugs may, in albeit limited circumstances, play a useful role in patient treatment.

261. However, the over prescribing and excessive misuse and abuse of compounded drugs carry several significant risks relating to safety, efficacy, and cost.

262. Compounded drugs are not FDA-approved, meaning that the FDA has not evaluated these products for safety, effectiveness, and quality before they are provided to patients.

263. Safety-wise, most compounded drugs are exempt from the FDA's new drug approval process, current good manufacturing practices, and other FDA requirements.

264. Further, SMK Pharmacy purportedly created and dispensed Compounded Products that were clinically ineffective and unwarranted because the patient had no legitimate clinical need for the Compounded Product, or because the Compounded Product contained a combination of ingredients that were clinically ineffective in their combined form.

265. To be exempt from FDA oversight, the drugs must be compounded by a licensed pharmacist or physician for an identified individual patient based on the receipt of a valid prescription.

266. Also, compounded drugs that are essentially copies of commercially available drug products and compounded regularly or in large amounts are not exempt from FDA regulations.

267. The restrictions on making drugs that are essentially copies of existing commercially available products ensures that patients are not unnecessarily exposed to drug products that have not been shown to be safe and effective and that may have been prepared under substandard manufacturing conditions.

268.    The restrictions on anticipatory compounding addresses the increased patient risk that may arise when large amounts of contaminated compounded products are held in inventory and subject to microbial proliferation.

269.    The restrictions on compounded drugs also protect patients from the potential high expense of these specialized products.

270.    SMK Pharmacy billed for Compounded Products comprised of very expensive chemical ingredients, which are unproven for topical absorption and clinical efficacy.

### a.    Invalid Prescriptions

271.    Compounded Products must be formulated for individual patients based upon the receipt of a valid prescription for an identified individual patient, or a notation on a prescription that a compounded product is necessary for the identified patient. *See* 21 U.S.C. § 353a.

272.    The prescriptions for the Compounded Products billed to Allstate by SMK Pharmacy were not valid.

273.    Valid prescriptions for Compounded Products must be uniquely tailored to an individual patient's needs.

274.    However, the Compounded Products prescribed to Allstate Claimants, and then purportedly dispensed and delivered by SMK Pharmacy, were never tailored to each claimant's unique needs, and were never necessary to address the claimant's alleged accident-related conditions.

275.    Legitimate compounding involves creating medications using unique mixtures of drugs, which are specifically formulated to meet the individualized needs of the patient.

276.    There was nothing unique about the Compounded Products billed by SMK Pharmacy.

277.    Specifically, SMK Pharmacy repeatedly billed for an identical Compounded Product named "DCLTM 180G Cream."

278.    Legitimate compounded topical drugs should never be prescribed according to predetermined formulas in which the type and quantity of the drugs included never change from patient to patient.

279.    However, the Compounded Products billed by SMK Pharmacy contained the same specific drugs in predetermined quantities.

280.    Such pre-formulated Compounded Products to be prepared and dispensed by a pharmacy such as SMK Pharmacy are illegal.

281.    Legitimate prescriptions for compounded topical drugs should not be generated by prescribers utilizing pre-set stamps that recite the pharmacy's predetermined formula, especially when the stamps are created by the dispensing pharmacy.

282.    DCLTM 180G Cream was prescribed to a series of SMK Pharmacy claimants by the same provider, non-party David Lifschutz, M.D. ("Lifschutz").

283.    Lifschutz has a history of engaging in professional misconduct involving the illegal prescription of drugs and medications.

284.    On March 2, 2020, Lifschutz pleaded guilty to 1 count of Criminal Diversion of Prescription Medications in the 4th Degree.

285.    On January 10, 2022, the State Board for Professional Medical Conduct found that Lifschutz's criminal conviction constituted professional misconduct and placed Lifschutz on probation for 2 years.

286.    An Administrative Review Board affirmed the determination of the Board of Professional Medical Conduct that Lifschutz engaged in professional misconduct.

287.    Based on Lifschutz's failure to take responsibility for his conduct, the Administrative Review Board increased the penalty to 3 years of probation and imposed a stayed 3 year suspension of Lifschutz's medical license.

288.    The chart below contains numerous examples of Lifschutz's prescriptions of DCLTM 180G Cream that was billed to Allstate by SMK Pharmacy:

| Claimant | Date of Prescription | Drug Prescribed | Prescribing Provider |
|---|---|---|---|
| A.M. (claim no. 0537532723) | 5/1/2019 | DCLTM 180G Cream | David Lifschutz, M.D. |
| B.A. (claim no. 0468831169) | 3/27/2018 | DCLTM 180G Cream | David Lifschutz, M.D. |
| C.P. (claim no. 0542254453) | 5/2/2019 | DCLTM 180G Cream | David Lifschutz, M.D. |
| C.S. (claim no. 0487531048) | 1/23/2018 | DCLTM 180G Cream | David Lifschutz, M.D. |
| E.W. (claim no. 0476224175) | 1/30/2018 | DCLTM 180G Cream | David Lifschutz, M.D. |
| E.R. (claim no. 0502795684) | 5/24/2018; 6/20/2018 | DCLTM 180G Cream | David Lifschutz, M.D. |
| F.H. (claim no. 0473545697) | 2/7/2018; 5/16/2018; 12/5/2018 | DCLTM 180G Cream | David Lifschutz, M.D. |
| J.A. (claim no. 0486141575) | 8/1/2018 | DCLTM 180G Cream | David Lifschutz, M.D. |
| J.S. (claim no. 0537759978) | 3/27/2019; 5/8/2019; 7/10/2019 | DCLTM 180G Cream | David Lifschutz, M.D. |
| J.N. (claim no. 053478326) | 3/12/2019 | DCLTM 180G Cream | David Lifschutz, M.D. |
| K.H. (claim no. 0538487422) | 4/11/2019; 7/11/2019 | DCLTM 180G Cream | David Lifschutz, M.D. |
| M.C. (claim no. 0539644574) | 4/11/2019 | DCLTM 180G Cream | David Lifschutz, M.D. |
| M.P. (claim no. 0486141575) | 8/8/2018 | DCLTM 180G Cream | David Lifschutz, M.D. |
| M.S. (claim no. 0503167405) | 5/30/2018 | DCLTM 180G Cream | David Lifschutz, M.D. |
| N.M. (claim no. 0528403371) | 2/19/2019 | DCLTM 180G Cream | David Lifschutz, M.D. |

| Claimant | Date of Prescription | Drug Prescribed | Prescribing Provider |
|---|---|---|---|
| R.S. (claim no. 0488630245) | 5/23/2018 | DCLTM 180G Cream | David Lifschutz, M.D. |
| R.M. (claim no. 0516211661) | 5/14/2019 | DCLTM 180G Cream | David Lifschutz, M.D. |
| S.L. (claim no. 0539825280) | 4/3/2019 | DCLTM 180G Cream | David Lifschutz, M.D. |
| S.G. (claim no. 0500607320) | 4/25/2018; 5/30/2018 | DCLTM 180G Cream | David Lifschutz, M.D. |

289.    Lifschutz routinely prescribed DCLTM 180G Cream, including those prescriptions listed above, through a stamp applied to his official New York State prescription pad that recited the same drugs to be combined in identical quantities.

290.    Upon information and belief, Field, Volman, Burlak, and/or Kassman, or someone acting under their direction or control, supplied Lifschutz with the stamp for DCLTM 180G Cream to facilitate his prescribing of this medically unnecessary Compounded Product.

291.    Therefore, in direct conflict with the purpose of compounding, Lifschutz was steered by SMK Pharmacy into prescribing a Compounded Product that was predetermined and pre-formulated in set amounts without regard for individual patient needs.

292.    Below is a representative example of Lifschutz's prescription for DCLTM 180G Cream using a rubber stamp as prescribed to claimant F.H. (claim no. 0473545697) on December 5, 2018:



293.    Prescribers like Lifschutz were instructed to prescribe the DCLTM 180G Cream and other drugs and medications to patients, and then deliver the prescriptions to SMK Pharmacy.

294.    None of these prescriptions identify why a compounded product was necessary or why a commercially available FDA-approved drug would not be appropriate or reference any patient condition that necessitated the prescribed drug, let alone a compound of any kind.

295.    Lifschutz did not indicate in his examination reports that the claimants had a legitimate need for a Compounded Product or that any other forms of oral or topical medications failed or were contraindicated.

296.    In reality, the DCLTM 180G Cream prescribed, and billed for, during this scheme was purportedly dispensed without any regard for the specific needs of any individual patient.

297.   As such, these Compounded Products were "new" drugs that required FDA approval, but SMK Pharmacy never sought or received such approval for DCLTM 180G Cream.

298.   By manufacturing and distributing its identical mass-produced drugs to numerous patients under the guise of purported individualized and unique compounds exempt from FDA approval, SMK Pharmacy deliberately sought to avoid the FDA approval regime intended to protect the health and safety of patients.

299.   Because the SMK Pharmacy Compounded Products were not individualized, were not tailored to the unique characteristics of each Allstate Claimant, were not provided pursuant to legitimate prescriptions, and were compounded in preset, predetermined quantities, SMK Pharmacy was never exempt from the applicable New York state licensing requirements.

300.   As a result, SMK Pharmacy violated one or more applicable requirements of state and federal law and regulations governing compounding when billing for the Compounded Products purportedly dispensed and delivered to Allstate Claimants.

### b.    *Fraudulent Billing*

301.   The Defendants billed for DCLTM 180G Cream based on its potential to inflate SMK Pharmacy's charges through combining numerous medically unnecessary ingredients.

302.   Under New York's No-Fault laws, reimbursement for a medically necessary Compounded Product is calculated based upon the price of each drug included in the formula for the Compounded Product.

303.   DCLTM 180G Cream was deliberately formulated using several different ingredient drugs as a means to manipulate New York's No-Fault laws.

304.   Utilizing several drugs in each formula allowed SMK Pharmacy to unduly multiply the cost of each Compounded Product, including DCLTM 180G Cream.

305.    The name "DCLTM" is derived from this Compounded Product's 5 preformulated ingredients of Diclofenac 10%, Cyclobenzaprine 3%, Lidocaine 5%, Tetracaine 3%, and Menthol 2%.

306.    The amounts of several ingredients contained in DCLTM 180G Cream were excessive, including the 10% concentration of diclofenac.

307.    As explained above, diclofenac sodium 3% gel is FDA approved to treat a specific skin condition called actinic keratosis; however, the DCLTM 180G Cream calls for more than 3 times the approved 3% concentration.

308.    DCLTM 180G Cream contains excessive topical anesthetics.

309.    DCLTM 180G Cream unnecessarily includes both Lidocaine and Tetracaine—2 different anesthetics—which unnecessarily increased the risk of adverse events to claimants that purportedly received this Compounded Product.

310.    Moreover, in many instances, Lifschutz also prescribed an oral NSAID (e.g., Naproxen, Celecoxib, and Butalbital/Acetaminophen/Caffeine) and/or an oral muscle relaxer (e.g., Tizanidine) at the same time as the prescription for DCLTM 180G Cream, which resulted in therapeutic duplication because the DCLTM 180G Cream already contained both an NSAID (i.e., diclofenac) and muscle relaxer (i.e., cyclobenzaprine).

311.    The chart below contains representative examples of Lifschutz's prescription of an oral NSAID and/or muscle relaxer simultaneously with a prescription for DCLTM 180G Cream that were dispensed and billed to Allstate by SMK Pharmacy:

| Claimant | Date of Prescriptions | Medications Prescribed | Prescribing Provider |
|---|---|---|---|
| B.A. (claim no. 0468831169) | 3/27/2018 | DCLTM 180G Cream; Celecoxib | David Lifschutz, M.D. |
| S.S. (claim no. 0469193569) | 1/9/2018 | DCLTM 180G Cream; Naproxen | David Lifschutz, M.D. |

| Claimant | Date of Prescriptions | Medications Prescribed | Prescribing Provider |
|---|---|---|---|
| F.A. (claim no. 0473545697) | 2/7/2018 | DCLTM 180G Cream; Tizanidine; Celecoxib; Butalbital/Acetaminophen/Caffeine | David Lifschutz, M.D. |
| M.P. (claim no. 0486141575) | 8/8/2018 | DCLTM 180G Cream; Tizanidine | David Lifschutz, M.D. |
| J.A. (claim no. 0486141575) | 1/10/2018 | DCLTM 180G Cream; Tizanidine; Celecoxib | David Lifschutz, M.D. |
| S.G. (claim no. 0500607320) | 4/25/2018 | DCLTM 180G Cream; Tizanidine; Celecoxib | David Lifschutz, M.D. |
| S.L. (claim no. 0539825280) | 4/3/2019 | DCLTM 180G Cream; Tizanidine | David Lifschutz, M.D. |
| C.P. (claim no. 0542254453) | 5/2/2019 | DCLTM 180G Cream; Celecoxib | David Lifschutz, M.D. |

312.    By targeting a Compounded Product with multiple expensive drugs as part of a pre-formulated recipe, the Defendants were able to inflate the amounts billed to Allstate.

313.    Regardless of whether the Compounded Products were actually necessary (which they never were), SMK Pharmacy typically billed $820.00 for a single prescription of DCLTM 180G Cream.

314.    Upon information and belief, SMK Pharmacy paid kickbacks or other financial incentives to Lifschutz, and other prescribing providers, to funnel numerous prescriptions for DCLTM 180G Cream to SMK Pharmacy to allow SMK Pharmacy to charge hundreds of dollars each time that it dispensed 180 grams of this cream to claimants even though the claimants did not need—or even want—this Compounded Product.

315.    SMK Pharmacy's repeated charges for DCLTM 180G Cream across numerous claimants underscores that this Compounded Product was not individualized for specific patient needs and thus did not comport with legitimate and lawful compounding practices.

316.    Rather, SMK Pharmacy engaged in unlawful bulk compounding in violation of New York and federal law when it produced and dispensed large quantities of DCLTM 180G Cream.

317.    The prescriptions sent by Lifschutz to SMK Pharmacy pursuant to an unlawful referral relationship for medically unnecessary DCLTM 180G Cream were not valid.

318.    Based on these violations of federal and New York licensing requirements for pharmacies, SMK Pharmacy was not eligible to receive No-Fault reimbursement for its charges for DCLTM 180G Cream.

### 4.    Billing For Medically Unnecessary and Non-Compensable Post-Surgery Medications

319.    SMK Pharmacy also charged Allstate for drugs and medications prescribed by referring providers in connection with arthroscopic surgery procedures.

320.    Where the arthroscopic procedures were unnecessary and were not causally related to the underlying accident, all drugs and medications prescribed in connection with these unnecessary arthroscopic procedures likewise were not necessary or causally related to the motor vehicle accident and were not compensable under New York's No-Fault laws.

321.    Even if the surgeries leading to these prescriptions were medically necessary, the drugs and medications prescribed by the surgeons and referred to SMK Pharmacy were not necessary and were not covered drugs.

322.    One such surgeon funneling post-surgical prescriptions to SMK Pharmacy was non-party Raz Winiarsky, M.D. ("Winiarsky").  Winiarsky allegedly performed unnecessary arthroscopic surgeries for patients at a New Jersey ambulatory surgical center and used these surgeries to justify the prescription of unnecessary and expensive post-operative durable medical

equipment pursuant to unlawful referral arrangements with the DME providers. *See Allstate Ins. Co. v. Advanced Recovery Equipment & Supplies, LLC*, No. 22-cv-05232-HG (E.D.N.Y.).

323.    These surgeries performed by Winiarsky for Allstate claimants were scheduled before the claimants had an opportunity to undergo conservative care and/or were in connection with degenerative conditions or other conditions or injuries that would not be expected to occur as a result of a motor vehicle accident. *Id.*

324.    Winiarsky also used these unnecessary surgeries to generate prescriptions for medically unnecessary drugs and medications, including narcotics, celecoxib (an NSAID), ondansetron (an anti-nausea medication), and docusate sodium (a stool softener).

325.    It is not medically necessary to routinely prescribe ondansetron for patients undergoing arthroscopic surgeries.

326.    Ondansetron is commonly used to treat nausea for chemotherapy patients while Winiarsky's patients underwent relatively minor arthroscopic knee or shoulder surgeries.

327.    However, Winiarsky repeatedly prescribed ondansetron to patients in connection with arthroscopic surgeries without any documentation of any history of symptoms that would justify the medication.

328.    SMK Pharmacy billed hundreds of dollars in charges to Allstate each time that Winiarsky referred a prescription for ondansetron:

| Claimant | Prescriber | Date of Prescription | Medication | Underlying Procedure | Pharmacy | Amount Charged |
|---|---|---|---|---|---|---|
| I.M. (claim no. 0532030814) | Winiarsky | 7/15/2019 | Ondansetron (68462-0158-13) | Left knee arthroscopy | SMK Pharmacy | $312.99 |
| I.M. (claim no. 0532030814) | Winiarsky | 5/17/2019 | Ondansetron (65862-0188-30) | Left knee arthroscopy | SMK Pharmacy | $470.19 |

| Claimant | Prescriber | Date of Prescription | Medication | Underlying Procedure | Pharmacy | Amount Charged |
|---|---|---|---|---|---|---|
| M.Z. (claim no. 0573283990) | Winiarsky | 6/20/2020 | Ondansetron (67877-0170-30) | Left knee arthroscopy | SMK Pharmacy | $237.59 |
| D.R. (claim no. 0481555670) | Winiarsky | 5/4/2018 | Ondansetron (65862-0188-30) | Right shoulder arthroscopy | SMK Pharmacy | $502.39 |
| L.D. (claim no. 0501906929) | Winiarsky | 4/24/2019 | Ondansetron (65862-0188-30) | Left shoulder arthroscopy | SMK Pharmacy | $470.19 |
| I.R. (claim no. 0625450951) | Winiarsky | 12/7/2021 | Ondansetron (65862-0188-30) | Left shoulder arthroscopy | SMK Pharmacy | $456.39 |
| A.I. (claim no. 0638268938) | Winiarsky | 12/11/2021 | Ondansetron (65862-0188-30) | Right knee arthroscopy | SMK Pharmacy | $456.39 |
| S.C. (claim no. 0554401133) | Winiarsky | 6/12/2020 | Ondansetron (67877-0170-30) | Right knee arthroscopy | SMK Pharmacy | $237.59 |
| T.E. (claim no. 0491533535) | Winiarsky | 5/25/2018 | Ondansetron (65862-0188-30) | Right knee arthroscopy | SMK Pharmacy | $502.39 |
| T.M. (claim no. 0504027301) | Winiarsky | 3/1/2019 | Ondansetron (65862-0188-30) | Left shoulder arthroscopy | SMK Pharmacy | $469.19 |
| I.R. (claim no. 0625450951) | Winiarsky | 12/7/2021 | Ondansetron (65862-0188-30) | Left shoulder arthroscopy | SMK Pharmacy | $456.39 |
| J.D. (claim no. 0606916831) | Winiarsky | 2/2/2021 | Ondansetron (65862-0188-30) | Left knee arthroscopy | SMK Pharmacy | $649.89 |

329.    Winiarsky also regularly prescribed docusate sodium to patients who underwent arthroscopic surgeries for the purpose of treating constipation, which can occur following general anesthesia or opioid use.  However, docusate sodium has been described as no more effective than a placebo.

330.     Moreover, SMK Pharmacy billed for docusate sodium prescribed by Winiarsky under NDC Nos. 66424-0399-10 and 00904-6998-80, both of which are over-the-counter products not covered under New York's No-Fault laws.

331.     SMK Pharmacy's charges to Allstate per capsule for the over-the-counter docusate sodium exceeded the per capsule cost of docusate sodium available at retail (i.e., Colace).

332.     Like Winiarsky, another provider, non-party Frances Rispoli, D.O. ("Rispoli"), a provider treating patients of non-party Englewood Orthopedics Group, PC ("Englewood Ortho"), also ordered medically unnecessary drugs pursuant to a fraudulent prescription protocol in connection with patients undergoing minor arthroscopic surgeries.

333.     Also like Winiarsky, Rispoli has a history of involvement with schemes centered around unlawful referrals of post-surgical prescriptions. *See Gov't Empls. Ins. Co. v. Reliable CPM Surgical Supply, Inc.*, No. 20-cv-05475-LDH-JRC (E.D.N.Y.).

334.     Surgery patients were referred to Rispoli by another non-party physician named Jamie Gutierrez, M.D. ("Gutierrez"), who also has a history of engaging in fraudulent conduct and for exploiting patients for financial gain. *See Allstate Ins. Co. v. Gutierrez*, No. 17-cv-01139-NGG-JO (E.D.N.Y.) (alleging that Gutierrez served as the nominal owner of a fraudulently incorporated professional corporation that billed for medically unnecessary and falsely charged services).

335.     Gutierrez was disciplined by the New York State Board for Professional Medical Conduct and the Professional Medical Conduct Administrative Review Board for failure to maintain accurate patient records and for exercising undue influence over patients for financial gain.

336.    Rispoli routinely prescribed the same set of medications to arthroscopic surgery patients, including narcotics, cefadroxil and cephalexin (antibiotics) and naproxen, which were not medically necessary.   Notably, Rispoli regularly prescribed an oral antibiotic to patients undergoing arthroscopic surgery; however, these patients already were administered prophylactic antibiotics intravenously during the procedure and thus did not require oral antibiotics as well. Administration of antibiotics generally is not routinely necessary for arthroscopic procedures and carries risks.

337.    Overall, SMK Pharmacy used these medically unnecessary arthroscopic surgeries performed by Winiarsky and Rispoli, and others, to generate billing opportunities for these medically unnecessary and non-compensable drugs and medications.

### 5.    Billing For Services Not Rendered As Represented

338.    There is evidence that SMK Pharmacy did not deliver the billed-for medications as represented on the delivery receipts submitted to Allstate, which is consistent with the prescription of the unneeded, and unwanted, Topical Pain Products pursuant to predetermined protocols.

339.    SMK Pharmacy's delivery receipts purport to contain the patients' signatures to make it appear that the drugs and medications were delivered when they were not. Upon closer examination, however, the signatures on SMK Pharmacy's delivery receipts and/or Assignment of Benefits Forms ("AOBs") (which likely were executed simultaneously) do not correspond with the actual signature of the claimant as reflected on other documentation submitted to Allstate, including the claimant's Application for Motor Vehicle No-Fault Benefits ("NF-2") and/or AOB forms submitted by other providers for the claimant.

340.    For example, claimant S.C. (claim no. 0554401133) purportedly was delivered several medications by SMK Pharmacy on or about June 13, 2020.   However, the signature

identified as S.C.'s on the delivery receipt for this medication and on the SMK Pharmacy AOB do not match the signature identified as S.C.'s on the NF-2:

*SMK Pharmacy Delivery Receipt:*



*SMK Pharmacy AOB:*



*NF-2:*



341.    Claimant T.E. (claim no. 0491533535) purportedly was delivered 5 medications by or on behalf of SMK Pharmacy on or about May 26, 2018.  However, the signatures claimed to be T.E's on the SMK Pharmacy delivery receipt and SMK Pharmacy AOB do not match T.E.'s actual signature on AOB forms submitted by other providers:

### *SMK Pharmacy Delivery Receipt:*



### *SMK Pharmacy AOB:*



*Advanced Recovery Equipment & Supplies LLC AOB:*



342.    Claimant J.F. (claim no. 0540997250) purportedly was delivered 5 medications by or on behalf of SMK Pharmacy on or about November 10, 2020.  However, the signatures claimed to be J.F.'s on the SMK Pharmacy delivery receipt and SMK Pharmacy AOB do not match J.F.'s actual signature on the NF-2:

*SMK Pharmacy Delivery Receipt*



*SMK Pharmacy AOB:*



*NF-2:*



343.    Upon information and belief, SMK Pharmacy, or someone acting on its behalf, forged certain claimants' signatures on the delivery receipts and/or AOB forms to create the false appearance that the drugs and medications had been delivered to the claimant as represented in the delivery receipt.

### C.    DEFENDANTS' UNLAWFUL REFERRAL RELATIONSHIPS WITH PRESCRIBERS

344.    The Defendants' scheme to defraud required a high volume of facially valid prescriptions to permit the Pharmacy Defendants to bill for prescription Topical Pain Products and/or Compounded Products.

345.    To maintain a steady flow of prescriptions for these specific drugs, the Defendants colluded with No-Fault providers and clinics with large available patient bases for the Defendants to take advantage of.  These No-Fault providers and clinics generated prescriptions for Topical Pain Products, Compounded Products, and other drugs and medications in accordance with the Defendants' predetermined prescription protocol regardless of whether the patients needed, or even wanted, the drugs and medications.

346.    Upon information and belief, the Defendants paid kickbacks or other incentives to the prescribers and clinics in exchange for these unlawful prescriptions in violation of New York

law.   The kickbacks and referral payments were paid through other entities owned and/or controlled by the Defendants.

347.   The prescribers and clinics funneled these prescriptions to the Pharmacy Defendants without giving the patients any choice of where to fill the prescriptions.

348.   In the event that the prescribing provider deviated from the predetermined prescription protocol, the Defendants would substitute the desired medication for the originally prescribed medication.

349.   The prescribers and clinics also intentionally disregarded electronic prescribing requirements to transmit prescriptions by telephone to the Pharmacy Defendants for Topical Pain Products that were not authorized by the prescribing provider.

350.   However, the limitations under New York law restricting the circumstances where oral and telephone prescriptions are permissible renders it nearly impossible that the Pharmacy Defendants would legitimately receive a large volume of telephone prescriptions from multiple different healthcare providers at multiple different No-Fault clinics.

351.   These unlawful referral relationships were crucial to the success of the Defendants' scheme to defraud and resulted in false and fraudulent charges for medically unnecessary and expensive drugs and medications, including Topical Pain Products and Compounded Products.

### 1.   Prescribing Providers' History of Fraudulent Activity

352.   Prescribers associated with the Pharmacy Defendants have been accused of engaging in fraudulent activity under New York's No-Fault laws and/or have been subject to professional discipline for misconduct involving the submission of false and fraudulent charges under New York's No-Fault laws for medically unnecessary healthcare services, medical

equipment, and drugs and medications and involving the providers' participation in unlawful referral arrangements.

353.    Non-party Metro Pain Specialists P.C. ("Metro Pain") was a source of prescriptions for unnecessary, unwarranted, and unneeded Topical Pain Products billed to Allstate by S & K Warbasse.

354.    S & K Warbasse billed for drugs and medications purportedly prescribed by providers treating patients at Metro Pain, including non-parties John Greco, M.D. ("Greco") and Michael Alleyne, M.D. ("Alleyne").

355.    Metro Pain, and its successor, non-party Tri-borough NY Medical Practice, P.C. ("Tri-borough"), have been accused of participating in unlawful referral relationships with other providers.  *See Gov't Empls. Ins. Co. v. John Street Pharmacy, LLC*, No. 22-cv-05651-EK-JMW (E.D.N.Y.); *Allstate Ins. Co. v. Metro Pain Specialists Professional Corporation*, No. 21-cv-05586-DG-RER (E.D.N.Y.); *State Farm Mut. Ins. Co. v. Metro Pain Specialists Professional Corporation*, No. 21-cv-05523-MKB-PK (E.D.N.Y.).

356.    Providers working for Metro Pain and Tri-borough, including Alleyne, have stated under oath that unauthorized prescriptions under their name and credentials actually were forged or altered and then sent to pharmacies or DME providers without their consent or knowledge. *Gov't Empls. Ins. Co. v. Avonora, Inc. d/b/a Avonora Pharmacy*, No. 23-cv-03409-ARR-MMH (E.D.N.Y.) (citing Alleyne's testimony under oath regarding unauthorized prescriptions submitted under his name that were forged and/or altered without his knowledge in support of allegations of unlawful referral relationships between illegitimate pharmacies and Metro Pain clinics); *Gov't Empls. Ins. Co. v. Orthopain Supply, Inc.*, No. 23-cv-03413-RPK-RER (E.D.N.Y.) (citing to statements under oath of Metro Pain and Tri-borough providers Alleyne and Patricia Kelly, D.O.

regarding unauthorized prescriptions for durable medical equipment (DME) with copies or forgeries of their signature used without their consent in support of allegations of unlawful referral relationships between illegitimate DME providers and Metro Pain and Tri-borough clinics); *see also Gov't Empls. Ins. Co. v. Ideal Care Pharmacy, Inc.*, No. 22-cv-03630-KAM-VMS (E.D.N.Y.) (alleging that Alleyne steered prescriptions for medically unnecessary topical products to a pharmacy pursuant to an unlawful referral relationship).

357.    In a sworn affidavit, Alleyne stated that he was required to follow a predetermined prescription protocol at Metro Pain and Tri-borough. According to Alleyne, his continued employment at Metro Pain was conditioned on his prescribing of Topical Pain Products using a pre-printed prescription form.    Alleyne also described how Metro Pain administrative staff enforced this requirement:

> 6. The administrative staff at the various clinics from where I worked for Metro Pain would also continuously insist that I authorize these prescriptions. In the event I did not consistently authorize prescriptions for Topical Pain Products to Metro Pain's patients, I would get persistent reminders or admonishing phone calls from clinic staff about not prescribing in accordance with the prescription regimen. I was once yelled at by one of these individuals for not issuing prescriptions for Topical Pain Products to patients. At times, I was asked to sign blank pre-printed prescription forms so that the clinics' staff could fill in the medications that Dr. Shapiro required be prescribed to Metro Pain's patients. I also learned that Metro Pain obtained a stamp of my signature without my consent or authorization, but I do not know what they use the stamp for or if it has ever been used on prescriptions for pharmaceuticals.

358.    Alleyne also stated in this affidavit that Metro Pain submitted altered prescription forms under his name without his permission to include additional Topical Pain Products, including lidocaine 5% patches.

359.    Alleyne "rarely, if ever, prescribed Lidocaine/Lidoderm 5% Patches and [he] would never simultaneously prescribe both Lidocaine 5% Ointment and Lidocaine/Lidoderm 5% Patches because doing so could cause various side effects including dizziness and a sudden decrease in blood pressure, and could result in overdosing the patient."

360.    The submission of unauthorized prescriptions for drugs and medications and DME was a common practice at Metro Pain.

361.    Non-party William Elton, M.D. also testified that he resigned from Metro Pain when he discovered that prescriptions for Topical Pain Products, including diclofenac sodium 3% gel, were submitted without his knowledge.

362.    Non-party prescriber Jean-Pierre Georges Barakat, M.D. ("Barakat") also referred numerous prescriptions for unnecessary—and unapproved—Lidothol patches to S & K Warbasse. Barakat has been the subject of numerous allegations that he participated in massive No-Fault schemes to defraud, including schemes involving the funneling of prescriptions of medically unnecessary Topical Pain Products to pharmacies that then submitted inflated charges for these products and involving illegal kickback and patient referral relationships.  *See Gov't Empls. Ins. Co. v. Gelb*, No. 23-cv-05250-ENV-RML (E.D.N.Y.) (alleging that Barakat served as the nominal owner of a fraudulently-incorporated PC that billed for medically unnecessary and falsely charged services pursuant to unlawful referral arrangements); *Gov't Empls. Ins. Co. v. Cool Med Supply, Inc.*, No. 23-cv-04316-HG (E.D.N.Y.) (alleging that Barakat prescribed fraudulent durable medical equipment pursuant to unlawful referral relationships with suppliers); *Gov't Empls. Ins.*

*Co. v. Barakat*, No. 22-cv-07532-NGG-RML (E.D.N.Y.) (alleging that Barakat and his practices "engaged in a massive fraudulent insurance scheme against GEICO and the New York automobile insurance industry in which they billed GEICO alone more than $1.5 million for the alleged performance of the Fraudulent Services at approximately 15 separate locations from February 2021 to the present."); *see also Gov't Empls. Ins. Co. v. Direct Rx Pharmacy, Inc.*, No. 19-cv-05876-FB-LB (E.D.N.Y.) (alleging that Direct Rx Pharmacy, Inc. entered into illegal, collusive arrangements with prescribing providers, including Barakat, for the referral of prescriptions for unnecessary drugs and medications); *Allstate Ins. Co. v. New Century Pharmacy, Inc.*, No. 19-cv-05702-ENV-VMS (E.D.N.Y.) (alleging that Barakat generated prescriptions for medically unnecessary drugs and medications pursuant to an unlawful relationship with Direct Rx Pharmacy, Inc.); *Gov't Empls. Ins. Co. v. Barakat*, No. 17-cv-01066-NGG-LB (E.D.N.Y.) (alleging that Barakat served as the nominal owner of a medical practice actually controlled by unlicensed individuals that billed for unnecessary and fraudulent services rendered to patients unlawfully referred to the practice in exchange for kickback payments).

363.    The additional providers set forth in the chart below purportedly prescribed Topical Pain Products billed for by one or more of the Pharmacy Defendants and also have histories of alleged involvements in No-Fault schemes to defraud:

| **Prescribing Provider** | **Pharmacy Defendant(s)** | **Prior Healthcare/No-Fault Fraud Actions** |
|---|---|---|
| Phyllis Gelb, M.D. | S & K Warbasse | • *Gov't Empls. Ins. Co. v. Q Pharmacy Rx Inc.*, No. 23-cv-09085 (E.D.N.Y.)<br>   o Gelb prescribed medically unnecessary drugs and medications, including topical products, pursuant to fraudulent "telephone" prescriptions, per complaint. |

| Prescribing Provider | Pharmacy Defendant(s) | Prior Healthcare/No-Fault Fraud Actions |
|---|---|---|
| | | • *Gov't Empls. Ins. Co. v. Gelb*, No. 23-cv-05250-ENV-RML (E.D.N.Y.)<br>  ○ Gelb served as the nominal owner of a fraudulently-incorporated PC that billed for medically unnecessary and falsely charged services pursuant to unlawful referral arrangements, per complaint.<br>• *Liberty Mut. Ins. Co. v. AVK Rx Inc.*, No. 22-cv-07329-GRB-SIL (E.D.N.Y.)<br>  ○ Gelb entered into illegal, collusive agreements to prescribe and direct large volumes of prescriptions for predetermined medications to specific pharmacies, per complaint.<br>• *Gov't Empls. Ins. Co. v. Ahmed*, No. 22-cv-01679-ENV-SJB (E.D.N.Y.)<br>  ○ Gelb involved in illegal PC ownership and patient referral scheme, per complaint. |
| Hong Sik Pak, M.D. | S & K Warbasse | • *Gov't Empls. Ins. Co. v. Park Chemists 4 Av LLC*, No. 1:23-cv-09168 (E.D.N.Y.)<br>  ○ Pak steered numerous prescriptions for medically unnecessary Lidothol patches pursuant to an unlawful referral relationship, per complaint.<br>• *Gov't Empls. Ins. Co. v. John Street Pharmacy, LLC*, No. 22-cv-05651-EK-JMW (E.D.N.Y.)<br>  ○ Pak steered prescriptions for medically unnecessary topical products to a pharmacy pursuant to an unlawful |

| Prescribing Provider | Pharmacy Defendant(s) | Prior Healthcare/No-Fault Fraud Actions |
|---|---|---|
| | | referral relationship, per complaint. |
| | | • *Gov't Empls. Ins. Co. v. Ideal Care Pharmacy, Inc.*, No. 22-cv-03630-KAM-VMS (E.D.N.Y.) |
| | | ○ Pak steered prescriptions for medically unnecessary topical products to a pharmacy pursuant to an unlawful referral relationship, per complaint. |
| | | • *Gov't Empls. Ins. Co. v. Wallegood, Inc.*, No. 21-cv-01986-PKC-RLM (E.D.N.Y.) |
| | | ○ Pak prescribed medically unnecessary durable medical equipment to patients pursuant to an unlawful referral relationship, per complaint. |
| | | • *Liberty Mut. Ins. Co. v. AVK Rx Inc.*, No. 22-cv-07329-GRB-SIL (E.D.N.Y.) |
| | | ○ Pak unlawfully referred prescription drugs and medications to pharmacies, per complaint. |
| | | • *Gov't Empls. Ins. Co. v. Ultimed Health Care, P.C.*, No. 18-cv-16887-BRM-LHG (D.N.J.) |
| | | ○ Pak performed medically unnecessary initial examinations and electrodiagnostic testing and engaged in unlawful self referrals, per complaint. |
| Kyungsook Bu, NP | S & K Warbasse | • *Gov't Empls. Ins. Co. v. Binns*, No. 22-cv-01553-NGG-PK (E.D.N.Y.) |
| | | ○ Bu served as the nominal owner of a medical practice actually controlled by unlicensed individuals at clinics "organized to supply convenient, one-stop shops for |

| Prescribing Provider | Pharmacy Defendant(s) | Prior Healthcare/No-Fault Fraud Actions |
|---|---|---|
| | | no-fault insurance fraud," per complaint. <br> • *Liberty Mut. Ins. Co. v. JP Medical Services, P.C.*, No. 22-cv-01487-NRM-LGD (E.D.N.Y.) <br> ○ Bu provided fraudulent treatments and services as an independent contractor under the control of unlicensed laypersons, per complaint. |
| Sonia Armengol, M.D. | S & K Warbasse | • *Gov't Empls. Ins. Co. v. Armengol*, No. 20-cv-06052-RPK-SJB (E.D.N.Y.) <br> ○ Armengol purported to render medically unnecessary treatments and services at clinics that were controlled by non-physicians who steered patients to the clinics for the unnecessary treatments, per complaint. <br> • *State Farm Mut. Auto. Ins. Co. v. Lexington Medical Diagnostic Services, P.C.*, No. 18-cv-03312-DLI-PK (E.D.N.Y.) <br> ○ Armengol engaged in improper financial and illegal kickback and/or referral arrangements and provided healthcare services pursuant to a predetermined treatment protocol, per complaint. |
| Leonid Litovskiy, PA | S & K Warbasse | • *Liberty Mut. Ins. Co. v. Woodside Chemists, Inc.*, No. 17-cv-06313-ILG-CLP (E.D.N.Y.) <br> ○ Litovskiy referred fraudulent prescriptions for medically unnecessary compounded pain creams to a pharmacy in exchange for kickback payments, per complaint. |
| Richard Seldes, M.D. | SMK Pharmacy | • *Allstate Ins. Co. v. Melgar*, No. 22-cv-07634-AMD-SIL (E.D.N.Y.) |

| Prescribing Provider | Pharmacy Defendant(s) | Prior Healthcare/No-Fault Fraud Actions |
|---|---|---|
| | | o Seldes conspired with non-physicians to cede control over PCs registered in his name and provided excessive and medically unnecessary tests and treatments billed for by these PCs, per complaint. |
| William Gibbs, M.D. | SMK Pharmacy | • *Gov't Empls. Ins. Co. v. Cean*, No. 19-cv-02363-PKC-RLM (E.D.N.Y.)<br>  o Gibbs prescribed fraudulent compounded pain creams pursuant to an illegal kickback, fee-splitting, and referral relationship between the clinic that he worked for and a pharmacy, per complaint.<br>• *Liberty Mut. Ins. Co. v. Korge Prods. Corp.*, No. 23-cv-05053-NGG-RER (E.D.N.Y.)<br>  o Gibbs referred identical prescriptions for durable medical equipment (DME) according to a fraudulent predetermined protocol pursuant to an unlawful referral relationship with a DME company, per complaint.<br>• *United States v. Chervin*, No. 10-cr-918 (S.D.N.Y. 2012)<br>  o Gibbs ceded control over a PC registered in his name to unlicensed laypersons who used the PC to commit No-Fault fraud, per indictment. Gibbs pleaded guilty to 1 count of healthcare fraud. |
| John Greco, M.D. | S&K Warbasse | • *Gov't Empls. Ins. Co. v. JPRx Corp.*, No. 22-cv-01248-PKC-LB (E.D.N.Y.)<br>  o Greco prescribed medically unnecessary topical pain |

| Prescribing Provider | Pharmacy Defendant(s) | Prior Healthcare/No-Fault Fraud Actions |
|---|---|---|
| | | products pursuant to a predetermined protocol when treating Metro Pain patients, per complaint. <br> • *Gov't Empls. Ins. Co. v. JMD Pharmacy, Inc.*, No. 22-cv-03629-LDH-PK (E.D.N.Y.) <br>   ○ Greco steered the highest number of fraudulent prescription forms for medically unnecessary pharmaceuticals, including topical pain products when treating Metro Pain patients, per complaint. <br> • *Gov't Empls. Ins. Co. v. Insta Drugs Inc.*, No. 22-cv-02533-AMD-MMH (E.D.N.Y.) <br>   ○ Greco prescribed medically unnecessary topical pain products pursuant to a predetermined protocol when treating Metro Pain patients, per complaint. |

364. These prescribing providers with alleged histories of participation in similar schemes to defraud were logical sources of prescriptions for unnecessary drugs and medications referred to the Defendants.

## 2. Unlawful Kickbacks or Incentives in Exchange for Invalid Prescriptions

365. The Defendants directly or indirectly incentivized the prescribers and clinic controllers to fuel the scheme to defraud with invalid prescriptions for Topical Pain Products and Compounded Products.

366. Certain facts regarding the type of incentive, the amount of incentive, and the manner of transmitting the incentive are peculiarly within the Defendants' knowledge.

367.    However, there is evidence that SMK Pharmacy used sham transactions and the conversion of checks to cash to conceal kickback payments to prescribing providers and clinics. *Gov't Empls. Ins. Co. v. SMK Pharmacy Corp.*, No. 21-cv-03247-AMD-RLM (E.D.N.Y.), Dkt. No. 40.

368.    SMK Pharmacy paid hundreds of thousands of dollars to various entities that did not provide legitimate goods or services in exchange for the payments.

369.    According to testimony of non-party Larry Gabel, the owner of non-party LJG Consulting Inc. ("LJG Consulting"), SMK Pharmacy made payments to LJG Consulting from 2017 to 2021, ostensibly for marketing services, even though LJG Consulting did not provide any services to SMK Pharmacy during this time period:

```
13          Q.   Now, what else was done in between
14     2017 and presently for SMK Pharmacy?
15               MR. TORCZYNER:  Objection.
16          A.   Nothing.
17          Q.   Okay.  So within that time, though,
18     you would agree that you still continued to
19     receive the payments from SMK Pharmacy;
20     correct?
21          A.   Correct.
```

370.    According to testimony of non-party Darick Mirvis, the purported owner of non-party Mirlar Consulting Inc. ("Mirlar Consulting"), SMK Pharmacy paid Mirlar Consulting in

excess of its standard monthly service fee, including through checks signed by Field and Volman, without explanation of the purpose of the payment:

```
 6        Q.  Second check, page two, now this is
 7    a check issued in the amount $12,500,
 8    correct?
 9        A.  Yes.
10        Q.  Then looking at the signature line
11    do you recognize whose signature that is?
12        A.  Looks like Simon's signature.
13        Q.  Who?
14        A.  Simon Field's signature.
15        Q.  Do you know what this check was
16    issued for?
17        A.  No.
18        Q.  Again you would agree that this
19    check the amount is substantially higher than
20    the service fee charged to SMK Pharmacy on a
21    monthly basis?
22        A.  Yes.
```

\*       \*       \*

```
 2        Q.  Move on to page three, June 2,2017,

 3     a check in the amount of $3,500, directing

 4     your attention to the signature line, is that

 5     Mr. Kassman's signature?

 6        A.  Looks like Mr. Volman's --

 7            MR. LASHER:   -- Just note my

 8         objection, you can answer.

 9        Q.  You said that is Mr. Volman's?

10        A.  Looks like Mr. Volman's, yes.

11        Q.  Do you know what this check was

12     issued for?

13        A.  No.

14        Q.  Again you would agree this payment

15     amount is higher than what the monthly

16     service charge is to SMK Pharmacy?

17        A.  Yes.
```

\*      \*      \*

```
7        Q.  Next check page eight
8    September 6,2019 in the amount of $2,500,
9    directing your attention to the signature,
10   can you tell us whose signature that is?
11       A.  Looks like Kim Volman's.
12       Q.  Do you know what this check was
13   issued for?
14       A.  No.
15       Q.  Again you would agree this is higher
16   than the monthly service charge to SMK
17   Pharmacy?
18       A.  Yes.
```

371.    According to testimony of Defendant Kassman, the co-owner of Ilana Kassman, Inc. ("Kassman, Inc."), Kassman, Inc. did not provide any services to SMK Pharmacy, even though, upon information and belief, this entity received regular payments from SMK Pharmacy:

```
11       Q.  So now moving on to SMK Pharmacy,
12   has Kassman, Inc. ever provided any services
13   and/or goods or products to SMK Pharmacy?
14       A.  No.
```

372.    Upon information and belief, SMK Pharmacy used transactions with companies that provided no legitimate goods or services to SMK Pharmacy, including, but not limited to, LJG Consulting, Milar Consulting, and Kassman, Inc., to convert the checks to cash to distribute as

kickback payments to prescribing providers and/or clinic controllers and to conceal SMK Pharmacy as the source of the money.

373.    Other evidence shows that the Defendants converted checks to cash; upon information and belief, the proceeds were used to pay kickback and other financial incentives.

374.    Specifically, a check issued to SMK Pharmacy on January 2, 2019 was cashed at a New Jersey check cashing facility by non-party Alla Kuratova ("Kuratova").  Kuratova has been identified as regularly cashing millions of dollars in checks in connection with similar kickback schemes.  *See Gov't Empls. Ins. Co. v. Avonora, Inc. d/b/a Avonora Pharmacy*, No. 23-cv-03409-ARR-MMH (E.D.N.Y.) (alleging that Kuratova exchanged checks payable to AVK Rx Inc. and Avonora Inc. for cash at a New Jersey check-cashing facility as part of a money laundering operation); *Gov't Empls. Ins. Co. v. Ideal Care Pharmacy, Inc.*, No. 22-cv-03630-KAM-VMS (E.D.N.Y.) (alleging that Kuratova illegally exchanged a check—to an entity with no legitimate business operations—issued by Ideal Care Pharmacy, Inc. for cash at New Jersey check cashing facility); *Gov't Empls. Ins. Co. v. Ahmad*, No. 1:22-cv-06713-ENV-SJB (E.D.N.Y.) (alleging that Kuratova illegally processed checks payable to defendant professional corporation—in furtherance of illegal kickback and referral arrangements—at a New Jersey check-cashing facility); *Gov't Empls. Ins. Co. v. Time to Care Pharmacy, Inc.*, No. 22-cv-02158-AMD-RLM (E.D.N.Y.) (alleging that Kuratova converted to cash checks that were issued by Time to Care Pharmacy, Inc. to entities with no apparent legitimate business operations); *Gov't Empls. Ins. Co. v. Barakat*, No. 22-cv-07532-NGG-RML (E.D.N.Y.) (alleging that "Barakat participated in illegal kickback schemes by issuing checks from Far Rockaway Medical, P.C." to sham companies that were exchanged for cash by Kuratova, along with checks issued to PCs owned by Barakat, as part of a "pattern of illegal money laundering to further illegal pay-to-play schemes").

375.    Upon information and belief, the Defendants used transactions with sham companies and the conversion of checks to cash to conceal the Pharmacy Defendants' unlawful collusive relationships with prescribing providers and clinics for the purpose of obtaining a steady stream of invalid prescriptions for medically unnecessary drugs and medications, including Topical Pain Products and Compounded Products.

### 3.    Billing Pursuant to Unauthorized Prescriptions

376.    The Pharmacy Defendants regularly billed for drugs, including Topical Pain Products, that were not prescribed in accordance with New York's electronic prescription mandate.

377.    There are only very limited exceptions to New York's electronic prescription mandate, which went into effect in March 2016, and there is no evidence in the prescribers' records that any of these exceptions applied.  The regularity with which providers submitted prescriptions to the Pharmacy Defendants for drugs and medications, particularly Topical Pain Products, by telephone, facsimile, or means other than an electronic prescription or an official serialized New York State prescription form, is evidence that these prescriptions actually were unauthorized and submitted to the Pharmacy Defendants without the prescribing providers' consent or knowledge.

378.    S & K Warbasse has been identified as billing for Topical Pain Products pursuant to prescriptions that were not authorized by the provider.

379.    Non-party Arkam Rehman, M.D. ("Rehman") has stated in a sworn affidavit that a number of providers—including S & K Warbasse—billed for services pursuant to orders and prescriptions made under his name and credentials that he "did not issue or authorize."

380.    Rehman identified S & K Warbasse in his sworn affidavit as billing for pharmacy services that he did not authorize.

381.    Rehman's sworn affidavit contains an example of an unauthorized prescription under his name and credentials for Lidothol patches that purportedly was transmitted by telephone to S & K Warbasse; Rehman identified this prescription as fraudulent:



382.    S & K Warbasse billed Allstate for Lidothol patches purportedly prescribed by Rehman as well.

383.    For example, Rehman purportedly prescribed Lidothol patches to claimant N.A. (claim no. 0600671804) on January 27, 2021, which prescription was recorded by S & K Warbasse on the same form identified as Rehman as used by S & K Warbasse to record unauthorized prescriptions for Lidothol patches under his name and credentials without his knowledge or consent:

384. Rehman's affidavit contained a specific example of an unauthorized prescription form under his name and credentials used by S & K Warbasse to falsely justify the charges for Lidothol patches:



33. The following prescription below is also fraudulent in nature as I did not sign the

Page 35 of 62

34.    The above prescription order form in paragraph 33 is a representative example and is fraudulent in nature as I never prescribed the items to be dispensed nor did I sign or authorize the prescription.

385.    Rehman identified the pre-printed prescription form supporting S & K Warbasse's charges for the Lidothol patches as fraudulent and containing a statement of medical necessity that he did not agree to. *Id.*

386.    Rehman also purportedly completed a pre-printed facsimile prescription form for the Lidothol patches billed to Allstate by S & K Warbasse for N.A., which was identical to the form that Rehman identified as fraudulent in his sworn affidavit:

387.    S & K Warbasse also billed Allstate for drugs, including Topical Pain Products, that were ordered using "telephone prescriptions," which were recorded using the same fraudulent prescription order form identified by Rehman.

388.    For example, S & K Warbasse billed Allstate for several drugs, including lidocaine 5% ointment, purportedly prescribed by Alleyne via telephone for claimant M.B. (claim no.

0575371760) using the same telephone prescription form used by S & K Warbasse for Rehman's unauthorized telephone prescriptions:



389.    Alleyne also purportedly prescribed lidocaine 5% ointment for claimant M.B. using the same fraudulent prescription order form identified by Rehman:

390.    Upon information and belief, Alleyne also did not sign this form, authorize the prescriptions, or actually attest to the statement of medical necessity contained in fraudulent prescription order form submitted for claimant M.B. As noted above, Alleyne has testified that unauthorized orders for Topical Pain Products were submitted under his name.

391.   Overall, the prescriptions steered to S & K Warbasse under Alleyne's name and credentials were unauthorized and fraudulent based on Metro Pain's demonstrated practice of submitting unauthorized prescriptions for Topical Pain Products to pharmacies, on Alleyne's own admissions that unauthorized orders were submitted under his name and credentials.

392.   Moreover, several other Metro Pain providers, including non-parties John Greco, M.D., Carline Boubert, PA, and Theodros Seyoum, M.D., also purportedly authorized prescriptions that were transmitted to S & K Warbasse by telephone and pre-printed prescription form in the same manner identified by Rehman as false and fraudulent, including the representative examples contained in the chart below:

| Claimant | Date of Prescription | Prescribed Medications | Prescribing Provider |
|---|---|---|---|
| D.B. (claim no. 0537276859) | 6/19/2019 | Naproxen; Lidocaine 5% ointment | Michael Alleyne, M.D. |
| C.L. (claim no. 0547314450) | 6/19/2019 | Naproxen; Lidocaine 5% ointment | Michael Alleyne, M.D. |
| J.P. (claim no. 0578325433) | 5/13/2020 | Lidocaine 5% ointment; Naproxen; Cyclobenzaprine | Michael Alleyne, M.D. |
| R.W. (claim no. 0567146238) | 2/26/2020 | Naproxen tab; Cyclobenzaprine tab; Lidocaine 5% ointment | Michael Alleyne, M.D. |
| K.S. (claim no. 0575954144) | 3/2/2020 | Naproxen; Cyclobenzaprine; Lidocaine 5% ointment | John Greco, M.D. |
| L.H. (claim no. 0575149448) | 3/9/2020 | Naproxen; Cyclobenzaprine; Lidocaine 5% ointment | John Greco, M.D. |
| G.A. (claim no. 0562978064) | 3/13/2020 | Naproxen; Cyclobenzaprine; Lidocaine 5% ointment | John Greco, M.D. |

| Claimant | Date of Prescription | Prescribed Medications | Prescribing Provider |
|---|---|---|---|
| T.S. (claim no. 0567178421) | 8/24/2020 | Lidothol patches; Cyclobenzaprine | John Greco, M.D. |
| G.R. (claim no. 603715236) | 10/22/2020 | Lidothol patches; Cyclobenzaprine | John Greco, M.D. |
| B.F. (claim no. 0553851825) | 7/29/2019 | Lidocaine 5% ointment; Ibuprofen | Carline Boubert, PA |
| L.B. (claim no. 0554417188) | 9/23/2019 | Lidocaine 5% ointment | Theodros Seyoum, M.D. |

393.    The fraudulent prescriptions were not limited only to Metro Pain and Tri-borough providers, however.  In other instances, S & K Warbasse billed for Topical Pain Products prescribed via telephone by other prescribers using a pre-printed menu of drugs, including Topical Pain Products.

394.    For example, non-party Kyungsook Bu, NP ("Bu") transmitted a prescription for lidocaine 5% ointment for claimant M.B. (claim no. 0667848527) to S & K Warbasse by telephone on August 11, 2022:



395.    Bu purportedly prescribed lidocaine 5% ointment using the same fraudulent prescription order form identified by Rehman:

396. Bu is no stranger to allegations of participation in No-Fault fraud schemes. *See Gov't Empls. Ins. Co. v. Binns*, No. 22-cv-01553-NGG-PK (E.D.N.Y.); *Liberty Mut. Ins. Co. v. JP Medical Services, P.C.*, No. 22-cv-01487-NRM-LGD (E.D.N.Y.).

397. Likewise, non-party Phyllis Gelb, M.D. ("Gelb") prescribed several drugs to claimant A.L. (claim no. 0689712080) on November 21, 2022 by "phoned-in prescription":



398.    Gelb's purported prescription was accompanied by the same fraudulent prescription order form identified by Rehman, which contained a rubber stamp of Gelb's signature:

399.    Gelb has a history of allegedly engaging in collusive relationships with pharmacies involving the prescription of drugs pursuant to a predetermined protocol.  *See Liberty Mut. Ins. Co. v. AVK Rx Inc.*, No. 22-cv-07329-GRB-SIL (E.D.N.Y.). Further, Gelb's stamped signature allegedly was provided to a non-physician managing the PC nominally owned by Gelb and applied

by this non-physician to "purport to sign treatment records and prescription forms for medically unnecessary services as 'Phyllis M Gelb, MD', all without any meaningful involvement by Gelb to create the appearance that those services were performed or ordered by a licensed physician, when in fact they were not." *Gov't Empls. Ins. Co. v. Gelb*, No. 23-cv-05250-ENV-RML (E.D.N.Y.).

400.    Likewise, non-party Hong Pak, M.D. ("Pak") prescribed several medications, including an oral NSAID and lidocaine 5% ointment to claimant P.R. (claim no. 0690680871) on December 14, 2022 by "phoned-in prescription":



401.    These telephone prescriptions purportedly submitted to S & K Warbasse by Pak for P.R. were accompanied by a pre-printed prescription form that bore Pak's letterhead, but was otherwise nearly identical to the fraudulent prescription order form identified by Rehman:

**PAK HONG SIK MEDICAL CARE PC**
1100 PELHAM PKWY S, BRONX, NY 10461
TEL. 718-682-3152
FAX. 718-682-3153

Name: ▊▊▊▊▊▊▊  10/31/22

Address: ▊▊▊▊▊▊▊

Home Phone: ▊▊▊▊▊▊▊

Medication Allergies:

Insurance:

Carrier/claim #:

| Ibuprofen tablets: SIG QD BID TID QID | Celebrex Tablets: | Naproxen Tablets: | Cyclobenzaprine Tablets: |
|---|---|---|---|
| Once per day___ Twice a day___ Strength: 600mg___ 800 mg___ Disp: 30__ 60__ 90__ 120__ | Once per day___ Twice a day Strength: 200mg__ 400 mg__ Disp: 30__ 60__ 90__ | Once per day___ Twice a day___ Strength: 500mg___ Disp: 30__ 60__ | Strength: 10mg__ 800 mg Disp: 30__ 60__ 90__ |

| Dicofenac Sodium Gel 3%: | Lidocaine Ointment 5% | Lidothol Patch Lidocaine 4.5% Menthol 5 | Pennsaid 2%: |
|---|---|---|---|
| Once per day___ Twice a day___ Strength: 200gm__ 250gm__ | Once per day___ Twice a day___ Strength: 200gm__ 250gm__ | Once per day___ Twice a day___ Disp: 45__ 60__ | Once per day___ Twice a day___ Disp: 120__ |

| Zipsor Capsules (NSAID): | Topiramante: | Sumatriptan Tablets: | Other: |
|---|---|---|---|
| Strength: 250mg___ Disp: 120__ | Strength: 25mg__ 50mg__ 100mg__ Disp: _____ | Strength: 25mg__ 50mg__ Disp: 9__ 18__ | |

Prescriber Information:

Doctors Name: HONG PAK MD

Address: 1100 Pelham Pkwy S, Bronx, NY 10461

NPI# 1427077056          License#: 294969-1

Statement of Medical Necessity:

Side effects associated with oral administration can often be avoid when medications are used topically. When Medications are administered topically. They are not observed through the gastrointestinal system and do not undergo first pass hepatic metabolism. Topical creams/patches will be used in conjunction with lower doses of oral medication to prevent dependence and side effects in oral medications.

Physician Signature: _____    Date: 11/4/22

402.    Pak has been accused of colluding with numerous pharmacies for the unlawful referral of medically unnecessary topical products. *Liberty Mut. Ins. Co. v. AVK Rx Inc.*, No. 22-cv-07329-GRB-SIL (E.D.N.Y.); *Gov't Empls. Ins. Co. v. John Street Pharmacy, LLC*, No. 22-cv-

05651-EK-JMW (E.D.N.Y.); *Gov't Empls. Ins. Co. v. Ideal Care Pharmacy, Inc.*, No. 22-cv-03630-KAM-VMS (E.D.N.Y.).

403.    The chart below contains additional representative examples of fraudulent prescriptions purportedly authorized by Bu, Gelb, and Pak:

| Claimant | Date of Prescription | Prescribed Medications | Prescribing Provider |
|---|---|---|---|
| O.F. (claim no. 0682239553) | 8/29/2022 | Lidocaine 5% ointment | Kyungsook Bu, NP |
| O.F. (claim no. 0682239553) | 10/3/2022 | Naproxen; Cyclobenzaprine; Diclofenac sodium 1.5% solution | Kyungsook Bu, NP |
| Y.K. (claim no. 0683110068) | 9/29/2022 | Naproxen; Diclofenac 1.5% solution; Cyclobenzaprine | Kyungsook Bu, NP |
| Y.K. (claim no. 0683110068) | 8/29/2022 | Cyclobenzaprine; Lidocaine 5% ointment | Kyungsook Bu, NP |
| Z.A. (claim no. 0675353585) | 12/27/2022 | Lidothol patches; Celexocib; Cyclobenzaprine | Phyllis Gelb, M.D. |
| Z.A. (claim no. 0675353585) | 7/26/2022 | Meloxicam; Lidocaine 5% ointment; Cyclobenzaprine | Phyllis Gelb, M.D. |
| I.N. (claim no. 0682508866) | 12/1/2022 | Celecoxib; Lidocaine 5% ointment | Hong Pak, M.D. |
| C.A. (claim no. 0693675902) | 11/22/2022 | Lidocaine 5% ointment; Celecoxib | Hong Pak, M.D. |
| V.R. (claim no. 0690680871) | 12/14/2022 | Celecoxib; Lidocaine 5% ointment | Hong Pak, M.D. |

404.    SMK Pharmacy also billed Allstate for drugs that were ordered by telephone using the same fraudulent form identified by Rehman.

405.    For example, non-party Richard Seldes, M.D. ("Seldes") purportedly prescribed several drugs to claimant E.K. (claim no. 0588054775) on March 24, 2022, including lidocaine 5% ointment, using the same generic telephone prescription form even though there is no evidence that Seldes was unable to transmit prescriptions electronically:



406.    Seldes was the subject of allegations that he participated in a scheme to defraud through the submission of non-compensable charges for medical treatments, tests, and services under New York's No-Fault laws. *See Allstate Ins. Co. v. Melgar*, No. 22-cv-07634-AMD-SIL (E.D.N.Y.).  Upon information and belief, the telephone prescriptions purportedly authorized by Seldes were invalid and transmitted to SMK Pharmacy pursuant to an unlawful referral relationship.

407.    The chart below contains additional representative examples of instances where SMK Pharmacy billed Allstate for drugs supported by fraudulent prescription forms:

| Claimant | Date of Prescription | Prescribed Medications | Prescribing Provider |
|---|---|---|---|
| E.A. (claim no. 0605317676) | 9/9/2021 | Lidocaine 5% ointment; Celecoxib | Richard Seldes, M.D. |
| C.H. (claim no. 0666887203) | 6/23/2022 | Lidocaine 5% ointment; Celecoxib | Richard Seldes, M.D. |
| K.S. (claim no. 0652615253) | 8/8/2022 | Lidocaine 5% ointment; Celecoxib Docusate; Ondansetron | Richard Seldes, M.D. |
| L.W. (claim no. 0632859286) | 5/18/2022 | Lidocaine 5% ointment; Celecoxib; Docusate; Ondansetron | Richard Seldes, M.D. |

### 4.    Steering Prescriptions to Maximize Billing

408.    Prescribers were steered into ordering the most expensive products as part of this scheme.

409.    The Defendants also influenced the prescribing providers' selection of drugs and medications prescribed by requesting that the prescribing provider change the drug or medication prescribed to the desired product.

410.    In certain instances, the prescribing providers sent prescriptions for lidocaine 4% topical cream to SMK Pharmacy.  However, SMK Pharmacy did not dispense this product because lidocaine 4% cream was not part of the Defendants' predetermined prescription protocol.

411.    Rather, according to notations on the prescriptions for lidocaine 4% cream, SMK Pharmacy purportedly contacted the prescribing provider to "change to lidocaine 5% ointment" as illustrated in the prescription for lidocaine 4% cream transmitted to SMK Pharmacy by Winiarsky on November 6, 2020 for claimant J.F. (claim no. 0540997250):



412.    Additional representative examples of SMK Pharmacy's substitution of lidocaine 5% ointment for the lidocaine 4% cream are contained in the chart below:

| Claimant | Prescribing Provider | Date of Prescription | Prescribed Medication | Billed-For Medication |
|---|---|---|---|---|
| R.C. (claim no. 0549090348) | Raz Winiarsky, M.D. | 9/3/2020 | Lidocaine 4% cream | Lidocaine 5% ointment |

| Claimant | Prescribing Provider | Date of Prescription | Prescribed Medication | Billed-For Medication |
|---|---|---|---|---|
| I.K. (claim no. 0571765619) | Raz Winiarsky, M.D. | 12/22/2020 | Lidocaine 4% cream | Lidocaine 5% ointment |
| R.T. (claim no. 0595167776) | Raz Winiarsky, M.D. | 11/23/2021 | Lidocaine 4% cream | Lidocaine 5% ointment |
| L.N. (claim no. 0605524628) | Raz Winiarsky, M.D. | 3/9/2021 | Lidocaine 4% cream | Lidocaine 5% ointment |
| J.D. (claim no. 0606916831) | Raz Winiarsky, M.D. | 2/2/2021 | Lidocaine 4% cream | Lidocaine 5% ointment |
| A.I. (claim no. 0638268938) | Raz Winiarsky, M.D. | 12/7/2021 | Lidocaine 4% cream | Lidocaine 5% ointment |
| M.Z. (claim no. 0573283990) | Raz Winiarsky, M.D. | 11/17/2021 | Lidocaine 4% cream | Lidocaine 5% ointment |
| N.P. (claim no. 0590525481) | Raz Winiarsky, M.D. | 3/9/2022 | Lidocaine 4% cream | Lidocaine 5% ointment |
| N.P. (claim no. 0590525481) | Raz Winiarsky, M.D. | 1/19/2022 | Lidocaine 4% cream | Lidocaine 5% ointment |

413.    Lidocaine 4% cream was not part of the Defendants' prescription protocol because it was an over-the-counter product that was not covered under New York's No-Fault laws.

414.    SMK Pharmacy billed Allstate over $600 for 100 grams of lidocaine 5% ointment. Meanwhile, a 100 gram portion of Aspercreme (which contains lidocaine 4%) is available over-the-counter for $10.99.

415.    SMK Pharmacy did not seek to substitute lidocaine 5% ointment out of concern for patient care. Rather, SMK Pharmacy rejected the prescriptions for lidocaine 4% cream because it could charge more for lidocaine 5% ointment even though the lidocaine 5% ointment billed to Allstate by the Pharmacy Defendants was not medically unnecessary or effective to treat the claimants' injuries.

416.    The Defendants also influenced the prescribers' selection of drugs by supplying pre-printed stamps containing the name of the desired drugs.

417.    The Defendants steered Barakat to prescribe unnecessary and unapproved Lidothol patches to S & K Warbasse patients through the use of a rubber stamp applied to Barakat's prescription pad without any evidence that Barakat was exempt from electronic prescribing requirements.

418.    For example, S & K Warbasse charged Allstate for Lidothol patches prescribed by Barakat to claimant T.P. (claim no. 0604873315) on January 19, 2021 through the use of a rubber stamp:



419.    Barakat's report of T.P.'s examinations on January 19, 2021 do not contain evidence that he was unable to prescribe the Lidothol patches electronically.  Rather, upon

information and belief, Barakat repeatedly referred stamped prescriptions for unnecessary Lidothol patches to S & K Warbasse pursuant to an unlawful relationship.

420.    The chart below contains numerous representative examples of unnecessary and unapproved Lidothol patches billed to Allstate by S & K Warbasse that were prescribed by Barakat using a stamp:

| Claimant | Pharmacy Defendant | Medication | Date of Prescription |
|---|---|---|---|
| E.Z. (claim no. 0611888990) | S & K Warbasse | Lidothol patches | 3/2/2021 |
| E.Z. (claim no. 0611888990) | S & K Warbasse | Lidothol patches | 1/19/2021 |
| J.S. (claim no. 0619060072) | S & K Warbasse | Lidothol patches | 4/8/2021 |
| J.S. (claim no. 0619060072) | S & K Warbasse | Lidothol patches | 3/11/2021 |
| M.B. (claim no. 0610565574) | S & K Warbasse | Lidothol patches | 2/10/2021 |
| M.T. (claim no. 0607685419) | S & K Warbasse | Lidothol patches | 1/20/2021 |
| S.S. (claim no. 0606755403) | S & K Warbasse | Lidothol patches | 1/13/2021 |

**5.    Concealing the Volume of Drugs Dispensed to Claimants**

421.    Prescribers and clinics often maintained unlawful referral arrangements with multiple pharmacies, which helped conceal the unlawful referral scheme.    Prescriptions purportedly ordered on the same date were often split between 2 (or more) pharmacies.

422.    For example, claimant J.F. (claim no. 0611966631) was examined by non-party Osvaldas Pranevicius, M.D. ("Pranevicius") on March 2, 2021, March 23, 2021, and April 20, 2021.    The reports of J.F.'s visits do not indicate that any drugs were prescribed during these encounters.

423.    However, prescriptions for diclofenac sodium 3% gel and lidocaine 5% ointment—purportedly issued by Pranevicius—were steered to S & K Warbasse and to non-party Bronx Chemists Rx Inc., respectively.

424.    Notably, claimant D.F. (claim no. 0611966631) was involved in the same motor vehicle accident as J.F., and was also examined by Pranevicius.

425.    As with J.F., Pranevicius's reports for D.F. do not indicate that any drugs were prescribed to D.F. during these encounters.

426.    However, prescriptions for diclofenac sodium 3% gel and lidocaine 5% ointment—purportedly issued by Pranevicius—were steered to S & K Warbasse and to non-party Bronx Chemists Rx Inc., respectively.

427.    S & K Warbasse regularly billed for lidocaine 5% ointment, so there was no reason to send the prescriptions to a different pharmacy.

428.    According to both J.F. and D.F., they both "always" received the prescribed medications directly at Pranevicius's office from the receptionist even though S & K Warbasse's delivery receipts indicate that the diclofenac sodium 3% gel was delivered to their homes.

429.    Therefore, neither J.F. nor D.F. had any choice of pharmacy and likely did not even know that S & K Warbasse and Bronx Chemists Rx Inc. would bill for the medications. Indeed, according to D.F., he generally fills his prescriptions "[a]t the CVS pharmacy," given the choice.

430.    Similarly, Barakat simultaneously prescribed claimants with both Lidothol patches—which prescriptions were funneled to S & K Warbasse—and lidocaine 5% ointment—which prescriptions were sent to another pharmacy, non-party Bayside Drugs Inc. d/b/a Sterling Pharmacy ("Bayside Drugs").

431.    For example, Barakat prescribed both Lidothol patches and lidocaine 5% ointment to claimant E.Z. (claim no. 0611888990) on March 2, 2021, but funneled the prescriptions to S & K Warbasse and Bayside Drugs, respectively.

432.    Likewise, Barakat prescribed both Lidothol patches and lidocaine 5% ointment to claimant M.R. (claim no. 0613121839) on January 26, 2021 and March 2, 2021, but funneled the prescriptions to S & K Warbasse and Bayside Drugs, respectively

433.    As noted above, S & K Warbasse regularly billed for lidocaine 5% ointment, so there was no reason to send the prescriptions to a different pharmacy.

434.    Upon information and belief, Barakat's prescriptions were steered to different pharmacies to conceal that he was over-prescribing duplicative lidocaine products to the same claimant and to preserve unlawful referral relationships with multiple pharmacies, including S & K Warbasse.

435.    Excessive doses of lidocaine can lead to potentially serious side effects, including cardiovascular issues.

436.    By spreading the duplicative prescriptions for Lidothol patches and lidocaine 5% ointment to different pharmacies, Barakat deprived claimants, including E.Z. and M.R., of the opportunity to receive counseling from the dispensing pharmacist regarding the risks of therapeutic duplication of products containing topical lidocaine.

437.    S & K Warbasse's prescribing providers' regular practice of dividing prescriptions for medically unnecessary and duplicative Topical Pain Products to more than 1 pharmacy is further indicia of these providers' unlawful referral relationships with S & K Warbasse to direct prescriptions for a predetermined protocol of drugs and medications to S & K Warbasse without regard for patient care.

## 6. Depriving Claimants' Choice of Pharmacy

438. The Defendants ensured that prescriptions were funneled directly to the Pharmacy Defendants, which prevented claimants from choosing their own pharmacy.

439. Claimants received drugs from the Pharmacy Defendants directly at the No-Fault clinic or through delivery to their homes because the Pharmacy Defendants were not located near most claimants, who resided outside of the Brighton Beach and Rockaway Beach neighborhoods where the Pharmacy Defendants are located.

440. The chart below contains representative examples illustrating the considerable distance between S & K Warbasse's physical location in Brooklyn, NY and the residences of many of its claimants:

| Claimant | Claimant's Residence | Approximate Miles from S & K Warbasse |
|---|---|---|
| M.L. (claim no. 0540634383) | Riverhead, NY | 82 |
| N.R. (claim no. 0595330135) | New York, NY | 27 |
| A.W. (claim no. 0563067917) | Spring Valley, NY | 50 |
| J.L. (claim no. 0601505639) | Spring Valley, NY | 50 |
| W.H. (claim no. 062229888) | Middletown, NY | 97 |
| J.F. (claim no. 061196631) | Nanuet, NY | 57 |
| J.E. (claim no. 0629780494) | Bronx, NY | 26 |
| D.M. (claim no. 0633393707) | Spring Valley, NY | 50 |
| C.D. (claim no. 0627174766) | Nanuet, NY | 56 |
| Z.A. (claim no. 0675353585) | Massapequa, NY | 32 |
| M.M. (claim no. 0662314244) | Spring Valley, NY | 50 |

441.   The chart below contains representative examples illustrating the considerable distance between SMK Pharmacy's physical location in Rockaway Beach, NY and the residences of many of its claimants:

| Claimant | Claimant's Residence | Approximate Miles from SMK Pharmacy |
|---|---|---|
| A.S. (claim no. 0684596660) | Westbury, NY | 27 |
| D.C. (claim no. 0677127870) | Bridgeport, CT | 66 |
| M.O. (claim no. 0695261164) | Lindenhurst, NY | 29 |
| E.Z. (claim no. 0481952406) | White Plains, NY | 39 |
| D.C. (claim no. 0599015765) | Selden, NY | 60 |
| M.O. (claim no. 0485392062) | Huntington Station, NY | 39 |
| R.M. (claim no. 0516211661) | Smithtown, NY | 50 |
| S.P. (claim no. 0590507745) | Cold Spring Harbor, NY | 39 |
| T.W. (claim no. 0933085921) | Chester, NY | 74 |
| F.C. (claim no. 0666294475) | Sloatsburg, NY | 55 |
| K.S. (claim no. 0652615253) | West Nyack, NY | 49 |

### 7.   Submitting False and Fraudulent Peer-Review Rebuttals

442.   When their bills were challenged on grounds of medical necessity, the Pharmacy Defendants submitted peer-review rebuttals in support of actions filed against Allstate to collect payment for these drugs and medications.

443.   Allstate received several peer-review rebuttals purportedly authored by the prescribing providers, including non-parties Joyce Goldenberg, M.D., Jean-Pierre Georges

Barakat, M.D., Michael Alleyne, M.D., Carline Boubert, PA, John Greco, M.D., Aleksandr Kopach, PA, Raz Winiarsky, M.D., and Richard Seldes, M.D.

444.    The rebuttal letters were false and fraudulent because they materially misrepresented the medical necessity of the billed-for drugs and medications.

445.    Additionally, despite purportedly being authored by individual providers regarding distinct patients, many of these rebuttal letters are patchworks of verbatim language and references repeatedly cited by other providers regarding wholly different patients.

446.    Upon information and belief, the Defendants, or persons acting at their direction, created the rebuttal letters by mixing and matching the same paragraphs, quotations, and references in different combinations and sequence to create the false appearance that the letters were the unique work-product of the prescribing providers.

447.    However, upon information and belief, the prescribing providers personally authored few, if any, of the assertions contained in the rebuttal letters submitted to Allstate by the Pharmacy Defendants.

448.    For example, S & K Warbasse submitted peer-review rebuttals in support of its claims for drugs, including lidocaine 5% ointment, that were purportedly authorized by prescribing providers John Greco, M.D., Michael Alleyne, M.D., and Carline Boubert, PA who each worked for Metro Pain during the relevant period, a clinic with a history of involvement in unlawful referral schemes.

449.    These rebuttals, including those identified in the chart below, shared significant portions of language despite being authored by different providers regarding entirely different patients:

| Claimant | Author of Rebuttal | Date of Rebuttal | Pharmacy Defendant |
|---|---|---|---|
| J.G. (claim no. 0595330135) | John Greco, M.D. | 4/27/2022 | S & K Warbasse |
| R.W. (claim no. 0567146238) | Michael Alleyne, M.D. | 1/30/2022 | S & K Warbasse |
| N.R. (claim no. 0595330135) | John Greco, M.D. | 4/27/2022 | S & K Warbasse |
| D.B. (claim no. 0537276859) | Michael Alleyne, M.D. | 4/14/2021 | S & K Warbasse |
| S.R. (claim no. 0548071901) | Michael Alleyne, M.D. | 2/3/2022 | S & K Warbasse |
| B.F. (claim no. 0553851825) | Carline Boubert, PA | 5/12/2021 | S & K Warbasse |
| J.R. (claim no. 0548071901) | Michael Alleyne, M.D. | 2/4/2022 | S & K Warbasse |

450.    Likewise, S & K Warbasse submitted peer-review rebuttals purportedly written by different prescribing providers for distinct patients in support of claims for medically unnecessary Lidothol patches that contained verbatim language, quotations, and references contained in other rebuttals purportedly authored on behalf of S & K Warbasse by a mix of providers regarding different patients.

451.    Examples of such rebuttals containing various identical passages despite purportedly being authored by different prescribing providers regarding different patients are identified in the chart below:

| Claimant | Author of Rebuttal | Date of Rebuttal | Pharmacy Defendant |
|---|---|---|---|
| S.S. (claim no. 0606755403) | Jean-Pierre Georges Barakat, M.D. | 3/13/2023 | S & K Warbasse |
| F.C. (claim no. 0626739502) | Aleksandr Kopach, PA | 10/7/2022 | S & K Warbasse |
| E.Z. (claim no. 0611888990) | Jean-Pierre Georges Barakat, M.D. | 1/5/2023 | S & K Warbasse |
| H.C. (claim no. 0589333961) | John Greco, M.D. | 6/7/2022 | S & K Warbasse |

452.     Similarly, the peer-review rebuttals offered by SMK Pharmacy in support of claims for lidocaine 5% ointment and patches also contain certain language and citations identical to those contained in rebuttals submitted by S & K Warbasse.

453.     For example, language from the same authority is cut and pasted into rebuttals listed in the chart below:

| Claimant | Author of Rebuttal | Date of Rebuttal | Pharmacy Defendant |
|---|---|---|---|
| D.B. (claim no. 0537276859) | Michael Alleyne, M.D. | 4/14/2021 | S & K Warbasse |
| R.C. (claim no. 0549090348) | Raz Winiarsky, M.D. | 9/15/2021 | SMK Pharmacy |
| H.C. (claim no. 0666887203) | Richard Seldes, M.D. | 11/30/2022 | SMK Pharmacy |
| J.M. (claim no. 0650450471) | Joyce Goldenberg, M.D. | 2/15/2022 | SMK Pharmacy |
| D.K. (claim no. 0673719373) | Joyce Goldenberg, M.D. | 11/22/2022 | SMK Pharmacy |
| L.S. (claim no. 0638720235) | Joyce Goldenberg, M.D. | 3/17/2022 | SMK Pharmacy |
| J.G. (claim no. 0595330135) | John Greco, M.D. | 4/27/2022 | S & K Warbasse |
| H.C. (claim no. 0589333961) | John Greco, M.D. | 6/7/2022 | S & K Warbasse |

454.     The rebuttals were intended to create the false impression that the prescribing providers were offering their own original justification for the Topical Pain Product prescribed by them when, in reality, the rebuttals were cut and pasted from a variety of other rebuttals.

D.     **FAILURE TO LAWFULLY OVERSEE DISPENSING OF DRUGS AND MEDICATIONS**

455.     Pharmacists and their interns have a duty under New York law to conduct a review before each medication is dispensed or delivered to the patient to avoid therapeutic duplication and drug-drug interactions that may cause drug therapy problems and harm the patient.   8 N.Y.C.R.R. § 63.6(b)(7).

456.    Using their professional judgment, a pharmacist or pharmacy intern may refuse to dispense a medication that could endanger the health of the patient through "potential adverse effects, interactions or other therapeutic complications."  8 N.Y.C.R.R. § 63.6(b)(8)(i)(e), § 63.6(b)(8)(ii)(d)(5).

457.    For a drug or medication that is delivered on the pharmacy's premises, before dispensing a medication to a new patient or a new medication to an existing patient, the pharmacist or pharmacy intern must personally counsel the patient by telephone or in person on appropriate matters, including known indications, common adverse side effects or interactions, and therapeutic contraindications.  8 N.Y.C.R.R. § 63.6(b)(8)(i)(a)-(b).

458.    When dispensing a drug or medication to a patient off of pharmacy premises, the pharmacist or pharmacy intern must "include with each prescription a written offer to counsel the patient" regarding the drug or medication, including its "known indications" and "common severe side or adverse effects or interactions and therapeutic contraindications that may be encountered." 8 N.Y.C.R.R. § 63.6(b)(8)(i)(a)(1), (4), § 63.6(b)(8)(ii)(a).

459.    The written offer of counseling for drugs dispensed off of pharmacy premises "shall provide a telephone number at which a licensed pharmacist or pharmacy intern may be readily reached."  8 N.Y.C.R.R. § 63.6(b)(8)(ii)(a).

460.    For a drug or medication that is delivered off of pharmacy premises, if the pharmacist or pharmacy intern "determines that there are potential drug therapy problems which could endanger the health of a patient," the pharmacist or pharmacy intern must personally contact the patient prior to dispensing the medication by telephone or in person to offer counseling on the identified potential problems and any other appropriate matters, including known indications,

common adverse side effects or interactions, and therapeutic contraindications.  8 N.Y.C.R.R. § 63.3(b)(8)(ii)(d)(1).

461.    The responsibility of offering counseling to patients in these situations "shall not be delegated to an individual not authorized to practice pharmacy under a license or limited permit."  8 N.Y.C.R.R. § 63.6(b)(8)(ii)(d)(2).

462.    If the patient refuses to accept counseling, such refusal must be documented.  8 N.Y.C.R.R. § 63.6(b)(8)(c); 8 N.Y.C.R.R. § 63.6(b)(8)(ii)(d)(4).

463.    Many claimants were prescribed the Topical Pain Products containing diclofenac in addition to oral NSAIDs, such as naproxen and meloxicam.

464.    Topical diclofenac, and NSAIDs in general, may cause side-effects, including damage to the intestines, the lining of the stomach, and other serious medical problems.

465.    Therefore, when an oral NSAID, such as naproxen, is taken in conjunction with a topical NSAID, like diclofenac, there are certain health risks to the patient.

466.    The providers at the No-Fault clinics prescribed both oral and topical NSAIDs to the same patient without properly considering the potential hazardous effects.

467.    The Pharmacy Defendants dispensed patients with both the oral and topical NSAIDs without conducting a proper review to avoid therapeutic duplication presenting a risk to the health and safety of the claimants.

468.    An individual who is not a licensed pharmacist is not authorized to perform functions requiring professional judgment, including evaluating prescriptions for drug interactions and counseling patients.  8 N.Y.C.R.R. § 29.7(21)(ii)(b)(1), (2), (6), (7).

469.     Based on the Pharmacy Defendants' receipts purporting to confirm delivery, a courier service delivered drugs and medications, including Topical Pain Products, to certain of the Pharmacy Defendants' claimants off of the Pharmacy Defendants' premises.

470.     In other instances, the Pharmacy Defendants' receipts do not identify who delivered the drug or medication to the patient.

471.     Upon information and belief, the Pharmacy Defendants' patients were not personally offered counseling on the issues raised by the prescriptions for both oral and topical NSAIDs, including therapeutic duplication, by a pharmacist or pharmacy intern over the phone or in person before the courier service delivered the drugs and medications to the patients off of the Pharmacy Defendants' premises.

472.     In many instances, the receipts purporting to confirm delivery of medications to claimants fail to document whether the claimant requested counseling.

473.     For example, the receipt for the lidocaine 5% ointment, naproxen, and cyclobenzaprine purportedly delivered to claimant M.B. (claim no. 0575371760) by S & K Warbasse leaves pertinent portions of the receipt blank, including whether M.B. requested counseling, whether the medications actually were delivered, and at what time:

474.    SMK Pharmacy also submitted delivery receipts that left pertinent portions blank, including whether the claimant requested or received counseling, whether the medications actually were delivered, and at what time, as illustrated by the receipt for claimant T.M. (claim no. 0504027301) purporting to confirm delivery of several medications, including lidocaine 5% ointment and Celecoxib:

475.    The Defendants and the prescribing providers disregarded patient safety when prescribing, dispensing, and delivering duplicative and medically unnecessary topical medications with oral NSAIDs in furtherance of their scheme to prescribe and bill for as many drugs and medications as possible.

476.    The Defendants violated their duty to the Pharmacy Defendants' patients to identify risks posed by the therapeutic duplication of topical and oral NSAIDs and to provide an offer of appropriate counseling personally from a licensed pharmacist or pharmacy intern over the

telephone or in person before the medications were delivered off of the Pharmacy Defendants' premises.

477.    Thus, the Pharmacy Defendants violated New York law governing pharmacies and the dispensation of medications when it billed Allstate for duplicative and medically unnecessary topical medications that were purportedly delivered off premises by a non-pharmacist who could not lawfully offer or provide counseling to patients regarding the risks posed by the drugs and medications.

E.    SPECIFIC EXAMPLES OF FRAUDULENT BILLING

1.    SMK Pharmacy

a.    *Exemplar Claim—Claimant A.I. (0638268938)*

478.    Claimant A.I. purportedly was involved in a motor vehicle accident on August 6, 2021.

479.    On October 4, 2021, A.I. underwent an initial orthopedic evaluation with non-party Richard Seldes, M.D. ("Seldes").  As noted above, Seldes allegedly participated in a No-Fault scheme involving billing for medically unnecessary tests and treatment.  Seldes immediately prescribed A.I. with a Topical Pain Product, diclofenac sodium 1% gel, even though this product was available over the counter, which unnecessary prescription was steered to SMK Pharmacy.

480.    A.I. was evaluated for complaints of right knee pain with a different provider, non-party Brooklyn Premier Orthopedics, on November 24, 2021, at which visit A.I. was recommended right knee arthroscopy.  Non-party Raz Winiarsky, M.D. ("Winiarsky") purportedly performed the right knee arthroscopic procedure on December 14, 2021.

481. As noted above, Winiarsky allegedly performed unnecessary arthroscopic surgeries and used these surgeries to justify the prescription of unnecessary and expensive post-operative DME pursuant to unlawful referral arrangements.

482. On December 7, 2021, Winiarsky prescribed A.I. with 6 different medications in connection with the right knee arthroscopy for A.I., including Movantik (which was substituted by SMK Pharmacy with Colace, an over-the-counter stool softener), aspirin tablets, ondansetron tablets, Percocet tablets, celecoxib capsules, and lidocaine 4% topical cream (which was substituted by SMK Pharmacy with lidocaine 5% ointment).

483. Winiarsky prescribed the topical lidocaine ointment with 2 refills even though this Topical Pain Product is not indicated to treat knee pain such as that complained of by A.I.

484. SMK Pharmacy billed Allstate for the medically unnecessary lidocaine 5% ointment on December 11, 2021, February 4, 2022, and March 25, 2022 for a total of $1,843.47 in charges.

485. However, Winiarsky never documented that the topical lidocaine was in any way effective to treat A.I.'s knee pain or that the Topical Pain Product was even being used. Indeed, according to records submitted to Allstate, A.I. did not treat with Winiarsky or any of his clinics after December 22, 2021, and thus the 2 refills of the lidocaine ointment were dispensed as a matter of course without any oversight by the prescribing provider as to the efficacy.

486. SMK Pharmacy also billed Allstate $456.39 for ondansetron, an anti-nausea medication, prescribed by Winiarsky to A.I. in connection with a relatively simple arthroscopic surgery without any indication that A.I. had a history warranting anti-nausea medication meant for chemotherapy patients.

487.    Allstate paid SMK Pharmacy $2,585.67 for these medically unnecessary medications prescribed by Seldes and Winiarsky to A.I.

488.    To the extent that Allstate paid SMK Pharmacy in reliance on the documents created and submitted in connection with the drugs and medications for A.I., Allstate is entitled to recover all payments made to SMK Pharmacy in connection with these services, including, but not limited to, the payments listed in Exhibit 3.  To the extent that any of SMK Pharmacy's charges for the drugs for A.I. remain unpaid, Allstate has no further obligation to make payment because A.I.'s charges are not compensable under New York's No-Fault laws

### b.    *Exemplar Claim—Claimant R.M. (0516211661)*

489.    Claimant R.M. purportedly was involved in a motor vehicle accident on September 6, 2018.

490.    R.M. underwent several neurology evaluations with non-party David Lifschutz, M.D. ("Lifschutz") for complaints of neck pain and stiffness, middle/lower back pain, and bilateral knee pain that was worse on the left side.

491.    As noted above, Lifschutz has a history of engaging in professional misconduct involving the illegal prescription of drugs and medications.

492.    On November 27, 2018, Lifschutz prescribed R.M. with a predetermined compounded product called "DCLTM 180G Cream," which Lifschutz prescribed using a rubber stamp applied to his prescription form:



493.    The DCLTM 180G Cream prescribed to R.M. contained a pre-set formula of diclofenac 10%, cyclobenzaprine 3%, lidocaine 5%, tetracaine 3%, and menthol 2%.

494.    Lifschutz further prescribed this formulation containing a muscle relaxer (cyclobenzaprine) while simultaneously advising R.M. to continue with another oral muscle relaxer, Tizanidine, thus subjecting R.M. to unnecessary therapeutic duplication.

495.    As explained above, Lifschutz regularly prescribed this exact same DCLTM 180G Cream to numerous patients and this compounded medication was not tailored to these patients', including R.M.'s, specific clinical needs.  Nonetheless, SMK Pharmacy unlawfully purported to manufacture and distribute this DCLTM 180G Cream pursuant to Lifschutz's prescriptions for the same formula, which constituted a "new" drug that required FDA approval.

496.    Lifschutz's report of the examination on November 27, 2018 does not indicate what body part the compounded product was intended to treat; however, the topical compounded

medication containing both diclofenac and lidocaine was not necessary to treat any of R.M.'s complaints of musculoskeletal pain following a motor vehicle accident.

497.    Despite not being medically unnecessary, Lifschutz prescribed this Compounded Product to R.M. on 2 additional occasions again using a stamp of the set formulation.

498.    SMK Pharmacy billed Allstate for DCLTM 180G Cream on November 28, 2018, April 3, 2019, and May 17, 2019 for a total charge of $2,259.88.

499.    To the extent that Allstate paid SMK Pharmacy in reliance on the documents created and submitted in connection with the drugs and medications for R.M., Allstate is entitled to recover all payments made to SMK Pharmacy in connection with these services, including, but not limited to, the payments listed in Exhibit 3.  To the extent that any of SMK Pharmacy's charges for the drugs for R.M. remain unpaid, Allstate has no further obligation to make payment because R.M.'s charges are not compensable under New York's No-Fault laws.

*c.    Exemplar Claim—Claimant J.A. (0486141575)*

500.    Claimant J.A. purportedly was involved in a motor vehicle accident on December 21, 2017.

501.    J.A. presented to non-party Lifschutz for an initial neurology and pain evaluation on January 10, 2018 for complaints of headaches, neck pain, right shoulder pain, and mid-low back pain.

502.    At this initial visit, Lifschutz prescribed J.A. with a compounded product containing the predetermined formula of diclofenac 10%, cyclobenzaprine 3%, lidocaine 5%, tetracaine 3%, and menthol 2%, known as "DCLTM 180G Cream," for use on J.A.'s "affected regions" generally even though this compounded topical pain product containing both lidocaine

and diclofenac was not indicated to treat J.A.'s complaints of musculoskeletal pain following a motor vehicle accident.

503.    Lifschutz also simultaneously prescribed an oral NSAID (Celebrex) and a muscle relaxer (Tizanidine) alongside the DCLTM 180G Cream even though this Compounded Product also contained these agents, thus resulting in therapeutic duplication.

504.    Lifschutz prescribed this Compounded Product to J.A. using a rubber stamp to apply the predetermined formula to his prescription pad, with one refill, despite no evidence that DCLTM 180G Cream would be effective to treat J.A.'s complaints of pain to the shoulder and spine:



505.    Lifschutz refilled this prescription for DCLTM 180G Cream for J.A. 4 additional times despite no documentation that the medication was effective to treat J.A.'s complaints of pain. Rather, Lifschutz merely noted that J.A. was "running low" on the cream and directed that it be refilled, which needlessly created a total of 6 billing opportunities for SMK Pharmacy at a rate of approximately $820.79 each time that DCLTM 180G Cream purportedly was dispensed to J.A.

506.    Indeed, after months of repeated refills of the DCLTM 180G Cream, J.A. reported, at best, minimal improvements in pain levels from her initial complaints.

507.    By September 27, 2018, Lifschutz reported that J.A. continued to complain of headaches, neck pain, right shoulder pain, and middle/lower back pain of just incrementally decreased intensity than what J.A. complained of in January 2018 to the same areas.

508.    Allstate paid SMK Pharmacy $831.00 in connection with medically unnecessary drugs and medications prescribed by Lifschutz to J.A.

509.    To the extent that Allstate paid SMK Pharmacy in reliance on the documents created and submitted in connection with the drugs and medications for J.A., Allstate is entitled to recover all payments made to SMK Pharmacy in connection with these services, including, but not limited to, the payments listed in Exhibit 3.  To the extent that any of SMK Pharmacy's charges for the drugs for J.A. remain unpaid, Allstate has no further obligation to make payment because J.A.'s charges are not compensable under New York's No-Fault laws.

### d.    *Exemplar Claim—Claimant G.M. (0685678807)*

510.    Claimant G.M. purportedly was involved in a motor vehicle accident on September 13, 2022.

511.    A week later, G.M. was evaluated by non-party Joyce Goldenberg, M.D. ("Goldenberg") for complaints of pain to the neck, lower back, left shoulder, left knee, left ankle, and left foot.

512.    At this initial visit, Goldenberg prescribed G.M. with several medications, including diclofenac sodium 1% topical gel and Lidoderm 5% topical patches, including 2 refills of each topical medication, as well as an oral NSAID and oral muscle relaxer.

513.    However, Goldenberg's reports of subsequent follow-up visits regarding G.M.'s progress do not indicate whether the medications were effective to treat G.M.'s complaints of pain or even acknowledge that G.M. was using the prescribed topical pain medications purportedly dispensed to G.M. by SMK Pharmacy on September 21, 2022, October 21, 2022, November 16, 2022, and January 17, 2023 pursuant to Goldenberg's prescriptions.

514.    Rather, in the reports of follow-up visits, including those for dates of service of November 3, 2022, December 1, 2022, and January 26, 2023, the portions of the reports regarding "medication the patient is currently taking" never include the prescribed Topical Pain Products.

515.    Therefore, SMK Pharmacy billed Allstate 3 times for lidocaine 5% patches purportedly dispensed to G.M. at a rate of $903.59 per prescription and 3 times for diclofenac sodium 1% gel purportedly dispensed to G.M. at a rate of $393.49 per prescription even though these medications—if G.M. was using them at all—were not indicated or effective to treat her complaints of musculoskeletal pain to multiple areas of the body.

516.    Allstate paid SMK Pharmacy $2,583.61 in connection with medically unnecessary drugs and medications prescribed by Goldenberg to G.M.

517.    To the extent that Allstate paid SMK Pharmacy in reliance on the documents created and submitted in connection with the drugs and medications for G.M., Allstate is entitled

to recover all payments made to SMK Pharmacy in connection with these services, including, but not limited to, the payments listed in Exhibit 3.  To the extent that any of SMK Pharmacy's charges for the drugs for G.M. remain unpaid, Allstate has no further obligation to make payment because G.M.'s charges are not compensable under New York's No-Fault laws.

## 2.  S & K Warbasse

### a.  *Exemplar Claim—Claimant A.J. (0697887651)*

518.    Claimant A.J. purportedly was involved in a motor vehicle accident on December 31, 2022.

519.    On January 9, 2023, A.J. was examined by non-party Kyungsook Bu, N.P. ("Bu")—who has a history of alleged participation in No-Fault schemes to defraud—for complaints of headaches, lower back pain, hip pain, and bilateral knee pain.

520.    At this initial visit, Bu merely circled a preprinted list of "management plan" options, including "Medications: Tylenol/Motrin PM" and did not indicate that any other medications were recommended:



521.    However, Bu actually prescribed A.J. with several medications on January 9, 2023, including diclofenac sodium 3% gel, cyclobenzaprine 7.5mg tablets, and the NSAID Celebrex, and transmitted these prescriptions to S & K Warbasse even though there was no discussion of the indications or directions for use of these medications in Bu's report.  S & K Warbasse purportedly dispensed these 3 medications to A.J. on January 19, 2023.

522.    Bu again examined A.J. on February 14, 2023, through a different clinic, for complaints of neck pain, low back pain, right shoulder pain, and right knee pain.

523.    Notably, Bu reported that A.J. was not taking any medications at the time of this February 14, 2023 visit despite the medications prescribed by Bu to A.J. at the prior visit:

**MEDICATIONS:** None.

524.    According to the report of the February 14, 2023 visit, Bu prescribed A.J. with cyclobenzaprine 7.5mg tablets, Celebrex, "diclofenac," and "lidocaine," and prescriptions for the cyclobenzaprine, Celebrex, and diclofenac sodium 3% gel again were transmitted to S & K Warbasse, which purportedly delivered these 3 medications to A.J. on March 6, 2023.  Bu also prescribed A.J. with lidocaine 5% ointment on February 14, 2023, but transmitted this prescription to another pharmacy, non-party Better Soon Rx Inc., to conceal that A.J. was prescribed 2 unnecessary Topical Pain Products and to distribute the billing for these Topical Pain Products to different pharmacies.

525.    On March 16, 2023, A.J. was re-evaluated by another provider at the same clinic, and was again prescribed cyclobenzaprine 7.5mg tablets, Celebrex, diclofenac sodium 3% gel, and lidocaine 5% ointment even though the report of this follow-up visit does not contain any discussion as to whether these medications previously dispensed by S & K Warbasse were effective to treat A.J.'s complaints of musculoskeletal pain or were even being used by A.J.

526.    On March 21, 2023, however, Bu transmitted prescriptions to yet another pharmacy, non-party Volfi, for lidocaine 5% ointment, diclofenac sodium 3% gel, cyclobenzaprine

7.5mg tablets, and Celebrex for A.J., which medications Volfi purportedly delivered to A.J. on March 27, 2023.

527.    A.J. was re-examined at the clinic on April 17, 2023 for complaints of lower back pain and left knee pain; the report of this follow-up examination does not contain any discussion of A.J.'s present medications, their efficacy, or whether A.J. was using the medications, yet Bu again prescribed A.J. with cyclobenzaprine 7.5mg tablets, Celebrex, diclofenac sodium 3% gel, and lidocaine 5% ointment as a matter of course.

528.    On April 17, 2023, Bu again sent prescriptions for cyclobenzaprine 7.5mg tablets, Celebrex, diclofenac sodium 3% gel, and lidocaine 5% ointment to Volfi, which purportedly delivered these medications to A.J. on April 26, 2023.

529.    The lack of discussion in the reports of the examinations of A.J. regarding these medications, including 2 Topical Pain Products, billed to Allstate by S & K Warbasse and Volfi on 4 separate occasions underscores that these medications simply were not indicated to treat A.J.'s complaints of musculoskeletal pain to multiple areas of the body, including the spine, shoulder, and knee.

530.    Rather, these medications, including expensive topical gels and ointments and the uncommon—and higher priced—7.5mg dosage of cyclobenzaprine, were funneled to S & K Warbasse and Volfi to inflate the charges submitted to Allstate, which totaled nearly $14,000.00.

531.    To the extent that Allstate paid S & K Warbasse in reliance on the documents created and submitted in connection with the drugs for A.J., Allstate is entitled to recover all payments made to S & K Warbasse in connection with these services, including, but not limited to, the payments listed in Exhibit 4.  To the extent that any of S & K Warbasse's charges for the

drugs for A.J. remain unpaid, Allstate has no further obligation to make payment because A.J.'s charges are not compensable under New York's No-Fault laws.

**b.** ***Exemplar Claim—Claimant H.W. (0697926582)***

532.    Claimant H.W. was purportedly involved in a motor vehicle accident on January 1, 2023.

533.    On January 12, 2023, H.W. was examined by non-party Bu for complaints including headaches and pain to the spinal axis.

534.    According to the report of this initial visit, Bu prescribed H.W. with a protocol of medications consisting of Celebrex, lidocaine 5% ointment, cyclobenzaprine 7.5mg tablets, and diclofenac sodium 3% gel, but did not include any discussion as to the specific indications for each medication.

535.    Bu transmitted the prescriptions for Celebrex and cyclobenzaprine to S & K Warbasse, which purportedly delivered the medications to H.W. on January 21, 2023; Bu transmitted the prescription for lidocaine 5% ointment for H.W. to a different pharmacy, Better Soon Rx Inc., even though S & K Warbasse regularly bills for lidocaine 5% ointment. Rather, Bu intentionally distributed the billing for these drugs and medications to 2 different pharmacies to conceal that H.W. was prescribed multiple unnecessary drugs and medications and to maintain a variety of unlawful referral relationship with pharmacies.

536.    Bu re-examined H.W. on February 13, 2023 through a different clinic for complaints of neck pain, mid back pain, and lower back pain.

537.    Even though Bu had prescribed several medications to H.W. at the previous visit, the report of the February 13, 2023 examination reported that H.W. was not using any medications:

**MEDICATIONS:** None.

538.    The report dated February 13, 2023 again indicated that Bu was prescribing H.W. with Celebrex, lidocaine 5% ointment, cyclobenzaprine 7.5mg tablets, and diclofenac sodium 3% gel.  Bu transmitted prescriptions for diclofenac sodium 3% gel, cyclobenzaprine 7.5mg tablets, and Celebrex to S & K Warbasse, which purportedly delivered these medications to H.W. on March 6, 2023.

539.    Just 10 days later, on March 16, 2023, Bu again evaluated H.W.'s complaints of neck pain, mid back pain, and lower back pain.  The report of this visit specifically indicates that H.W. was not taking any pain medications, despite the medications previously prescribed by Bu and purportedly dispensed to H.W. by S & K Warbasse:

**PAIN MEDICATIONS:** None.

540.    Despite no documentation regarding the previously prescribed medications, their efficacy, and whether H.W. was even using the medications, Bu prescribed H.W. at the March 16, 2023 follow-up visit with a laundry list of additional drugs, including cyclobenzaprine 7.5mg tablets, Naprosyn, Celebrex, baclofen, tramadol, Neurontin, diclofenac sodium 3% gel, and lidocaine 5% ointment.

541.    Bu transmitted the prescriptions for the cyclobenzaprine 7.5mg tablets, Celebrex, diclofenac sodium 3% gel, and lidocaine 5% ointment to Volfi, which purportedly delivered the 4

medications to H.W. on March 24, 2023—even though S & K Warbasse purportedly had just delivered diclofenac sodium 3% gel, cyclobenzaprine, and Celebrex to H.W. on March 6.

542.    Bu again examined H.W. on April 25, 2023 for persistent complaints of pain to the neck, mid back, and lower back; the report of this visit, however, does not include any discussion of the previous medications prescribed to H.W., including whether they had any effect or whether H.W. was even using the medications.

543.    Despite the apparent inefficacy of the prescribed medications due to H.W.'s continued complaints of pain, Bu again prescribed H.W. with cyclobenzaprine 7.5mg tablets, Celebrex, diclofenac sodium 3% gel, and lidocaine 5% ointment, which prescriptions were transmitted to Volfi and purportedly delivered to H.W. on May 2, 2023.

544.    The lack of any discussion regarding whether the medications prescribed by Bu, including 2 expensive Topical Pain Products and an uncommon—and costly—dosage of cyclobenzaprine, were indicated (they were not) or effective (they were not) is telling.  Bu prescribed these medications and transmitted the prescriptions as part of a predetermined protocol designed to inflate the charges submitted to Allstate at the expense of H.W.'s care to over $12,000.00.

545.    To the extent that Allstate paid S & K Warbasse in reliance on the documents created and submitted in connection with the drugs for H.W., Allstate is entitled to recover all payments made to S & K Warbasse in connection with these services, including, but not limited to, the payments listed in Exhibit 4.  To the extent that any of S & K Warbasse's charges for the drugs for H.W. remain unpaid, Allstate has no further obligation to make payment because H.W.'s charges are not compensable under New York's No-Fault laws.

### c.      *Exemplar Claim—Claimant M.N. (0614067197)*

546.     Claimant M.N. purportedly was involved in a motor vehicle accident on January 30, 2021.

547.     On March 2, 2021, M.N. was examined by non-party Osvaldas Pranevicius, M.D. ("Pranevicius") for complaints of neck pain and upper and lower back pain.

548.     Pranevicius's report of this initial examination recommended that M.N. undergo a course of NSAIDs along with other interventions, including steroid injections.

549.     However, the NSAID purportedly chosen by Pranevicius for M.N. was not a first-line treatment with a commercially available oral NSAID, but diclofenac sodium 3% gel, which is not indicated or effective to treat musculoskeletal pain such as that complained of by M.N.  Rather, diclofenac sodium 3% gel is indicated to treat a skin condition called actinic keratosis.

550.     Pranevicius purportedly prescribed the diclofenac sodium 3% gel on March 2, 2021 using a telephone prescription form known to be used to submit false and fraudulent prescriptions:



551.    On March 19, 2021, non-party Volfi purportedly dispensed the diclofenac sodium 3% gel prescribed by Pranevicius to M.N.

552.    Pranevicius prescribed other medications to M.N. on March 2, 2021, including another unnecessary Topical Pain Product, lidocaine 5% ointment, but funneled these prescriptions to another pharmacy, non-party Bronx Chemists Rx, Inc., to conceal the multiple ineffective and expensive Topical Pain Products prescribed to M.N.

553.    On March 30, 2021, M.N. followed up with Pranevicius for persistent complaints of constant neck pain and lower back pain.  In his report of this follow-up visit, Pranevicius specifically noted that "[c]urrent treatments provided minimal pain relief."

554.    Pranevicius's March 30, 2021 report does not contain any documentation whatsoever that M.N. was using the prescribed diclofenac sodium 3% gel—and even if she was, it was not affording her any relief.

555.    Despite the diclofenac gel's lack of efficacy and no mention of prescribed medications in his March 30, 2021 report, Pranevicius renewed the prescription of diclofenac sodium 3% gel for M.N. using the same fraudulent telephone prescription form, which was submitted to Volfi.  Again, Pranevicius also needlessly transmitted another prescription for lidocaine 5% ointment on the same day to another pharmacy.

556.    On April 15, 2021, Volfi purportedly delivered diclofenac sodium 3% gel to M.N. in Monroe, NY a second time.

557.    Pranevicius again examined M.N. on May 5, 2021, June 1, 2021, and July 15 2021, but the reports of these visits do not review any prescribed medications, their use, or their efficacy despite Pranevicius's numerous prescribed medications for M.N.

558.    On July 15, 2021, however, Pranevicius renewed his prescription for diclofenac sodium 3% gel—without any documented rationale—using the same fraudulent telephone prescription form.

559.    This time, Pranevicius transmitted the fraudulent prescription for unnecessary diclofenac sodium 3% gel to S & K Warbasse, which purported to deliver the medication to M.N. in Monroe, NY (which is nearly 80 miles away from S & K Warbasse's Brooklyn location) on August 3, 2021—even though the delivery receipt does not indicate whether M.N. requested counseling or whether the medication was actually delivered:



560. The reports of subsequent follow-up examinations of M.N. dated August 10, 2021 and September 28, 2021 contain no discussion of any medications prescribed or used by M.N.

561. S & K Warbasse and Volfi billed Allstate a combined $5,691.57 alone for the diclofenac sodium 3% gel fraudulently prescribed by Pranevicius to M.N.

562. To the extent that Allstate paid S & K Warbasse in reliance on the documents created and submitted in connection with the drugs for M.N., Allstate is entitled to recover all payments made to S & K Warbasse in connection with these services, including, but not limited to, the payments listed in Exhibit 4. To the extent that any of S & K Warbasse's charges for the drugs for M.N. remain unpaid, Allstate has no further obligation to make payment because M.N.'s charges are not compensable under New York's No-Fault laws.

### d.     Exemplar Claim—Claimant S.S. (0603715236)

563. Claimant S.S. purportedly was involved in a motor vehicle accident on October 16, 2020.

564.    On October 20, 2020, S.S. underwent an initial examination with non-party John Greco, M.D. ("Greco") at Metro Pain for complaints as to the head, spinal axis, left shoulder, left hip, and right knee.

565.    As noted above, Greco has been the subject of numerous allegations that he prescribed medically unnecessary Topical Pain Products pursuant to a predetermined protocol when treating Metro Pain patients.

566.    Consistent with these allegations, Greco also prescribed medically unnecessary Topical Pain Products, among other medications, to S.S. at the initial visit at Metro Pain; according to the report of this initial visit, Greco circled several pre-printed medications to prescribe to S.S., including lidocaine 5% ointment and diclofenac sodium 3% gel:



567.    Greco issued several prescriptions for S.S. following this initial visit, including for medically unnecessary diclofenac sodium 3% gel, Lidothol patches, and lidocaine 5% ointment, which were distributed among different pharmacies, including S & K Warbasse, to conceal that S.S. was being subjected to numerous duplicative and expensive medications.

568.    Greco purportedly prescribed Lidothol patches and cyclobenzaprine 7.5mg tablets to S.S. following this initial examination using the same telephone prescription form identified as used to transmit false and fraudulent prescriptions to S & K Warbasse:

128

**LEADER** ™    *Telephone Prescription*

Kinray Generic Customer Service • Phone: 347-438-2884

Name _____    Age _____
Address _____    Date 07/22/20
Pharmacist _____    Time _____
Phone# _____    Refill _____

℞

Spone        30 Lidothol Pad
tomd              4.5-5%.
VD          Apply 1-3 patches
            for 12 hours on and
            12 hours off

This Prescription Will Be Filled Generically Unless
Prescriber Writes 'd a w' In The Box Below

Dispense As Written

Dr. Greco, John _____    Tel: 929-405-
Address _____       0039
Lic. No. _____    DEA# _____

Not A Physician Pad • Pharmacy Use Only

---

**LEADER** ™    *Telephone Prescription*

Kinray Generic Customer Service • Phone: 347-438-2884

Name _____    Age _____
Address _____    Date 10/22/20
Pharmacist _____    Time _____
Phone# _____    Refill _____

℞

Spone        30 cyclobenzpr 7.5mg
tomd         one tablet by
VD           mouth twice a
                 day

This Prescription Will Be Filled Generically Unless
Prescriber Writes 'd a w' In The Box Below

Dispense As Written

Dr. Greco, John _____    Tel: 929-405-
Address _____       0039
Lic. No. _____    DEA# _____

Not A Physician Pad • Pharmacy Use Only

569.    Greco also purportedly submitted a pre-printed prescription form dated October 22, 2020—also identified as used to transmit false and fraudulent prescriptions to S & K Warbasse— that circled Lidothol patches and cyclobenzaprine 7.5mg tablets to be prescribed to S.S.

570.    These prescription forms for S.S. were transmitted by Greco, or someone working at Metro Pain, to S & K Warbasse.  However, S & K Warbasse did not deliver these medications to S.S. until December 3, 2020, according to the delivery receipt, which does not indicate whether S.S. requested counseling or whether the medications were actually delivered to S.S.



571.    On January 5, 2021, S.S. was re-examined by Greco at Metro Pain for persistent complaints of moderate spinal axis pain and bilateral knee pain.  The report of this follow-up visit does not indicate that S.S. had any current medications even though S & K Warbasse purportedly

delivered Lidothol patches and cyclobenzaprine tablets to S.S. the previous month pursuant to Greco's prescriptions:

Current Medication: _____

572.     Therefore, Greco did not prescribe the Lidothol and cyclobenzaprine tablets to S.S. as a part of a legitimate treatment plan as evidenced by his failure to assess or consider how S.S. was responding to the prescribed medications or if she was using them at all.

573.     Allstate paid S & K Warbasse $1,435.50 in connection with medically unnecessary drugs and medications prescribed by Greco to S.S.

574.     To the extent that Allstate paid S & K Warbasse in reliance on the documents created and submitted in connection with the drugs for S.S., Allstate is entitled to recover all payments made to S & K Warbasse in connection with these services, including, but not limited to, the payments listed in Exhibit 4.  To the extent that any of S & K Warbasse's charges for the drugs for S.S. remain unpaid, Allstate has no further obligation to make payment because S.S.'s charges are not compensable under New York's No-Fault laws.

*e.*     ***Exemplar Claim—Claimant J.G. (0595330135)***

575.     Claimant J.G. purportedly was involved in a motor vehicle accident on August 3, 2020.

576.     The following day, J.G. underwent an initial examination with Greco at Metro Pain for complaints of pain of the neck, lower back, left wrist, and right ankle.

577.    Greco circled several medications to be prescribed in the report of J.G.'s initial examination, including, Flexeril (i.e., cyclobenzaprine), Naprosyn (i.e., naproxen), and lidocaine 5% ointment:



578.    On August 4, 2020, Greco purportedly prescribed these 3 medications, including lidocaine 5% ointment, to J.G. using the same telephone prescription forms identified as used to submit false and fraudulent prescriptions to S & K Warbasse:

579.    The lidocaine 5% ointment purportedly was delivered to J.G. by S & K Warbasse on September 23, 2020—7 weeks after the medication was prescribed—thus highlighting the utter lack of necessity for the lidocaine 5% ointment to treat J.G.'s complaints of musculoskeletal pain.

580.    J.G. underwent a follow-up examination with Greco at Metro Pain on October 13, 2020 with persistent complaints of moderate pain to the spinal axis.  Despite Greco's previous prescriptions for several medications for J.G., including lidocaine 5% ointment purportedly dispensed to J.G. by S & K Warbasse, Greco's report of this follow-up visit is silent as to any current medications being used by J.G.:



581.    Without any discussion of whether the lidocaine 5% ointment was effective, or even being used by J.G., Greco proceeded on October 13, 2020 to again prescribe several medications to J.G., including unnecessary lidocaine 5% ointment and diclofenac sodium 3% gel:



582.    On or about October 13, 2020, Greco, or someone working for Metro Pain, submitted false and fraudulent prescription forms to S & K Warbasse, including a telephone prescription form purporting to prescribe 250 grams of lidocaine 5% ointment to J.G.:

583.    Greco prescribed another medically unnecessary Topical Pain Product to J.G. on October 13, 2020, diclofenac sodium 3% gel, which was purportedly dispensed by another pharmacy even though S & K Warbasse regularly billed Allstate for diclofenac sodium 3% gel.

584.    S & K Warbasse purportedly delivered the unnecessary and ineffective lidocaine 5% ointment to J.G. several weeks later on November 6, 2020.

585.    On November 12, 2020, J.G. underwent another follow-up examination with Greco at Metro Pain with continued complaints of pain to the spinal axis.  However, Greco again failed to record any indication that the lidocaine 5% ointment was effective to treat J.G.'s musculoskeletal pain (it was not) or even being used at all:

Recent Surgery: _____

Current Medication: _____

586.    Overall, Greco repeatedly prescribed medically unnecessary lidocaine 5% ointment to J.G. and transmitted the fraudulent prescriptions to S & K Warbasse as part of a predetermined prescription protocol implemented as part of the unlawful referral relationship between S & K Warbasse and Metro Pain.

587.    S & K Warbasse billed Allstate $2,752.78 alone for the lidocaine 5% ointment fraudulently prescribed by Greco to J.G.

588.    To the extent that Allstate paid S & K Warbasse in reliance on the documents created and submitted in connection with the drugs for J.G., Allstate is entitled to recover all payments made to S & K Warbasse in connection with these services, including, but not limited to, the payments listed in Exhibit 4.  To the extent that any of S & K Warbasse's charges for the drugs for J.G. remain unpaid, Allstate has no further obligation to make payment because J.G.'s charges are not compensable under New York's No-Fault laws.

### f.    Exemplar Claim—Claimant J.S. (0619060072)

589.    Claimant J.S. purportedly was involved in a motor vehicle accident on March 9, 2021.

590.    J.S. was examined by non-party Barakat on March 11, 2021 for complaints of pain to the neck, lower back, and left shoulder.

591.    Barakat prescribed Lidothol patches to J.S. on the date of the initial examination just days after the underlying motor vehicle accident without affording J.S. any opportunity to undergo a course of conservative care and even though Lidothol patches are not indicated to treat

musculoskeletal pain over several large areas such as that complained of by J.S. and are not FDA approved as safe and effective.

592.    Barakat prescribed the Lidothol patches to J.S. using a rubber stamp applied to his prescription pad and transmitted the prescription to S & K Warbasse:



593.    S & K Warbasse purportedly delivered the Lidothol patches to J.S. on March 18, 2021, although the delivery receipt for this medication does not indicate whether J.S. requested counseling or whether the medication was actually delivered:

**S&K WARBASSE PHARMACY INC**

DELIVERY SHEET

499 NEPTUNE AVE
BROOKLYN,NY 11224
718-449-5177

ORDER DATE: 3/18/2021

J    S

PATIENT INFORMATION:

CIRCLE FOR COUNSELING    DELIVERED    TIME DELIVERED

YES    OR    NO    YES    OR    NO

| RXS | | |
| --- | --- | --- |
| 1336287 | LIDOTHOL PATCHES | |

594.    Barakat renewed these prescriptions for unnecessary, ineffective, and unapproved Lidothol patches for J.S. on April 8, 2021 and May 6, 2021 despite no documentation in the reports of Barakat's follow-up examinations that there was any benefit to the medications.

595.    S & K Warbasse purported to dispense the Lidothol patches to J.S. pursuant to Barakat's fraudulent prescriptions on April 16, 2021 and May 12, 2021 again without documenting whether J.S. requested counseling or whether the medications were actually delivered.

596.    Barakat also prescribed unnecessary lidocaine 5% ointment to J.S., but transmitted these prescriptions to pharmacies other than S & K Warbasse to conceal the prescription of multiple medically unnecessary, duplicative, and ineffective Topical Pain Products.

597.    Barakat prescribed the Lidothol patches to J.S. as part of a predetermined prescription protocol and unlawful referral relationship with S & K Warbasse to allow S & K Warbasse to submit inflated charges for the unnecessary topical patches.

598.   S & K Warbasse billed Allstate $7,897.20 for the Lidothol patches fraudulently prescribed by Barakat to J.S.

599.   To the extent that Allstate paid S & K Warbasse in reliance on the documents created and submitted in connection with the drugs for J.S., Allstate is entitled to recover all payments made to S & K Warbasse in connection with these services, including, but not limited to, the payments listed in Exhibit 4.  To the extent that any of S & K Warbasse's charges for the drugs for J.S. remain unpaid, Allstate has no further obligation to make payment because J.S.'s charges are not compensable under New York's No-Fault laws.

### g.   *Exemplar Claim—Claimant J.F. (0611966631)*

600.   Claimant J.F. purportedly was involved in a motor vehicle accident on December 31, 2020.

601.   On January 12, 2021, non-party Pranevicius examined J.F. for complaints of neck pain, upper and lower back pain, right shoulder pain, and left knee pain.  Pranevicius recommended that J.F. begin a course of NSAIDs, along with other interventions and studies.

602.   However, the NSAID that Pranevicius prescribed following this initial examination of J.F. was an ineffective and unnecessary diclofenac sodium 3% gel, which is indicated to treat a skin condition called actinic keratosis and not J.F.'s complaints of musculoskeletal pain over several areas of the body.

603.   Pranevicius purportedly prescribed the diclofenac sodium 3% gel for J.F. using a telephone prescription form known to be used to submit false and fraudulent prescriptions to S & K Warbasse:



604.    S & K Warbasse purportedly delivered the diclofenac sodium 3% gel purportedly prescribed by Pranevicius to J.F. on February 3, 2021 to J.F.'s home in Nanuet, NY, which is approximately 60 miles away from S & K Warbasse's Brooklyn location.  However, the receipt for this delivery does not indicate whether J.F. requested counseling or whether the medication actually was delivered:



605.    Pranevicius reexamined J.F. for persistent complaints of pain of the neck, upper and lower back, right shoulder, and left knee at several follow-up visits on March 2, 2021, March 23, 2021, April 20, 2021, May 25, 2021, and June 28, 2021.  None of the reports of these follow-up visits ever document that J.F. was actually using the prescribed medications, including the diclofenac sodium 3% gel, or that they were in any way effective (they were not).

606.    Nonetheless, Pranevicius continuously renewed the prescription for diclofenac sodium 3% gel on March 2, 2021, April 9, 2021, and April 20, 2021 through transmission of the same fraudulent telephone prescription form to S & K Warbasse:



607.    S & K Warbasse purportedly delivered the diclofenac sodium 3% gel prescribed by

Pranevicius to J.F. at J.F.'s Nanuet, NY residence on March 19, 2021, April 12, 2021, and May

21, 2021.  However, the receipt for each delivery fails to document whether J.F. requested counseling or whether the medications were actually delivered to J.F.

608.    Even if J.F. received the diclofenac sodium 3% gel, this medication was not necessary or effective to treat J.F.'s complaints of musculoskeletal pain and, rather, was prescribed by Pranevicius and dispensed by S & K Warbasse pursuant to an unlawful referral relationship to permit S & K Warbasse to bill Allstate for expensive—but wholly unnecessary—Topical Pain Products.

609.    S & K Warbasse billed Allstate a total of $7,588.76 for diclofenac sodium 3% gel purportedly dispensed to J.F. pursuant to this unlawful arrangement.

610.    Pranevicius also prescribed J.F. with lidocaine 5% ointment alongside the diclofenac sodium 3% gel, but directed the lidocaine ointment prescriptions to other pharmacies to conceal his multiple unnecessary prescriptions for Topical Pain Products for J.F.

611.    To the extent that Allstate paid S & K Warbasse in reliance on the documents created and submitted in connection with the drugs for J.F., Allstate is entitled to recover all payments made to S & K Warbasse in connection with these services, including, but not limited to, the payments listed in Exhibit 4.  To the extent that any of S & K Warbasse's charges for the drugs for J.F. remain unpaid, Allstate has no further obligation to make payment because J.F.'s charges are not compensable under New York's No-Fault laws.

## VI.    SPECIFIC ALLEGATIONS OF MAIL FRAUD RACKETEERING ACTIVITY

612.    The Defendants (a) created, prepared, and submitted (or caused to be created, prepared, and submitted) false No-Fault claim reimbursement documentation, (b) intentionally violated the laws of the United States by devising and intending to devise, schemes to defraud and obtain money and property using false and fraudulent pretenses and representations, and (c) placed,

or caused to be placed, in a post office and/or authorized depository for mail matter, things to be sent and delivered by the United States Postal Service, in violation of 18 U.S.C. § 1341 (mail fraud) to execute, or attempt, such fraudulent schemes.

613.    Unless otherwise pled to the contrary, all documents, notes, reports, invoices, prescription forms, delivery receipts, health insurance claim forms, assignment of benefit forms, letters of medical necessity, peer-review rebuttals, other No-Fault claim reimbursement documents, letters, and requests for payment in connection with the insurance claims referenced throughout this pleading (and accompanying exhibits) traveled through the U.S. Mail.

614.    Every automobile insurance claim detailed within this Complaint involved at least one use of the U.S. Mail, including the mailing of, among other things, the notice of claim, initial policies, insurance payments, claim-related payments, and the return of the canceled payment instruments to the financial institution(s) from which the draft(s) were drawn.

### A.    SMK PHARMACY ENTERPRISE

615.    Volman, Field, Kassman, and Burlak either personally used (or caused the use of) the U.S. Mail to further this fraudulent scheme by causing claimants' prescription records and treatment records, peer-review rebuttals, and/or invoices/bills from SMK Pharmacy to be mailed to Allstate (and/or counsel for claimants) or acted with knowledge that the use of the U.S. Mail would follow in the ordinary course of business.

616.    Volman, Field, Kassman, and Burlak caused SMK Pharmacy to falsely certify that it was eligible to be reimbursed under New York's No-Fault Laws each time that SMK Pharmacy mailed (or was caused to mail) a demand for payment (i.e., invoice or bill) to Allstate.

617.    Volman, Field, Kassman, and Burlak's participation in the operation and management of SMK Pharmacy, which included, among other things, (a) owning SMK Pharmacy,

(b) facilitating unlawful prescriptions between SMK Pharmacy and prescribers, (c) dispensing medically unnecessary and ineffective drugs and medications to SMK Pharmacy's patients, and (d) causing SMK Pharmacy to submit false and fraudulent No-Fault benefit claims to Allstate, rendered SMK Pharmacy completely ineligible for No-Fault reimbursement under New York law.

618. As a result of the above-described conduct, Volman, Field, Kassman, and Burlak purposely caused SMK Pharmacy to make a misrepresentation every time that SMK Pharmacy mailed (or was caused to mail) a document to Allstate claiming eligibility for No-Fault reimbursement.

619. Moreover, because (a) Volman, Field, Kassman, and Burlak engaged in (or caused) the above-described unlawful conduct through their participation in the operation and management of SMK Pharmacy, (b) Volman, Field, Kassman, and Burlak caused SMK Pharmacy to seek No-Fault reimbursement from Allstate (even though SMK Pharmacy was not lawfully entitled to such reimbursement), and (c) SMK Pharmacy used (or was caused to use) the U.S. Mail to seek reimbursement, it is clear that Volman, Field, Kassman, and Burlak committed mail fraud.

620. At all relevant times, Volman, Field, Kassman, and Burlak knew that SMK Pharmacy (including its employees, owner(s), contractors, and agents), a customer, a claimant, an insurance carrier, a claimant's attorney, other healthcare providers, or Allstate would use (or be caused to use) the U.S. Mail in connection with each of the fraudulent claims, including issuing payments based upon the documentation mailed by (or on behalf of) SMK Pharmacy.

621. Allstate estimates that the unlawful operation of the SMK Pharmacy enterprise generated hundreds of mailings. A table highlighting selected examples of mailings made in furtherance of this scheme is annexed at Exhibit 5 and incorporated herein by reference as if outlined in its entirety.

**B.    S & K WARBASSE ENTERPRISE**

622.    Field, Leis, Volman, and Mitsel either personally used (or caused the use of) the U.S. Mail to further this fraudulent scheme by causing claimants' prescription records and treatment records, peer-review rebuttals, and/or invoices/bills from S & K Warbasse to be mailed to Allstate (and/or counsel for claimants) or acted with knowledge that the use of the U.S. Mail would follow in the ordinary course of business.

623.    Field, Leis, Volman, and Mitsel caused S & K Warbasse to falsely certify that it was eligible to be reimbursed under New York's No-Fault Laws each time that S & K Warbasse mailed (or was caused to mail) a demand for payment (i.e., invoice or bill) to Allstate.

624.    Field, Leis, Volman, and Mitsel's participation in the operation and management of S & K Warbasse, which included, among other things, (a) owning S & K Warbasse, (b) facilitating unlawful prescriptions between S & K Warbasse and prescribers, (c) dispensing medically unnecessary and ineffective drugs and medications to S & K Warbasse's patients, and (d) causing S & K Warbasse to submit false and fraudulent No-Fault benefit claims to Allstate, rendered S & K Warbasse completely ineligible for No-Fault reimbursement under New York law.

625.    As a result of the above-described conduct, Field, Leis, Volman, and Mitsel purposely caused S & K Warbasse to make a misrepresentation every time that S & K Warbasse mailed (or was caused to mail) a document to Allstate claiming eligibility for No-Fault reimbursement.

626.    Moreover, because (a) Field, Leis, Volman, and Mitsel engaged in (or caused) the above-described unlawful conduct through their participation in the operation and management of S & K Warbasse, (b) Field, Leis, Volman, and Mitsel caused S & K Warbasse to seek No-Fault reimbursement from Allstate (even though S & K Warbasse was not lawfully entitled to such

reimbursement), and (c) S & K Warbasse used (or was caused to use) the U.S. Mail to seek reimbursement, it is clear that Field, Leis, Volman, and Mitsel committed mail fraud.

627.    At all relevant times, Field, Leis, Volman, and Mitsel knew that S & K Warbasse (including its employees, owner(s), contractors, and agents), a customer, a claimant, an insurance carrier, a claimant's attorney, other healthcare providers, or Allstate would use (or be caused to use) the U.S. Mail in connection with each of the fraudulent claims, including issuing payments based upon the documentation mailed by (or on behalf of) S & K Warbasse.

628.    Allstate estimates that the unlawful operation of the S & K Warbasse enterprise generated hundreds of mailings.  A table highlighting selected examples of mailings made in furtherance of this scheme is annexed at Exhibit 6 and incorporated herein by reference as if outlined in its entirety.

## VII.    SPECIFIC ALLEGATIONS OF FRAUDULENT CONCEALMENT AND MATERIAL MISREPRESENTATIONS MADE TO AND RELIED UPON BY ALLSTATE

### A.    SMK PHARMACY ENTERPRISE

629.    At all relevant times during the operation of the SMK Pharmacy enterprise, Volman, Field, Kassman, and Burlak purposely caused SMK Pharmacy to falsely certify that it was eligible to be reimbursed under New York's No-Fault Laws to induce Allstate to promptly pay charges related to prescription drugs and other pharmacy services purportedly provided to Allstate Claimants who were caused to be customers of SMK Pharmacy.

630.    At all relevant times, Volman, Field, Kassman, and Burlak directly participated in the operation and management of SMK Pharmacy.

631.    Because Volman, Field, Kassman, and Burlak were responsible for causing SMK Pharmacy's (a) billing Allstate for drugs that were not medically necessary and were completely

unjustified to treat the Allstate Claimants' purported injuries, (b) falsely charging for drugs with the knowledge that such drugs were not lawfully reimbursable under New York's No-Fault laws, (c) charging Allstate for drugs at grossly excessive rates, (d) dispensing drugs and medications in violation of applicable regulatory and licensing requirements, and/or (e) maintaining unlawful relationships with prescribers and inducing them, through financial means or otherwise, to furnish prescriptions for medically unnecessary drugs that were to be filled by SMK Pharmacy, SMK Pharmacy was caused to falsely claim eligibility for No-Fault reimbursement each and every time that SMK Pharmacy sought No-Fault reimbursement from Allstate.

632.    As alleged above, Volman, Field, Kassman, and Burlak caused SMK Pharmacy to create and submit to Allstate No-Fault claim reimbursement documents and demands for payment relative to prescription drugs and other pharmacy services that were (a) unlawful, (b) fraudulently reported, (c) completely unnecessary, (d) falsely charged, and/or (e) not actually provided as represented.

633.    Such conduct is unlawful, and rendered each such claim non-compensable under New York's No-Fault laws.

634.    Many of the Defendants' false, fraudulent, and unlawful acts are not readily evident within the documents submitted to Allstate by these Defendants and upon which Allstate relied in adjusting the claims and tendering payment in connection with each discrete patient claim.

635.    Claims under New York's No-Fault laws can only be submitted, and reimbursed, for services that were provided in accordance with all applicable New York state licensing requirements.

636.    Thus, every time that Volman, Field, Kassman, and Burlak caused SMK Pharmacy to submit No-Fault reimbursement demands to Allstate, Volman, Field, Kassman, and Burlak

necessarily certified that SMK Pharmacy was eligible to be reimbursed under New York's No-Fault laws.

637.    The full extent of Volman, Field, Kassman, and Burlak's fraudulent and unlawful acts relative to their participation in the SMK Pharmacy enterprise was not known to Allstate until shortly before it commenced this action.

**B.    S & K Warbasse Enterprise**

638.    At all relevant times during the operation of the S & K Warbasse enterprise, Field, Leis, Volman, and Mitsel purposely caused S & K Warbasse to falsely certify that it was eligible to be reimbursed under New York's No-Fault Laws to induce Allstate to promptly pay charges related to prescription drugs and other pharmacy services purportedly provided to Allstate Claimants who were caused to be customers of S & K Warbasse.

639.    At all relevant times, Field, Leis, Volman, and Mitsel directly participated in the operation and management of S & K Warbasse.

640.    Because Field, Leis, Volman, and Mitsel were responsible for causing S & K Warbasse's (a) billing Allstate for drugs that were not medically necessary and were completely unjustified to treat the Allstate Claimants' purported injuries, (b) falsely charging for drugs with the knowledge that such drugs were not lawfully reimbursable under New York's No-Fault laws, (c) charging Allstate for drugs at grossly excessive rates, (d) dispensing drugs and medications in violation of applicable regulatory and licensing requirements, and/or (e) maintaining unlawful relationships with prescribers and inducing them, through financial means or otherwise, to furnish prescriptions for medically unnecessary drugs that were to be filled by S & K Warbasse, S & K Warbasse was caused to falsely claim eligibility for No-Fault reimbursement each and every time that S & K Warbasse sought No-Fault reimbursement from Allstate.

641. As alleged above, Field, Leis, Volman, and Mitsel caused S & K Warbasse to create and submit to Allstate No-Fault claim reimbursement documents and demands for payment relative to prescription drugs and other pharmacy services that were (a) unlawful, (b) fraudulently reported, (c) completely unnecessary, (d) falsely charged, and/or (e) not actually provided as represented.

642. Such conduct is unlawful, and rendered each such claim non-compensable under New York's No-Fault laws.

643. Many of the Defendants' false, fraudulent, and unlawful acts are not readily evident within the documents submitted to Allstate by these Defendants and upon which Allstate relied in adjusting the claims and tendering payment in connection with each discrete patient claim.

644. Claims under New York's No-Fault laws can only be submitted, and reimbursed, for services that were provided in accord with all applicable New York state licensing requirements.

645. Thus, every time that Field, Leis, Volman, and Mitsel caused S & K Warbasse to submit No-Fault reimbursement demands to Allstate, Field, Leis, Volman, and Mitsel necessarily certified that S & K Warbasse was eligible to be reimbursed under New York's No-Fault laws.

646. The full extent of Field, Leis, Volman, and Mitsel's fraudulent and unlawful acts relative to their participation in the S & K Warbasse enterprise was not known to Allstate until shortly before it commenced this action.

## VIII.  **ALLSTATE'S JUSTIFIABLE RELIANCE**

647. Each claim submitted to Allstate by the Pharmacy Defendants was verified according to Insurance Law § 403.

648.    Volman, Field, Kassman, and Burlak, as owners of SMK Pharmacy, were responsible for the proper conduct of SMK Pharmacy in accordance with New York law.

649.    Kassman, as SMK Pharmacy's supervising pharmacist during the relevant period, was responsible for the proper conduct of SMK Pharmacy in accordance with New York law.

650.    Burlak, as SMK Pharmacy's supervising pharmacist during the relevant period, was responsible for the proper conduct of SMK Pharmacy in accordance with New York law.

651.    Field, Leis, and Mitsel, as owners of S & K Warbasse, were responsible for the proper conduct of S & K Warbasse in accordance with New York law.

652.    Leis, as S & K Warbasse's supervising pharmacist during the relevant period, was responsible for the proper conduct of S & K Warbasse in accordance with New York law.

653.    Volman, as S & K Warbasse's original supervising pharmacist, was responsible for the proper conduct of S & K Warbasse in accordance with New York law.

654.    To induce Allstate to promptly pay the Pharmacy Defendants' patient invoices, the Defendants submitted (or caused to be submitted) to Allstate NF-3 bills certifying that the Pharmacy Defendants were eligible to be reimbursed under New York's No-Fault Laws.

655.    Further, to induce Allstate to promptly pay the fraudulent charges for prescription drug and other pharmacy services purportedly provided to Allstate Claimants, the Defendants hired attorneys to pursue collection of the fraudulent and/or non-compensable charges from Allstate. These attorneys routinely file time-consuming and expensive lawsuits and arbitration matters against Allstate.

656.    Allstate is under statutory and contractual obligations to promptly and fairly process claims within 30 days. The facially valid documents submitted to Allstate by (or on behalf of) the Pharmacy Defendants in support of the fraudulent and/or non-compensable charges at issue,

combined with the material misrepresentations described above, were designed to, and did, cause Allstate to justifiably rely on them.

657.    The Defendants concealed from Allstate the truth regarding the Pharmacy Defendants' reimbursement eligibility under New York law.

658.    In reasonable reliance on these misrepresentations, Allstate paid money to the Pharmacy Defendants to its detriment.

659.    Allstate would not have paid these monies had the Defendants provided true and accurate information about the Pharmacy Defendants' reimbursement eligibility under New York law, including (a) the Pharmacy Defendants' No-Fault reimbursement eligibility under N.Y. Insurance Law § 5101, *et seq*., and (b) the fact and necessity of the services purportedly provided to those Allstate Claimants and customers of the Pharmacy Defendants eligible for insurance coverage under an automobile insurance policy issued by Allstate.

660.    As a result, Allstate was caused to pay the Pharmacy Defendants over $952,633.00 in reasonable reliance on the Pharmacy Defendants' false No-Fault claim reimbursement documentation and the Defendants' false representations regarding the Pharmacy Defendants' eligibility for reimbursement under New York's No-Fault Laws.

## IX.    <u>DAMAGES</u>

661.    The Defendants' pattern of fraudulent conduct injured Allstate in its business and property by reason of the aforesaid violations of state and federal law.  Although it is not necessary for Allstate to calculate damages with specificity at this stage in the litigation (whereas Allstate's damages continue to accrue), Allstate's injury includes, but is not limited to, compensatory damages for payments in connection with first-party claims in excess of $1,071,349.00, the exact amount to be determined at trial, including:

(a)    Payments made to SMK Pharmacy, Corp. d/b/a Nature's First Long Term Care & Compounding in connection with first-party claims in excess of $869,394.00, the exact amount to be determined at trial.  The chart annexed at Exhibit 3, and incorporated herein as if set forth in its entirety, identifies Allstate's payments to SMK Pharmacy, Corp. d/b/a Nature's First Long Term Care & Compounding in connection with first-party ("No-Fault") claims determined to be fraudulent and non-compensable as of the filing of this Complaint.

(b)    Payments made to S & K Warbasse Pharmacy Inc. d/b/a Warbasse Pharmacy in connection with first-party claims in excess of $201,954.00, the exact amount to be determined at trial.  The chart annexed at Exhibit 4, and incorporated herein as if set forth in its entirety, identifies Allstate's payments to S & K Warbasse Pharmacy Inc. d/b/a Warbasse Pharmacy in connection with first-party ("No-Fault") claims determined to be fraudulent and non-compensable as of the filing of this Complaint.

## X.    **CAUSES OF ACTION**

### **COUNT I**
### **VIOLATIONS OF 18 U.S.C. § 1962(c)**
### **SMK PHARMACY, CORP.**
### **D/B/A NATURE'S FIRST LONG TERM CARE & COMPOUNDING ENTERPRISE**
### **(Against Kim Volman, Simon Field, Marc Kassman, and Alexander Burlak)**

662.    Allstate re-alleges, re-pleads, and incorporates by reference the allegations made in paragraphs 1 through 661 as if set forth fully herein.

663.    In furtherance of their operation and management of SMK Pharmacy, Corp. d/b/a Nature's First Long Term Care & Compounding, Defendants Kim Volman, Simon Field, Marc Kassman, and Alexander Burlak (collectively, "Count I Defendants") intentionally prepared and mailed (or caused to be prepared and mailed) false No-Fault claim reimbursement documentation in connection with Allstate insurance claims in furtherance of this scheme to defraud.

664.    The Count I Defendants employed one or more mailings to demand and/or receive payment on certain dates, including, but not limited to, those dates identified in the chart at Exhibit 5.

665.    Among other things, NF-3 forms, documents, notes, reports, invoices, prescription forms, delivery receipts, health insurance claim forms, assignment of benefit forms, peer-review rebuttals, other No-Fault claim reimbursement documents, letters, and/or payment requests were routinely delivered to Allstate through the U.S. Mail.

666.    Policies of insurance were delivered to two or more Allstate Claimants through the U.S. Mail.

667.    Payments made by Allstate to SMK Pharmacy, Corp. d/b/a Nature's First Long Term Care & Compounding were delivered through the U.S. Mail.

668.    As documented above, the Count I Defendants repeatedly and intentionally submitted, or caused to be submitted, NF-3 forms and other claim-related documentation to Allstate related to Topical Pain Products, Compounded Products, and other drugs dispensed and delivered by SMK Pharmacy, Corp. d/b/a Nature's First Long Term Care & Compounding to collect payment from Allstate under the Personal Injury Protection benefits portion of the Allstate policies and applicable New York No-Fault laws.

669.    When the Count I Defendants mailed (or caused the mailing of) NF-3 forms and other claim-related documents to Allstate seeking No-Fault reimbursement, the Count I Defendants materially misrepresented SMK Pharmacy, Corp. d/b/a Nature's First Long Term Care & Compounding's No-Fault reimbursement eligibility under New York law.

670.    As a result of, and in reasonable reliance upon, the mailing and/or submission of those misleading documents and materially false representations, Allstate, by its agents and employees, issued drafts to SMK Pharmacy, Corp. d/b/a Nature's First Long Term Care & Compounding for the benefit of one or more of the Count I Defendants that would not otherwise have been paid.

671.    The Count I Defendants' pattern of preparing and mailing (or causing/directing the preparation and mailing of) these documents and other claim-related materials, each appearing legitimate on their face, also prevented Allstate from discovering this scheme for a significant period, thus enabling the Count I Defendants to continue this scheme without being detected.

672.    The facts set forth above constitute indictable offenses according to 18 U.S.C. § 1341 (mail fraud).

673.    The activities alleged in this case had the direct effect of causing funds to be transferred from Allstate to SMK Pharmacy, Corp. d/b/a Nature's First Long Term Care & Compounding for the benefit of the Count I Defendants.

674.    Allstate is in the business of writing insurance and paying claims in the State of New York.  Insurance fraud schemes practiced here and elsewhere have a deleterious impact on Allstate's overall financial well-being and adversely affect insurance rates.

675.    SMK Pharmacy, Corp. d/b/a Nature's First Long Term Care & Compounding constitutes an enterprise engaged in, and the activities of which affect, interstate commerce.

676.    The Count I Defendants associated with the foregoing enterprise, and participated—both directly and indirectly—in the conduct of this enterprise through a pattern of racketeering activities.

677.    Allstate is a "person" as defined by 18 U.S.C. § 1961(3) injured in its business or property because of the Count I Defendants' conduct.

678.    The Count I Defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

679.    Because of the Count I Defendants' violations of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained because of the claims submitted

by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

**COUNT II**
**VIOLATIONS OF 18 U.S.C. § 1962(d)**
**SMK PHARMACY, CORP.**
**D/B/A NATURE'S FIRST LONG TERM CARE & COMPOUNDING ENTERPRISE**
**(Against Kim Volman, Simon Field, Marc Kassman, and Alexander Burlak)**

680.    Allstate re-alleges, re-pleads, and incorporates by reference all paragraphs set forth above in paragraphs 1 through 661 as if fully set forth herein.

681.    Through their participation in the operation and management of SMK Pharmacy, Corp. d/b/a Nature's First Long Term Care & Compounding, Defendants Kim Volman, Simon Field, Marc Kassman, and Alexander Burlak (collectively, "Count II Defendants") conspired with each other to violate 18 U.S.C. § 1962(d).

682.    The Count II Defendants each agreed to participate in a conspiracy to violate 18 U.S.C. § 1962(d) by agreeing to conduct the affairs of SMK Pharmacy, Corp. d/b/a Nature's First Long Term Care & Compounding through a pattern of racketeering activity, including numerous acts of mail fraud as outlined in Exhibit 5, and through the preparation and/or submission of fraudulent insurance claim documents, including NF-3 forms, to Allstate.

683.    The purpose of the conspiracy was to obtain No-Fault payments from Allstate on behalf of SMK Pharmacy, Corp. d/b/a Nature's First Long Term Care & Compounding, even though SMK Pharmacy, Corp. d/b/a Nature's First Long Term Care & Compounding, as a result of the Count II Defendants' unlawful conduct, was not eligible to collect such No-Fault payments.

684.    The Count II Defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including the creation of insurance claim documents containing material misrepresentations and/or material omissions.

685.    Allstate has been injured in its business and property because of this conspiratorial conduct whereas Allstate has been induced to make No-Fault claim payments as a result of the defendants' unlawful conduct described herein.

686.    Because of this violation of 18 U.S.C. § 1962(d), the Count II Defendants are jointly and severally liable to Allstate, and Allstate is entitled to recover from each of the defendants identified three times the damages sustained because of the claims submitted by the defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT III
## VIOLATIONS OF 18 U.S.C. § 1962(c)
## S & K WARBASSE PHARMACY INC. D/B/A WARBASSE PHARMACY ENTERPRISE
### (Against Simon Field, Arlen Leis, Jacqueline Mitsel a/k/a Jacqueline G. Volman, and Kim Volman)

687.    Allstate re-alleges, re-pleads, and incorporates by reference the allegations made in paragraphs 1 through 661 as if set forth fully herein.

688.    In furtherance of their operation and management of S & K Warbasse Pharmacy Inc. d/b/a Warbasse Pharmacy, Defendants Simon Field, Arlen Leis, Jacqueline Mitsel a/k/a Jacqueline G. Volman, and Kim Volman (collectively, "Count III Defendants") intentionally prepared and mailed (or caused to be prepared and mailed) false No-Fault claim reimbursement documentation in connection with Allstate insurance claims in furtherance of this scheme to defraud.

689.    The Count III Defendants employed one or more mailings to demand and/or receive payment on certain dates, including, but not limited to, those dates identified in the chart at Exhibit 6.

690.    Among other things, NF-3 forms, documents, notes, reports, invoices, prescription forms, delivery receipts, health insurance claim forms, assignment of benefit forms, peer-review rebuttals, other No-Fault claim reimbursement documents, letters, and/or payment requests were routinely delivered to Allstate through the U.S. Mail.

691.    Policies of insurance were delivered to two or more Allstate Claimants through the U.S. Mail.

692.    Payments made by Allstate to S & K Warbasse Pharmacy Inc. d/b/a Warbasse Pharmacy were delivered through the U.S. Mail.

693.    As documented above, the Count III Defendants repeatedly and intentionally submitted, or caused to be submitted, NF-3 forms and other claim-related documentation to Allstate related to Topical Pain Products and other drugs dispensed and delivered by S & K Warbasse Pharmacy Inc. d/b/a Warbasse Pharmacy to collect payment from Allstate under the Personal Injury Protection benefits portion of the Allstate policies and applicable New York No-Fault laws.

694.    When the Count III Defendants mailed (or caused the mailing of) NF-3 forms and other claim-related documents to Allstate seeking No-Fault reimbursement, the Count III Defendants materially misrepresented S & K Warbasse Pharmacy Inc. d/b/a Warbasse Pharmacy's No-Fault reimbursement eligibility under New York law.

695.    As a result of, and in reasonable reliance upon, the mailing and/or submission of those misleading documents and materially false representations, Allstate, by its agents and employees, issued drafts to S & K Warbasse Pharmacy Inc. d/b/a Warbasse Pharmacy for the benefit of one or more of the Count III Defendants that would not otherwise have been paid.

696.    The Count III Defendants' pattern of preparing and mailing (or causing/directing the preparation and mailing of) these documents and other claim-related materials, each appearing legitimate on their face, also prevented Allstate from discovering this scheme for a significant period, thus enabling the Count III Defendants to continue this scheme without being detected.

697.    The facts set forth above constitute indictable offenses according to 18 U.S.C. § 1341 (mail fraud).

698.    The activities alleged in this case had the direct effect of causing funds to be transferred from Allstate to S & K Warbasse Pharmacy Inc. d/b/a Warbasse Pharmacy for the benefit of the Count III Defendants.

699.    Allstate is in the business of writing insurance and paying claims in the State of New York.  Insurance fraud schemes practiced here and elsewhere have a deleterious impact on Allstate's overall financial well-being and adversely affect insurance rates.

700.    S & K Warbasse Pharmacy Inc. d/b/a Warbasse Pharmacy constitutes an enterprise engaged in, and the activities of which affect, interstate commerce.

701.    The Count III Defendants associated with the foregoing enterprise, and participated—both directly and indirectly—in the conduct of this enterprise through a pattern of racketeering activities.

702.    Allstate is a "person" as defined by 18 U.S.C. § 1961(3) injured in its business or property because of the Count III Defendants' conduct.

703.    The Count III Defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

704.    Because of the Count III Defendants' violations of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained because of the claims submitted

by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT IV
## VIOLATIONS OF 18 U.S.C. § 1962(d)
## S & K WARBASSE PHARMACY INC. D/B/A WARBASSE PHARMACY ENTERPRISE
### (Against Simon Field, Arlen Leis, Jacqueline Mitsel a/k/a Jacqueline G. Volman, and Kim Volman)

705.    Allstate re-alleges, re-pleads, and incorporates by reference all paragraphs set forth above in paragraphs 1 through 661 as if fully set forth herein.

706.    Through their participation in the operation and management of S & K Warbasse Pharmacy Inc. d/b/a Warbasse Pharmacy, Defendants Simon Field, Arlen Leis, Jacqueline Mitsel a/k/a Jacqueline G. Volman, and Kim Volman (collectively, "Count IV Defendants") conspired with each other to violate 18 U.S.C. § 1962(d).

707.    The Count IV Defendants each agreed to participate in a conspiracy to violate 18 U.S.C. § 1962(d) by agreeing to conduct the affairs of S & K Warbasse Pharmacy Inc. d/b/a Warbasse Pharmacy through a pattern of racketeering activity, including numerous acts of mail fraud as outlined in Exhibit 6, and through the preparation and/or submission of fraudulent insurance claim documents, including NF-3 forms, to Allstate.

708.    The purpose of the conspiracy was to obtain No-Fault payments from Allstate on behalf of S & K Warbasse Pharmacy Inc. d/b/a Warbasse Pharmacy, even though S & K Warbasse Pharmacy Inc. d/b/a Warbasse Pharmacy, as a result of the Count IV Defendants' unlawful conduct, was not eligible to collect such No-Fault payments.

709.    The Count IV Defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including the creation of insurance claim documents containing material misrepresentations and/or material omissions.

710.    Allstate has been injured in its business and property because of this conspiratorial conduct whereas Allstate has been induced to make No-Fault claim payments as a result of the defendants' unlawful conduct described herein.

711.    Because of this violation of 18 U.S.C. § 1962(d), the Count IV Defendants are jointly and severally liable to Allstate, and Allstate is entitled to recover from each of the defendants identified three times the damages sustained because of the claims submitted by the defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

### COUNT V
### COMMON LAW FRAUD
**(Against All Defendants)**

712.    Allstate re-alleges, re-pleads, and incorporates by reference all paragraphs set forth above in paragraphs 1 through 661 as if fully set forth herein.

713.    The Defendants schemed to defraud Allstate by, among other things, (a) billing Allstate for drugs that were not medically necessary and were completely unjustified to treat the Allstate Claimants' purported injuries, (b) falsely charging for drugs with the knowledge that such drugs were not lawfully reimbursable under New York's No-Fault laws, (c) charging Allstate for drugs at grossly excessive rates, (d) dispensing drugs and medications in violation of applicable regulatory and licensing requirements, and/or (e) maintaining unlawful relationships with prescribers and inducing them, through financial means or otherwise, to furnish prescriptions for medically unnecessary drugs that were to be filled by SMK Pharmacy, Corp. d/b/a Nature's First Long Term Care & Compounding and S & K Warbasse Pharmacy Inc. d/b/a Warbasse Pharmacy.

714.    The Defendants' scheme to defraud Allstate was dependent upon a succession of material misrepresentations of fact related to SMK Pharmacy, Corp. d/b/a Nature's First Long

Term Care & Compounding and S & K Warbasse Pharmacy Inc. d/b/a Warbasse Pharmacy's eligibility for and entitlement to No-Fault reimbursement under New York law.

715.    The misrepresentations of fact by the Defendants included, but were not limited to, material misrepresentations of fact made in SMK Pharmacy, Corp. d/b/a Nature's First Long Term Care & Compounding and S & K Warbasse Pharmacy Inc. d/b/a Warbasse Pharmacy's NF-3 forms, prescription forms, patient treatment records, delivery receipts, peer-review rebuttals, health insurance claim forms, other No-Fault claim reimbursement documents, letters, and/or payment requests.

716.    The Defendants' representations were false or required disclosure of additional facts to render the documents, information, and materials furnished not misleading.

717.    The misrepresentations were intentionally made by the Defendants in furtherance of their scheme to defraud Allstate by submitting claims on behalf of SMK Pharmacy, Corp. d/b/a Nature's First Long Term Care & Compounding and S & K Warbasse Pharmacy Inc. d/b/a Warbasse Pharmacy demanding payment of No-Fault insurance benefits.

718.    The Defendants knew that the representations contained in the No-Fault claim reimbursement documentation relating to Allstate Claimants were false, and were made to induce Allstate to make payments for claims that were not legitimate or lawfully compensable.

719.    Allstate reasonably relied, to its detriment, upon the Defendants' material misrepresentations concerning SMK Pharmacy, Corp. d/b/a Nature's First Long Term Care & Compounding and S & K Warbasse Pharmacy Inc. d/b/a Warbasse Pharmacy's eligibility to receive No-Fault reimbursement in paying numerous bills for prescription drugs and other pharmacy expenses according to New York's No-Fault insurance laws.

720.    Allstate's damages include, but are not necessarily limited to, No-Fault monies paid to SMK Pharmacy, Corp. d/b/a Nature's First Long Term Care & Compounding and S & K Warbasse Pharmacy Inc. d/b/a Warbasse Pharmacy—totaling more than $1,071,349.00—for prescription drug and other pharmacy expenses and services rendered to Allstate Claimants, even though SMK Pharmacy, Corp. d/b/a Nature's First Long Term Care & Compounding and S & K Warbasse Pharmacy Inc. d/b/a Warbasse Pharmacy, were, at all relevant times, ineligible to receive No-Fault reimbursement under New York law.

## COUNT VI
## UNJUST ENRICHMENT
### (Against All Defendants)

721.    Allstate re-alleges, re-pleads, and incorporates by reference all paragraphs set forth above in paragraphs 1 through 661 as if fully set forth herein.

722.    As alleged herein, the Defendants, through various means, conspired to induce Allstate to make numerous and substantial payments to SMK Pharmacy, Corp. d/b/a Nature's First Long Term Care & Compounding and S & K Warbasse Pharmacy Inc. d/b/a Warbasse Pharmacy in connection with claims made under New York's No-Fault Laws.

723.    When Allstate paid SMK Pharmacy, Corp. d/b/a Nature's First Long Term Care & Compounding and S & K Warbasse Pharmacy Inc. d/b/a Warbasse Pharmacy, Allstate reasonably believed that it was legally obligated to make such payments based upon the misrepresentations and omissions that the Defendants, or those persons working under their control, made (or were caused to make) concerning SMK Pharmacy, Corp. d/b/a Nature's First Long Term Care & Compounding and S & K Warbasse Pharmacy Inc. d/b/a Warbasse Pharmacy's reimbursement eligibility under New York's No-Fault Laws.

724.    Every No-Fault reimbursement payment that Allstate was caused to make to (or for the benefit of) SMK Pharmacy, Corp. d/b/a Nature's First Long Term Care & Compounding and S & K Warbasse Pharmacy Inc. d/b/a Warbasse Pharmacy during this scheme constitutes a benefit that the Defendants aggressively caused SMK Pharmacy, Corp. d/b/a Nature's First Long Term Care & Compounding and S & K Warbasse Pharmacy Inc. d/b/a Warbasse Pharmacy to seek and voluntarily accept.

725.    Throughout their scheme, the Defendants caused SMK Pharmacy, Corp. d/b/a Nature's First Long Term Care & Compounding and S & K Warbasse Pharmacy Inc. d/b/a Warbasse Pharmacy to wrongfully obtain a multitude of payments from Allstate—totaling over $952,633.00—as a direct and proximate result of the unlawful conduct detailed throughout this Complaint.

726.    Under New York law, the Defendants had no legal right to seek, collect, or retain assigned No-Fault benefit payments made by Allstate in connection with claims submitted by (or on behalf of) the Defendants because SMK Pharmacy, Corp. d/b/a Nature's First Long Term Care & Compounding and S & K Warbasse Pharmacy Inc. d/b/a Warbasse Pharmacy (a) billed Allstate for drugs that were not medically necessary and were completely unjustified to treat the Allstate Claimants' purported injuries, (b) falsely charged for drugs with the knowledge that such drugs were not lawfully reimbursable under New York's No-Fault laws, (c) charged Allstate for drugs at grossly excessive rates, (d) dispensed drugs and medications in violation of applicable regulatory and licensing requirements, and/or (e) maintained unlawful relationships with prescribers and induced them, through financial means or otherwise, to furnish prescriptions for medically unnecessary drugs that were to be filled by SMK Pharmacy, Corp. d/b/a Nature's First Long Term Care & Compounding and S & K Warbasse Pharmacy Inc. d/b/a Warbasse Pharmacy.

727.    As a direct and proximate result of this unlawful conduct relating to the billing for fraudulent, unnecessary, and ineffective drugs with respect to Allstate Claimants, at no point were SMK Pharmacy, Corp. d/b/a Nature's First Long Term Care & Compounding and S & K Warbasse Pharmacy Inc. d/b/a Warbasse Pharmacy ever eligible for reimbursement under New York's No-Fault Laws.

728.    Throughout this scheme, the Defendants obtained substantial monetary benefits as the result of their unlawful conduct, benefits that were derived, in part, directly from the No-Fault reimbursement payments that Allstate was wrongfully induced to make to SMK Pharmacy, Corp. d/b/a Nature's First Long Term Care & Compounding and S & K Warbasse Pharmacy Inc. d/b/a Warbasse Pharmacy.

729.    Retention of those benefits by any of the Defendants would violate fundamental principles of justice, equity, and good conscience.

### COUNT VII
### DECLARATORY RELIEF UNDER 28 U.S.C. § 2201
### (Against SMK Pharmacy, Corp. d/b/a Nature's First Long Term Care & Compounding)

730.    Allstate re-alleges, re-pleads, and incorporates by reference the allegations made in paragraphs 1 through 661 as if set forth fully herein.

731.    To be eligible to receive assigned No-Fault benefits, an assignee provider of healthcare services, including providers of pharmacy services, must adhere to all applicable New York statutes that grant the authority to provide healthcare services in New York.

732.    In view of its (a) billing Allstate for drugs that were not medically necessary and were completely unjustified as a means of treating the Allstate Claimants' purported injuries, (b) falsely charging for drugs with the knowledge that such drugs were not lawfully reimbursable under New York's No-Fault laws, (c) charging Allstate for drugs at grossly excessive rates, (d)

dispensing drugs and medications in violation of applicable regulatory and licensing requirements, and (e) maintaining unlawful relationships with prescribers and inducing them, through financial means or otherwise, to furnish prescriptions for medically unnecessary drugs that were to be filled by SMK Pharmacy, Corp. d/b/a Nature's First Long Term Care & Compounding, SMK Pharmacy, Corp. d/b/a Nature's First Long Term Care & Compounding was, at all relevant times, completely ineligible for No-Fault reimbursement under New York law, and thus has no standing to submit or receive assigned No-Fault benefits.

733.    SMK Pharmacy, Corp. d/b/a Nature's First Long Term Care & Compounding continues to submit assigned No-Fault claims to Allstate demanding payment, and other assigned No-Fault claims remain pending with Allstate.

734.    SMK Pharmacy, Corp. d/b/a Nature's First Long Term Care & Compounding continues to challenge Allstate's prior claim denials.

735.    SMK Pharmacy, Corp. d/b/a Nature's First Long Term Care & Compounding continues to commence legal action, including arbitrations filed with the American Arbitration Association, against Allstate seeking payment of No-Fault benefits allegedly due and owing.

736.    A justifiable controversy exists between Allstate and SMK Pharmacy, Corp. d/b/a Nature's First Long Term Care & Compounding because SMK Pharmacy, Corp. d/b/a Nature's First Long Term Care & Compounding rejects Allstate's ability to deny such claims.

737.    Allstate has no adequate remedy at law.

738.    SMK Pharmacy, Corp. d/b/a Nature's First Long Term Care & Compounding also will continue to bill Allstate for No-Fault Benefit payments absent a declaration by this Court that its activities are unlawful, and that Allstate has no obligation to pay the pending, previously denied,

and/or future No-Fault claims submitted by SMK Pharmacy, Corp. d/b/a Nature's First Long Term Care & Compounding.

739.    Accordingly, Allstate requests a judgment according to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202 declaring (a) that SMK Pharmacy, Corp. d/b/a Nature's First Long Term Care & Compounding has no standing to seek, collect, or retain any payments made by Allstate in connection with assigned No-Fault benefits, and (b) that Allstate has no legal obligation to make any payment on any unpaid or otherwise pending bills that have been submitted to Allstate by, or on behalf of, SMK Pharmacy, Corp. d/b/a Nature's First Long Term Care & Compounding.

## COUNT VIII
## DECLARATORY RELIEF UNDER 28 U.S.C. § 2201
### (Against S & K Warbasse Pharmacy Inc. d/b/a Warbasse Pharmacy)

740.    Allstate re-alleges, re-pleads, and incorporates by reference the allegations made in paragraphs 1 through 661 as if set forth fully herein.

741.    To be eligible to receive assigned No-Fault benefits, an assignee provider of healthcare services, including providers of pharmacy services, must adhere to all applicable New York statutes that grant the authority to provide healthcare services in New York.

742.    In view of its (a) billing Allstate for drugs that were not medically necessary and were completely unjustified as a means of treating the Allstate Claimants' purported injuries, (b) falsely charging for drugs with the knowledge that such drugs were not lawfully reimbursable under New York's No-Fault laws, (c) charging Allstate for drugs at grossly excessive rates, (d) dispensing drugs and medications in violation of applicable regulatory and licensing requirements, and (e) maintaining unlawful relationships with prescribers and inducing them, through financial means or otherwise, to furnish prescriptions for medically unnecessary drugs that were to be filled

by S & K Warbasse Pharmacy Inc. d/b/a Warbasse Pharmacy, S & K Warbasse Pharmacy Inc. d/b/a Warbasse Pharmacy was, at all relevant times, completely ineligible for No-Fault reimbursement under New York law, and thus has no standing to submit or receive assigned No-Fault benefits.

743.   S & K Warbasse Pharmacy Inc. d/b/a Warbasse Pharmacy continues to submit assigned No-Fault claims to Allstate demanding payment, and other assigned No-Fault claims remain pending with Allstate.

744.   S & K Warbasse Pharmacy Inc. d/b/a Warbasse Pharmacy continues to challenge Allstate's prior claim denials.

745.   S & K Warbasse Pharmacy Inc. d/b/a Warbasse Pharmacy continues to commence legal action, including arbitrations filed with the American Arbitration Association, against Allstate seeking payment of No-Fault benefits allegedly due and owing.

746.   A justifiable controversy exists between Allstate and S & K Warbasse Pharmacy Inc. d/b/a Warbasse Pharmacy because S & K Warbasse Pharmacy Inc. d/b/a Warbasse Pharmacy rejects Allstate's ability to deny such claims.

747.   Allstate has no adequate remedy at law.

748.   S & K Warbasse Pharmacy Inc. d/b/a Warbasse Pharmacy also will continue to bill Allstate for No-Fault Benefit payments absent a declaration by this Court that its activities are unlawful, and that Allstate has no obligation to pay the pending, previously denied, and/or future No-Fault claims submitted by S & K Warbasse Pharmacy Inc. d/b/a Warbasse Pharmacy.

749.   Accordingly, Allstate requests a judgment according to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202 declaring (a) that S & K Warbasse Pharmacy Inc. d/b/a Warbasse Pharmacy has no standing to seek, collect, or retain any payments made by Allstate in connection

with assigned No-Fault benefits, and (b) that Allstate has no legal obligation to make any payment on any unpaid or otherwise pending bills that have been submitted to Allstate by, or on behalf of, S & K Warbasse Pharmacy Inc. d/b/a Warbasse Pharmacy.

## XI.    DEMAND FOR RELIEF

WHEREFORE, plaintiffs, Allstate Insurance Company, Allstate Property & Casualty Insurance Company, Allstate Indemnity Company, and Allstate Fire & Casualty Insurance Company, (collectively, "Allstate"), respectfully pray that judgment enter in their favor, as follows:

**COUNT I**
**VIOLATIONS OF 18 U.S.C. § 1962(c)**
**SMK PHARMACY, CORP.**
**D/B/A NATURE'S FIRST LONG TERM CARE & COMPOUNDING ENTERPRISE**
**(Against Kim Volman, Simon Field, Marc Kassman, and Alexander Burlak)**

(a)    AWARD Allstate's actual and consequential damages to be established at trial; and

(b)    AWARD Allstate's treble damages according to 18 U.S.C. § 1964, interests, costs, and attorneys' fees; and

(c)    GRANT injunctive relief enjoining the Count I Defendants from engaging in the wrongful conduct alleged in the Complaint; and

(d)    GRANT all other relief this Court deems just.

**COUNT II**
**VIOLATIONS OF 18 U.S.C. § 1962(d)**
**SMK PHARMACY, CORP.**
**D/B/A NATURE'S FIRST LONG TERM CARE & COMPOUNDING ENTERPRISE**
**(Against Kim Volman, Simon Field, Marc Kassman, and Alexander Burlak)**

(a)    AWARD Allstate's actual and consequential damages to be established at trial; and

(b)    AWARD Allstate's treble damages according to 18 U.S.C. § 1964, interests, costs, and attorneys' fees; and

(c)    GRANT injunctive relief enjoining the Count II Defendants from engaging in the wrongful conduct alleged in the Complaint; and

(d)    GRANT all other relief this Court deems just.

## COUNT III
### VIOLATIONS OF 18 U.S.C. § 1962(c)
### S & K WARBASSE PHARMACY INC. D/B/A WARBASSE PHARMACY ENTERPRISE
**(Against Simon Field, Arlen Leis, Jacqueline Mitsel a/k/a Jacqueline G. Volman, and Kim Volman)**

(a)    AWARD Allstate's actual and consequential damages to be established at trial; and

(b)    AWARD Allstate's treble damages according to 18 U.S.C. § 1964, interests, costs, and attorneys' fees; and

(c)    GRANT injunctive relief enjoining the Count III Defendants from engaging in the wrongful conduct alleged in the Complaint; and

(d)    GRANT all other relief this Court deems just.

## COUNT IV
### VIOLATIONS OF 18 U.S.C. § 1962(d)
### S & K WARBASSE PHARMACY INC. D/B/A WARBASSE PHARMACY ENTERPRISE
**(Against Simon Field, Arlen Leis, Jacqueline Mitsel a/k/a Jacqueline G. Volman, and Kim Volman)**

(a)    AWARD Allstate's actual and consequential damages to be established at trial; and

(b)    AWARD Allstate's treble damages according to 18 U.S.C. § 1964, interests, costs, and attorneys' fees; and

(c)    GRANT injunctive relief enjoining the Count IV Defendants from engaging in the wrongful conduct alleged in the Complaint; and

(d)    GRANT all other relief this Court deems just.

## COUNT V
### COMMON LAW FRAUD
**(Against All Defendants)**

(a)    AWARD Allstate's actual damages in an amount to be determined at trial; and

(b)    AWARD Allstate its costs, including, but not limited to, investigative costs incurred in the detection of the Defendants' illegal conduct; and

(c)    AWARD Allstate its costs in defending No-Fault collection suits filed by SMK Pharmacy, Corp. d/b/a Nature's First Long Term Care & Compounding and S & K Warbasse Pharmacy Inc. d/b/a Warbasse Pharmacy seeking payment of false and fraudulent invoices; and

(d)    GRANT any other relief this Court deems just.

## COUNT VI
## UNJUST ENRICHMENT
### (Against All Defendants)

(a)    AWARD Allstate's actual and consequential damages to be determined at trial; and

(b)    GRANT any other relief this Court deems just.

## COUNT VII
## DECLARATORY RELIEF UNDER 28 U.S.C. § 2201
### (Against SMK Pharmacy, Corp. d/b/a Nature's First Long Term Care & Compounding)

(a)    DECLARE that SMK Pharmacy, Corp. d/b/a Nature's First Long Term Care & Compounding, at all relevant times, was caused to be operated in violation of one or more state licensing requirements applicable to pharmacies, thus rendering SMK Pharmacy, Corp. d/b/a Nature's First Long Term Care & Compounding completely ineligible to seek or receive reimbursement under New York's No-Fault laws;

(b)    DECLARE that SMK Pharmacy, Corp. d/b/a Nature's First Long Term Care & Compounding's activities are unlawful;

(c)    DECLARE that Allstate has no obligation to pay any No-Fault insurance claims submitted by SMK Pharmacy, Corp. d/b/a Nature's First Long Term Care & Compounding or any of its agents; and

(d)    GRANT all other relief this Court deems just and appropriate.

## COUNT VIII
## DECLARATORY RELIEF UNDER 28 U.S.C. § 2201
### (Against S & K Warbasse Pharmacy Inc. d/b/a Warbasse Pharmacy)

(a)    DECLARE that S & K Warbasse Pharmacy Inc. d/b/a Warbasse Pharmacy, at all relevant times, was caused to be operated in violation of one or more state licensing requirements applicable to pharmacies, thus rendering S & K Warbasse Pharmacy Inc. d/b/a Warbasse Pharmacy completely ineligible to seek or receive reimbursement under New York's No-Fault laws;

(b)    DECLARE that S & K Warbasse Pharmacy Inc. d/b/a Warbasse Pharmacy's activities are unlawful;

(c)    DECLARE that Allstate has no obligation to pay any No-Fault insurance claims submitted by S & K Warbasse Pharmacy Inc. d/b/a Warbasse Pharmacy or any of its agents; and

(d)    GRANT all other relief this Court deems just and appropriate.

## XII.    JURY TRIAL DEMAND

The plaintiffs demand a trial by jury on all claims.

[SIGNATURE PAGE FOLLOWS]

KING, TILDEN, MCETTRICK & BRINK, P.C.,

*/s/ Michael W. Whitcher*

_____

Nathan A. Tilden (NT0571)
ntilden@ktmpc.com
Michael W. Whitcher (MW 7455)
mwhitcher@ktmpc.com
Caitlin F. Keresey
ckeresey@ktmpc.com
100 Ring Road, Suite 211
Garden City, NY 11530
Ph: 347-710-0050
Fax: 347-710-0055

Attorneys for the Plaintiffs,
*Allstate Insurance Company,*
*Allstate Property & Casualty Insurance Company,*
*Allstate Indemnity Company, and*
*Allstate Fire & Casualty Insurance Company*

Dated: July 1, 2024